No. 11-10959

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

NATIONAL RIFLE ASSOCIATION OF AMERICA, INCORPORATED;
ANDREW M. PAYNE; REBEKAH JENNINGS; BRENNAN HARMON,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES;
KENNETH MELSON, In His Official Capacity as Acting Director of the Bureau
of Alcohol, Tobacco, Firearms, and Explosives; ERIC H. HOLDER, JR., U.S.
ATTORNEY GENERAL,

*Defendants-Appellees.*

---

On Appeal from United States District Court for the Northern District of Texas
Civil Case No. 5:10-cv-00140-C (Honorable Sam Cummings)

---

**BRIEF OF PLAINTIFFS-APPELLANTS**

---

Brian Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052

Charles J. Cooper
David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
COOPER AND KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600; (202) 220-9601 Fax

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 5th Cir. R. 28.2.1, the undersigned counsel for Plaintiffs-Appellants certifies that, with respect to the private (non-governmental) parties, the following persons and entities are financially interested in the outcome of the litigation:

1. National Rifle Association of America, Inc. ("NRA"), Plaintiff-Appellant. The NRA has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

2. Rebekah Jennings, Brennan Harmon, and Andrew Payne, Plaintiffs-Appellants.

3. Paul White, owner and operator of My Favorite Gun Store in Richmond, Utah. *See* USCA5 670.

4. Roger Koeppe, owner and operator of Armory Management and Supply Services in Houston, Texas. *See* USCA5 673.

5. Cooper & Kirk, PLLC, Counsel for Plaintiffs-Appellants (Charles J. Cooper, David H. Thompson, Howard C. Nielson, Jr., and Peter A. Patterson)

6. Law Offices of Fernando M. Bustos, P.C., Counsel for Plaintiffs-Appellants (Fernando M. Bustos)

7. Brian S. Koukoutchos, Counsel for Plaintiff-Appellant

Dated:  December 5, 2011              Respectfully submitted,

                                      s/ Charles J. Cooper
                                      Charles J. Cooper
                                      *Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. This case satisfies the standards for allowing oral argument set forth in Fed. R. App. P. 34(a)(2). First, this appeal is not frivolous. For the reasons explained in our brief, the challenged ban on licensed handgun sales to law-abiding, 18-to-20 year old adults cannot be squared with the fundamental right to keep and bear arms protected by the United States Constitution. Second, although a ruling in Plaintiffs-Appellants' favor follows from the Supreme Court's pathmarking decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the dispositive issues in this appeal have not been authoritatively decided. Finally, Plaintiffs-Appellants respectfully submit that the decisional process on the important matters presented in this case would be significantly aided by oral argument.

.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS

STATEMENT REGARDING ORAL ARGUMENT

TABLE OF AUTHORITIES ......................................................................... iii

JURISDICTIONAL STATEMENT ........................................................... 1

ISSUES PRESENTED ............................................................................. 1

STATEMENT OF THE CASE .................................................................. 1

I.   INTRODUCTION. ............................................................................. 1

II.  CHALLENGED PROVISIONS. ............................................................ 3

III. COURSE OF PROCEEDINGS ............................................................. 6

STATEMENT OF THE FACTS ................................................................ 7

SUMMARY OF ARGUMENT .................................................................. 9

STANDARD OF REVIEW ..................................................................... 10

ARGUMENT ....................................................................................... 10

I.   THE BAN ON COMMERCIAL SALES OF HANDGUNS TO LAW-ABIDING ADULTS
     AGED 18-20 CANNOT BE SUSTAINED UNDER THE TEXTUAL AND HISTORICAL
     ANALYSIS MANDATED BY *HELLER*. ............................................. 10

     A.   *Heller* Rejected Balancing Tests and Levels of Scrutiny In Favor Of
          Textual And Historical Analysis. ......................................... 10

     B.   The Original Understanding of the Second Amendment Guaranteed
          the Right to Keep and Bear Arms to All Law-Abiding Adults ........... 13

1.     *The original understanding of the Second Amendment confirms that Second Amendment rights extended to 18-to-20-year-olds who were eligible for militia service.* ........................................ 13

2.     *The decision below erroneously rests on the misreading of a single dictum about categorical exclusions from the scope of the Second Amendment.* ........................................................ 20

C.    The Second Amendment Safeguards The Right To Acquire Arms as an Integral Part of the Right to Keep and Bear Arms. ....................... 22

1.     *The Second Amendment Was Originally Understood to Secure the Right to Acquire Arms.* ....................................................... 22

2.     *Congress May Not Circumvent a Constitutional Right to Possession by Banning Acquisition.* .............................................. 26

3.     *The Decision Below Erroneously Rests on a Single Pre-*Heller *Decision That Is Both Outdated and Inapposite.* ...................... 32

4.     *Section 922(b)(1)'s Ban on Sales by FFLs is Unconstitutional Even Though It Permits Occasional Unlicensed Handgun Sales By Private Parties.* ................................................................. 34

II.   EVEN IF SECTION 922(b)(1) WERE TO BE JUDGED UNDER THE INTEREST-BALANCING TEST REJECTED IN *HELLER,* IT WOULD BE STRUCK DOWN. ........ 41

A.    Section 922(b)(1) Requires Exacting Judicial Scrutiny. ..................... 41

B.    Even Traditional "Intermediate Scrutiny" Is A Hurdle That Section 922(b)(1) Cannot Clear. ................................................................... 45

III.  SECTION 922(b)(1) DENIES 18-TO-20-YEAR-OLDS THE EQUAL PROTECTION OF THE LAW. ..................................................................................... 53

CONCLUSION ................................................................................. 56

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page**

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010)......................40

*Bolling v. Sharpe*, 347 U.S. 497 (1954)..................................................................53

*Buckley v. Valeo*, 424 U.S. 1 (1976).........................................................................53

*Burdick v. Takushi*, 504 U.S. 428 (1992)..................................................................42

*Carey v. Population Services International*, 431 U.S. 678 (1977)........28, 29, 37, 40

*Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557 (1980).........46

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) ......................40

*Clark v. Jeter*, 486 U.S. 456 (1988).........................................................................53

*Craig v. Boren*, 429 U.S. 190 (1976)..................................................................55, 56

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981).......40

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... *passim*

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ..................................................................17

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................11, 26, 44, 45, 51

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) .............................................................50

*Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001)..............10

*Heller v. District of Columbia*, ___ F.3d ___, 2011 WL 4551558
    (D.C. Cir. 2011) .................................................................................................. 11

*Hodgson v. Minnesota*, 497 U.S. 417 (1990)........................................................... 55

*Huddleston v. United States*, 415 U.S. 814 (1974).....................................................2

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ..............................................30

*Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984) .............27

*McConnell v. FEC*, 540 U.S. 93 (2003).....................................................................30

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ................................... *passim*

*Nunn v. Georgia*, 1 Ga. 243 (1846) ........................................................................ 14

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007),
    *aff'd by Heller*, 554 U.S. 570...........................................................................17

*Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37 (1983).........41, 46

*Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833 (1992)...............37

*Planned Parenthood v. Danforth*, 428 U.S. 52 (1976) .............................14

*Reliable Consultants Inc. v. Earle*, 538 F.3d 355 (5th Cir. 2008) ..........................30

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) ..........................29

*Richard v. Hinson*, 70 F.3d 415 (5th Cir. 1995) .......................................42

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) ............................................49, 52

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............................41

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)............................55

*Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2003) ......................................42

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ............................................42

*United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009) ..................................6

*United States v. Bledsoe*, Criminal No. SA-08-CR-13(2)-XR,
    2008 WL 3538717 (W.D. Tex. Aug. 8, 2008)..................................................49

*United States v. Carter*, 801 F.2d 78 (2d Cir. 1986) ..............................................35

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003)...............................44, 53

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001)................12, 21, 22, 25, 26

*United States v. Emerson*, 46 F. Supp.2d 598 (N.D. Tex. 1999),
    *reversed by* 270 F.3d 203.............................................................................21

*United States v. King*, 532 F.2d 505 (5th Cir. 1976) ..............................................33

*United States v. Marzzarella*, 595 F.Supp.2d 596 (W.D. Pa. 2009),
    *aff'd*, 614 F.3d 85.......................................................................................27

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)................................26, 44

*United States v. McRobie*, No. 08-4632, 2009 WL 82715
    (4th Cir. Jan. 14, 2009) .............................................................................. 44

*United States v. Miller*, 307 U.S. 174 (1939) ........................................................19

*United States v. Orum*, 106 F. App'x 972 (6th Cir. 2004) ......................................35

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000).......................40

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010)..........................................44

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)...................................20, 44

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010)......................................44

*United States v. Shan*, 361 F. App'x 182 (2d Cir. 2010)........................................35

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ................................13, 32, 44

*United States v. Tooley*, 717 F.Supp.2d 580 (S.D.W.Va. 2010) ...........................32

*United States v. Virginia*, 518 U.S. 515 (1996) .....................................45, 46, 51, 52

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010).........................................44

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2009) ...........................................44

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007)....................................30, 31, 37

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.* 425 U.S. 748 (1976)....................................................................................................30

*Williams v. Attorney General of Alabama*, 378 F.3d 1232 (11th Cir. 2004)..........30

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)..........................41

## Constitutional and Legislative Materials

U.S. Const. art. I, § 8...................................................................................................16

18 U.S.C. § 2(a) ..............................................................................................................6

18 U.S.C. § 371 ...............................................................................................................6

18 U.S.C. § 921(a)(11)(A) .............................................................................................4

18 U.S.C. § 921(a)(11)(C) .............................................................................................4

18 U.S.C. § 921(a)(21)(C) .......................................................................................5, 25

18 U.S.C. § 922(a)(1)(A) .................................................................................4, 33, 34

18 U.S.C. § 922(b)(1).......................................................................................... *passim*

18 U.S.C. § 922(u) ..........................................................................................................5

18 U.S.C. § 922(x) .......................................................................................4, 34, 47, 48

18 U.S.C. § 922(x)(1) ...................................................................................................47

18 U.S.C. § 922(x)(2) ...................................................................................................47

18 U.S.C. § 922(x)(3)(D)(5) ........................................................................................47

18 U.S.C. § 924(b) ..........................................................................................................5

18 U.S.C. § 924(i)(1) ......................................................................................................5

28 U.S.C. § 1291 .............................................................................................................1

28 U.S.C. § 1331 .............................................................................................................1

Fed. R. App. P. 4(a)(1)(A) ...................................................................1

27 C.F.R. § 478.96(b) ........................................................................3

27 C.F.R. § 478.99(b)(1) ....................................................................3

27 C.F.R. § 478.124(a) .......................................................................3

TEX. FAM. CODE § 101.003(a) ..........................................................20

TEX. FAM. CODE § 101.003(c) ..........................................................20

VA. STAT. AT LARGE, 2 HENING 403 (1823)......................................25

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113)..........46

1 Stat. 271 ...................................................................................16, 19

82 Stat. at 225-26 .................................................................47, 49, 50

## **Other**

1 BLACKSTONE COMMENTARIES *463 ................................................19

2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834) ...............17, 18

*A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* Les Adams, THE SECOND AMENDMENT PRIMER 121 (1996)..........15

BATF, FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 165 (2005) ...............6

BLACK'S LAW DICTIONARY (9th ed. 2009) ............................................21

CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796).........................25

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, *in* GUN CONTROL AND THE CONSTITUTION 66 (Robert J. Cottrol ed., 1994) ..............................................................18

FBI, *Crime in the United States 2009*, Table 38:  Arrests by Age, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_38.html#overview......................55

*Federal Firearms Act:  Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854 Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. On the Judiciary*, 90th Cong., 1st Sess. (1967)..................50

Gary Kleck, *The Impact of the 1968 Gun Control Act's Restriction on Handgun Purchases by Persons Age 18 to 20* (May 7, 2011), *available at* Social Science Research Network, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1843526..........52

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS 31-53 (1994) ................................23

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE
    WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938) .........18

STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED 63 (1994)..........................24

Stephen P. Halbrook, THE FOUNDER'S SECOND AMENDMENT: ORIGINS OF THE
    RIGHT TO BEAR ARMS 329-30 (2008) ....................................................23, 24, 25

Thomas Jefferson, 6 WRITINGS 252-53 (P. Ford ed. 1895) ....................................25

Thomas McIntyre Cooley, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN
    THE UNITED STATES OF AMERICA 267-68 (1880)................................................14

U.S. Census Bureau, *Monthly Postcensal Resident Population, by single year of
    age, sex, race, and Hispanic origin*, July 1, 2009 data, *available for download
    at* http://www.census.gov/popest/national/asrh/2009-nat-res.html ...................55

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs brought claims arising under federal law.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The appeal is from a final judgment that disposes of all parties' claims.  The district court entered judgment on September 29, 2011.  Plaintiffs timely noticed this appeal on October 4, 2011.  *See* Fed. R. App. P. 4(a)(1)(A).

# ISSUES PRESENTED

1. Whether federal law that bans licensed sales of handguns or handgun ammunition to law-abiding adults aged eighteen to twenty violates the Second Amendment to the United States Constitution.

2. Whether federal law that bans licensed sales of handguns or handgun ammunition to law-abiding adults aged eighteen to twenty but allows such sales to law-abiding adults of other ages violates the Equal Protection component of the Fifth Amendment to the United States Constitution.

# STATEMENT OF THE CASE

## I. INTRODUCTION.

The Second Amendment protects "the right of the people to keep and bear Arms."  In its foundational decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment "guarantee[s] the in-

1

dividual right to possess and carry weapons in case of confrontation," *id.* at 592, and that the "central component of the right" is self-defense, *id.* at 599 (emphasis omitted). In *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court confirmed that the Second Amendment right "is fundamental to our scheme of ordered liberty," *id.* at 3036 (emphasis omitted). The Supreme Court has thus declared that a ban on the possession of handguns—"an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense—is flatly unconstitutional. *Heller*, 554 U.S. at 628-29.

And given that there is a right to possess handguns for self-defense and other lawful purposes, it follows that there must be a right readily to acquire such arms. A restriction on procurement is the functional equivalent of a restriction on possession, and thus cannot withstand constitutional scrutiny. This case concerns exactly such a restriction. Federal licensing law comprehensively regulates every aspect of the gun business, and with respect to "access to weapons by users," "the focus of the federal scheme is the federally licensed firearms dealer." *Huddleston v. United States*, 415 U.S. 814, 825 (1974). Pursuant to 18 U.S.C. § 922(b)(1) and its implementing regulations, all licensed firearms dealers are prohibited from selling handguns or handgun ammunition to law-abiding adults between the ages eighteen and twenty. In other words, federal law prohibits this class of citizens from obtaining handguns or ammunition from anyone engaged in the business of selling them,

2

while leaving open as an alternative only unlicensed, unreliable (and potentially unsafe) channels, such as garage sales or gifts.  By banning 18-to-20 year olds' access to the entire licensed handgun market, the federal government places a heavy, and unconstitutional, burden on their right to keep and bear arms.  The district court's ruling to the contrary, we respectfully submit, must be reversed.

## II.    CHALLENGED PROVISIONS.

The principal challenged law is 18 U.S.C. § 922(b)(1), which forbids any holder of a Federal Firearms License ("FFL") to "sell any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age." [1]  Section 922(c) permits an FFL to "sell a firearm to a person who does not appear in person at the licensee's business premises … only if" the person signs a sworn statement attesting "that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age."  Section 478.99(b)(1) of 27 C.F.R. provides that an FFL may not "sell or deliver" a handgun "to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age."  Sections 478.124(a) and 478.96(b) require

---

[1] Since the legal prohibitions relating to handguns and handgun ammunition are identical, we shall hereafter refer to both with the short-hand term "handguns."

that the FFL obtain a signed copy of Form 4473 before transferring a handgun to a purchaser.  Form 4473 states that its information "will be used to determine whether [the transferee is] prohibited under law from receiving a firearm" and instructs licensees that it is "unlawful for a licensee to sell any firearm other than a shotgun or rifle to any person under the age of 21."  Plaintiffs challenge these statutes and regulations only to the extent they bar FFLs from transferring handguns or handgun ammunition to otherwise qualified, law-abiding adults who are at least eighteen years of age.  For convenience, we shall collectively refer to the laws and regulations challenged here as "Section 922(b)(1)."  Plaintiffs do not challenge 18 U.S.C. § 922(x), which prohibits anyone, not just FFLs, from transferring handguns to juveniles under 18 and also prohibits said juveniles from possessing handguns (subject to limited exceptions).  This results in a rather curious legal regime under which adults aged 18 to 20 may, under Section 922(x), lawfully possess and use handguns, even though under Section 922(b)(1) they cannot purchase handguns from licensed firearms dealers.

The challenged laws bind everyone who is licensed by the federal government to sell firearms—which means they bind *every* person or commercial entity that is in the firearms business.  Section 922(a)(1)(A) requires all who "engage in the business of importing, manufacturing, or dealing in firearms" to obtain an FFL, and this includes pawnbrokers.  § 921(a)(11)(A), (C).  A person "engage[s] in the

4

business" of selling firearms if he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." § 921(a)(21)(C). In short, *everyone who engages in the firearms business must have an FFL and Section 922(b)(1) therefore shuts 18-to-20-year-olds out of the entire licensed market for handguns.*

Other federal laws target the purchaser rather than the FFL. In conjunction with Section 922(b)(1), these laws expose an 18-to-20-year-old who manages to purchase a firearm from an FFL to criminal prosecution. For example, it is a felony (punishable by ten years imprisonment) "to unlawfully take or carry away" a firearm from the premises of an FFL. *See* 18 U.S.C. §§ 922(u), 924(i)(1). Because the transfer of handguns to an 18-to-20 year old adult is unlawful, the carrying away of such handgun by such an adult is therefore a felony. Furthermore, if an 18-to-20-year-old "receives" a handgun through purchase from an FFL, she is also subject to prosecution under Section 924(b) because she should have known that the FFL was committing a felony by transferring the handgun to her. *See* 18 U.S.C. § 924(b) (making it a crime to "receive[] a firearm … in interstate or foreign commerce" with "knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith"). Finally, 18-to-20-year-olds who work with a "straw purchaser" to buy

5

a handgun from an FFL can be prosecuted as accessories or coconspirators. *See* 18 U.S.C. §§ 2(a), 371; *cf. United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009); BATF, FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 165 (2005).

## III.    COURSE OF PROCEEDINGS.

This suit was filed in district court on September 8, 2010, against the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Bureau's Acting Director, and the Attorney General of the United States (collectively, "BATF"), and it claims that the discriminatory sales ban violates the Second and Fifth Amendments to the United States Constitution.

The parties below filed cross-motions for summary judgment; the BATF filed its motion on December 22, 2010, and Plaintiffs filed theirs on January 28, 2011. USCA5 87 & 510. On September 29, 2011, the district court granted the BATF's motion, denied Plaintiffs', and entered judgment for the BATF. USCA5 1093 & 1110.[2]

In ruling for the BATF on Plaintiffs' Second Amendment claim, the district court equated Section 922(b)(1)'s complete ban on licensed handgun sales to 18-to-20 year olds with "presumptively lawful" measures "imposing conditions and qualifications on the commercial sale of arms." USCA5 1104. It also equated 18-

---

[2] The district court's order and judgment are included in the Record Excerpts at tabs 3 & 4.

to-20 year old adults with "infants" and "children" who "do not enjoy the same guarantees of the Second Amendment as do their elders." *Id.* at 1105.

Having concluded that 18-to-20 year olds possess diminished Second Amendment rights, and given the fact that age is not a suspect classification for Equal Protection purposes, the district court quickly dispatched Plaintiffs' Fifth Amendment claim as well.  USCA5 1107-08.

On October 4, 2011, Plaintiffs appealed the district court's ruling to this Court.  USCA5 1111.

## STATEMENT OF THE FACTS

Plaintiff Rebekah Jennings, age 20,[3] is a decorated pistol marksman and has broken several national records for competitive shooting.  USCA5 607-08.[4]  She has been a member of both the U.S. Olympic Development Team and the Texas State Rifle Association Junior Team and has logged thousands of hours with hand-guns. *Id.* at 608.  She is far better versed in safe gun handling than the vast major-ity of American adults over 21; indeed, it would be a very rare member of the Armed Forces who has more experience with handguns than Ms. Jennings.  None-theless, she does not own a pistol and must rely on her father to lend her his pistols for practice and competition, because the federal government forbids any licensed

---

[3] Plaintiffs' ages have been updated from their district court declarations to account for the passage of time.  Plaintiffs also note that Brennan Harmon no longer lives alone – she now has roommates.

[4] Plaintiffs' declarations are included in the Record Excerpts at tabs 5, 6, 7, & 8.

firearms dealer in America from selling a handgun to Ms. Jennings. *Id.* Ms. Jennings wishes to purchase a handgun, both for self-defense and to further her interest in competitive shooting. *Id.*

Plaintiff Brennan Harmon, age 20, lives in San Antonio, Texas. *Id.* at 613. She owns a rifle and a shotgun but, like most Americans, she would rather have a handgun, *id.* at 614—what the Supreme Court itself calls "the most preferred firearm in the nation to 'keep' and use for protection" of oneself and one's home. *Heller,* 554 U.S. 628-29. Ms. Harmon therefore would purchase a handgun from a federally licensed dealer if the challenged laws did not make that a crime. USCA5 615-16.

Plaintiff Andrew Payne, age 19, lives in Lubbock, Texas. *Id.* at 620. He is a hunter and a frequent visitor to the shooting range, and he is well-versed in the safe and proper handling of firearms. *Id.* He owns two long guns, but finds them insufficient for self-defense purposes. *Id.* at 621. But for the challenged laws, he would purchase a handgun. *Id.* at 622.

Plaintiff National Rifle Association ("NRA") is a membership organization committed to protecting Second Amendment rights and promoting the safe and responsible use of firearms for all lawful purposes. Tens of thousands of NRA members are 18-to-20 years old or will be that age during this litigation. *See id.* at 604. Under Section 922(b)(1), these members are unable to purchase a handgun

from an FFL.[5]  NRA members who hold licenses to sell firearms are also injured

because the statute outlaws sales of handguns to otherwise-qualified, would-be

customers.[6]

## SUMMARY OF ARGUMENT

1.    The Supreme Court's decision in *Heller* demonstrates that Second

Amendment claims are to be evaluated in light of the constitutional text and the

historical practices of the American people, not judicially created balancing tests.

2.    The textual and historical analysis mandated by *Heller* demonstrates

(a) that law-abiding, 18-to-20 year old adults possess full Second Amendment

rights, and (b) that the ability to *acquire* a firearm is part and parcel of the funda-

mental right to keep and bear arms.  Section 922(b)(1)'s restriction on firearm sales

is thus tantamount to a restriction on keeping and bearing arms, and it cannot be

sustained under the Second Amendment.

3.    If this Court decides that a levels-of-scrutiny analysis is appropriate,

strict scrutiny should apply.  Given the manifest disconnect between Section

922(b)(1) and any legitimate governmental interest, however, the law would fail

any form of heightened constitutional scrutiny.

---

[5] The individual plaintiffs are among these NRA members.  *See* USCA5 607, 613, 620.  The record also contains declarations from additional representative NRA members.  *See id.* at 626, 639, 648.

[6] The record includes declarations of two such members, Paul White and Roger Koeppe.  *See* USCA5 670, 673.

4.     Because Section 922(b)(1) discriminates with respect to a fundamen-

tal right, it is subject to strict equal protection scrutiny, which it plainly fails.

## STANDARD OF REVIEW

This Court reviews "grants of summary judgment de novo, guided by the

same Rule 56 standard as the district court." *Ford Motor Co. v. Texas Dep't of

Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).  "On cross-motions for summary

judgment, [this Court] review[s] each party's motion independently, viewing the

evidence and inferences in the light most favorable to the nonmoving party."  *Id.*

## ARGUMENT

**I.     THE BAN ON COMMERCIAL SALES OF HANDGUNS TO LAW-ABIDING ADULTS AGED 18-20 CANNOT BE SUSTAINED UNDER THE TEXTUAL AND HISTORICAL ANALYSIS MANDATED BY *HELLER*.**

**A.     *Heller* Rejected Balancing Tests and Levels of Scrutiny In Favor Of Textual And Historical Analysis.**

The Supreme Court's decisions in *Heller* and *McDonald* leave no doubt that

courts are to assess the constitutionality of firearms regulations by "examination of

a variety of legal and other sources to determine the public understanding of a legal

text." *Heller*, 554 U.S. at 605.  As the Chief Justice, a member of the *Heller* major-

ity, remarked during oral argument, any inquiry into levels of scrutiny would have

been both atextual and unhelpful.  *See* Tr. of Oral Argument at 44, *Heller*, 554 U.S.

570.  Second Amendment claims are to be evaluated based on the constitutional

text, the history of colonial and Founding-Era firearms restrictions, and the fire-

arms traditions of the American people, not on balancing tests. *Heller*, 554 U.S. at

605, 626-27,634-35; *see also Heller v. District of Columbia*, ___ F.3d ___, 2011

WL 4551558, at *23 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller* and

*McDonald* leave little doubt that courts are to assess gun bans and regulations

based on text, history, and tradition").  Thus, "*Heller* focused almost exclusively

on the original public meaning of the Second Amendment, consulting the text and

relevant historical materials to determine how the Amendment was understood at

the time of ratification." *Ezell v. City of Chicago,* 651 F.3d 684, 700 (7th Cir.

2011).

Similarly, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), the Court

expressly rejected judicial assessment of "the costs and benefits of firearms restric-

tions" and declared that courts applying the Second Amendment should stick to

historical exegesis and spurn litigants' pleas that the courts make "difficult empiri-

cal judgments about the efficacy of particular gun regulations." *Id*. at 3050 (plural-

ity).  "Constitutional rights are enshrined with the scope they were understood to

have when the people adopted them, whether or not future legislatures or (yes)

even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35.  When

a Second Amendment claim is put forward, "historical justifications" thus deter-

mine the scope of the right. *Id*. at 635.

Although federal tribunals elsewhere have sometimes failed to heed the Su-

preme Court's mandate in this regard, *this* Court was on the right track even a dec-

ade before the Supreme Court provided guidance.  In *United States v. Emerson*,

270 F.3d 203 (5th Cir. 2001), this Court eschewed talk of balancing tests and levels

of scrutiny.  "[M]indful that almost all of our sister circuits have rejected any indi-

vidual rights view of the Second Amendment," this Court cautioned that those

other courts had decided Second Amendment claims "without sufficient articulated

examination of the history and text of the Second Amendment."  *Id*. at 227.  This

Court thus concluded that while "the Second Amendment *does* protect individual

rights, that does not mean that those rights may never be made subject to any lim-

ited, narrowly tailored specific exceptions or restrictions for particular cases that

are reasonable *and not inconsistent with the right of Americans generally to indi-*

*vidually keep and bear their private arms as historically understood in this coun-*

*try.*" *Id.* at 261 (second emphasis added).  Although *Heller* directed that Second

Amendment claims be decided by reference to text, tradition and "historical justifi-

cations," 554 U.S. at 635, the decision below—which offered barely six paragraphs

of Second Amendment analysis—fails meaningfully to analyze the original under-

standing of the Second Amendment.  Instead, contravening *Heller*'s admonitions,

*see* 554 U.S. at 634-35, it vitiates Plaintiffs' constitutional rights by deferring to

Congress's "weigh[ing]" of "the relative policy considerations" underlying Section

922(b)(1)'s ban.  USCA5 1106.

To decide the case at hand this Court need not venture beyond its own precedents and those of the Supreme Court.  No expedition into what another court has aptly derided as the " 'levels of scrutiny' quagmire" is required here.  *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc).  This Court can, and should, decide this case by determining whether there is sufficient support for the challenged firearm sales regulations in the text of the Second Amendment and in whatever "historical justifications" may be offered in their defense by the BATF.  *Heller*, 554 U.S. at 635.

**B.    The Original Understanding of the Second Amendment Guaranteed the Right to Keep and Bear Arms to All Law-Abiding Adults.**

> **1.    *The original understanding of the Second Amendment confirms that Second Amendment rights extended to 18-to-20-year-olds who were eligible for militia service.***

In *Heller*, the Supreme Court held that Second Amendment "rights are enshrined with the scope they were understood to have when the people adopted them," regardless what future courts or legislatures might think.  *Heller*, 554 U.S. at 634-35.  Accordingly, the Court engaged in textual analysis and historical inquiry and concluded that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  554 U.S. at 592.  A similar analysis demonstrates that this right fully vests at age 18.

The Second Amendment provides that "the right of the people to keep and bear Arms shall not be infringed."  The "people" referred to in the Bill of Rights

have always been understood to be "the whole people."  Thomas McIntyre Cooley, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267-68 (1880). *See also Heller*, 554 U.S. at 580.  The Supreme Court has accordingly held that "the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.  " 'The right of the whole people, *old and young, men, women and boys, and not militia only*, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.' " *Heller*, 554 U.S. at 612-13 (quoting with approval *Nunn v. Georgia*, 1 Ga. 243, 250 (1846) (emphasis added)). To be sure, the rights of actual children may be restricted in ways that adults' may not.  *See Planned Parenthood v. Danforth*, 428 U.S. 52, 72-75 (1976).  But Founding-Era history demonstrates that 18-to-20-year-olds are not to be treated as children for purposes of the Second Amendment.

Although the Second Amendment's prefatory clause cannot be read to "limit or expand the scope of the operative clause," "[l]ogic demands that there be a link between the stated purpose and the command." *Heller*, 554 U.S. at 577, 578.  The prefatory clause —"A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified:  to prevent elimination of the militia." *Heller*, 554 U.S. at 599.  The "threat that the new Federal Government would destroy the citizens' militia by taking away their arms was

the reason that right … was codified in a written Constitution." *Id*. Therefore, although the Second Amendment extends beyond a right to keep and bear arms for military purposes, the Framers' understanding of the militia is highly probative in determining whether 18-to-20-year-olds enjoy Second Amendment rights. As the Court explained in Heller, " 'the Militia comprised all males physically capable of acting in concert for the common defense.' " 554 U.S. at 595. Members of the militia were understood to be capable of keeping and bearing arms and *therefore entitled to do so*. *See A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* Les Adams, THE SECOND AMENDMENT PRIMER 121 (1996).

Given the Second Amendment's stated purpose, logic demands that its protections extend *at the very least* to those the Framers understood to constitute the militia, for it would make no sense to enumerate a constitutional right to arms for the purpose of ensuring an armed militia if said right did not protect the militia's own members. *See Heller*, 554 U.S. at 580 ("the 'militia' in colonial America consisted of a *subset* of 'the people' ") (emphasis added); *cf. id.* at 578 (" 'It is nothing unusual in acts for the enacting part to go *beyond* the preamble.' ") (emphasis added, alterations omitted). Indeed, a contrary interpretation would destroy the "perfect[]" fit that *Heller* discerned between the Amendment's preface and its operative clause. *Id*. at 598. Law-abiding, able-bodied 18-to-20-year-olds were

15

plainly within the Framers' understanding of the militia. Against this backdrop, the contention that Second Amendment rights do not fully vest at age 18 is untenable.

There is no doubt that 18-to-20-year-olds were understood to be part of the militia at the time the Second Amendment was adopted. And for those young men to be part of the militia necessarily meant that the law understood them to have the capacity, indeed the obligation, to keep and bear arms. This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. Const. art. I, § 8. On May 8, 1792, mere months after ratification of the Second Amendment, Congress passed an Act providing that "every free able-bodied white male citizen … who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." 1 Stat. 271 ("Militia Act"). While Congress was under no obligation to organize and enroll everyone who was potentially subject to militia service, its constitutional authority extended *only* to militia members—that is, to those entitled to bear arms and physically capable of doing so. *See Heller*, 554 U.S. at 596. The constitutional outer limit of Congress' Article I power over the militia is defined demographically: Congress *had no authority* to require individuals to enroll and to arm themselves *unless* those individuals were *already* deemed able-bodied members of the

community understood to constitute the militia, and hence entitled to keep and bear arms.

As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that Second Amendment rights vest at age 18.  "[M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights.  But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570; *see Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) (such "contemporaneous legislative exposition of the Constitution" by the Founders "fixes the construction to be given the Constitution's provisions").

The legislative history of the Militia Act lends further support.  In 1790, Secretary of War Henry Knox submitted a militia plan to Congress stating that "all men of the legal military age should be armed," and providing that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen."  2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834). Acknowledging that "military age has generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain

17

without injury the hardships incident to the field." *Id*. at 2153. Representative

Jackson explained "that from eighteen to twenty-one was found to be the *best* age

to make soldiers of." *Id*. at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended as the age of

militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, Gen-

eral Washington—who as President signed the 1792 Militia Act into law—wrote

that "the Citizens of America … from 18 to 50 Years of Age should be borne on

the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total

strength of the Country might be called forth at a Short Notice on any very interest-

ing Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted

in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

State militia laws that were enacted shortly before the Second Amendment

provide additional evidence that the right to arms vested at 18. Minimum enroll-

ment ages ranged from 16 to 18.[7] There was thus a consensus in the States that, by

age 18, individuals were able to, and hence entitled to, bear arms. This followed

colonial practice: "From the earliest times the duty to possess arms was imposed

on the entire colonial populace, with actual militia service contemplated for every

male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B.

---

[7] States with a minimum age of 18 included Delaware, Pennsylvania, South Caro-
lina, Virginia. States with a minimum age of 16 included Connecticut, Georgia,
Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Caro-
lina, Rhode Island, Vermont. *See* Ex. A.

Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, *in* GUN CONTROL AND THE CONSTITUTION 66, 77 n.46 (Robert J. Cottrol ed., 1994). Plaintiffs are unaware of even a single State that exempted 18-20-year-olds from militia service at the time the Second Amendment was ratified.

The Supreme Court has recognized that *militia membership presupposed firearm possession,* because "when called for service these men were expected to appear bearing arms supplied by *themselves*." *United States v. Miller*, 307 U.S. 174, 179 (1939) (emphasis added). This is reflected in the Militia Act, which required each enrollee, regardless of age, to "provide himself with a good musket or firelock." 1 Stat. 271. Several state laws contained similar provisions.[8] These requirements confirm the Founders' shared understanding that Second Amendment rights vest at 18, because they demonstrate that, by that age, individuals not only (i) were entrusted with using firearms in connection with organized militia activities, but also (ii) were expected to keep and maintain those arms as private citizens. Regardless of the common-law age of majority, in that era minimum age requirements were "different for different purposes." 1 BLACKSTONE COMMENTARIES *463. At age 14, for example, individuals were deemed capable of discerning right from wrong and could be "capitally punished for any offense." *Id*. at *463-64.

---

[8] *See, e.g.*, militia laws of Connecticut, New Jersey, New York, Rhode Island, and Vermont, Ex. A at 1, 6-7, 8-9.

**2.    *The decision below erroneously rests on the misreading of a single dictum about categorical exclusions from the scope of the Second Amendment.***

The court below failed to engage this historical evidence.  First, it noted *Heller*'s caveat that " 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.' " USCA5 1104 (quoting 554 U.S. at 626-27) (emphasis omitted). The district court then cited cases upholding the denial of firearms to felons and persons subject to domestic violence protective orders, *id.* at 1104-06, but such cases distinguish themselves.  Indeed, one of the district court's own authorities went out of its way to explain that a career criminal's "right to bear arms is not weighed in the same manner as that of a law-abiding citizen, such as the appellant in *Heller*." *United States v. Rozier*, 598 F.3d 768, 771 & n.6 (11th Cir. 2010) (no Second Amendment right for drug dealer with multiple felony convictions).  The district court brushed past this glaring distinction by noting that, in *United States v. Emerson*, this Court included " 'felons, *infants*, and those of unsound mind' " in the list of those who " 'may be prohibited from possessing firearms.' "  USCA5 1105 (quoting 270 F.3d at 261) (emphasis added by the district court).  There are a host of independently decisive distinctions here.

First, despite the district court's italics, the Plaintiffs here are *legal adults*, not minors—let alone "*infants*" or "*children*."  *Id.*; *see* TEX. FAM. CODE §§

101.003(a)&(c).

Second, Plaintiffs *are not* "prohibited from possessing firearms."   As explained in detail below*,* Section 922(x) *authorizes handgun use and possession* by these very same 18-20-year-olds; it outlaws possession of handguns only by *juveniles* (who are defined in the statute as those *under age 18*).

Third, *Emerson* involved a party who had lost his firearms rights because he had threatened to kill his adulterous wife's lover and therefore been placed under a domestic-violence restraining order.  *See Emerson,* 270 F.3d at 211; *United States v. Emerson*, 46 F. Supp.2d 598, 599 (N.D. Tex. 1999), *reversed by* 270 F.3d 203. Plaintiffs here are law-abiding adults with exemplary records in handgun safety and responsibility.

Fourth, and finally, this Court's passing comment in *Emerson* that "infants … may be prohibited from possessing firearms," 270 F.3d at 261, cannot be read as a considered judgment about the Second Amendment rights of adults aged 18 to 20.   As a legal matter, the term "infant" is typically a synonym for "minor," which at common law was understood to include individuals under the age of 21.  *See* Black's Law Dictionary (9th ed. 2009), infant.  But as we have explained, even if the Plaintiffs here might technically have been considered "minors" two centuries ago, they would contemporaneously have been *affirmatively required*, *by statutes enacted by colonial, state and federal legislatures, to keep and bear arms* so

21

that they could fulfill their obligatory militia duties.  Whatever the details of 18th century law on "minority" and "infancy," it is beyond cavil that persons aged 18 to 20 were entitled and obliged to keep and bear arms.  Indeed, this Court's discussion of the militia in *Emerson* supports the proposition that 18-to-20-year-olds had then—and continue to have now—full Second Amendment rights.  This Court wrote that "the militia, *the assurance of whose continuation and the rendering possible of whose effectiveness [the Supreme Court] says were purposes of the Second Amendment*, referred to the generality of the civilian male inhabitants throughout their lives *from teenage years* until old age and to their *personally keeping their own arms*."  270 F.3d at 226 (emphasis added); *see also id.* at 236 ("the people, *from whom the militia must be taken*, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose") (quoting COOLEY, GENERAL PRINCIPLES ON CONSTITUTIONAL LAW 271 (Little, Brown, 1880; 1981 Rothman & Co. reprint) (emphasis added)).

### C. The Second Amendment Safeguards The Right To Acquire Arms as an Integral Part of the Right to Keep and Bear Arms.

#### 1. *The Second Amendment Was Originally Understood to Secure the Right to Acquire Arms.*

There is no doubt that the Framers would have considered a severe restriction on the acquisition of handguns to be an infringement of the right to "keep and

bear arms" because government interference with the acquisition of firearms was at the very center of the historical struggle that spawned the Second Amendment.

The Second Amendment is largely defined by its "historical background" precisely because it, "like the First and Fourth Amendments, codified a *pre-existing* right." Heller, 554 U.S. at 592 (original emphasis). In both *Heller* and *McDonald*, the Court explained that the principal impetus for the Second Amendment was the history of disarmament practiced by the royal government in England and the colonies. *See id.* at 593-94; *McDonald*, 130 S. Ct. at 3037. That history is replete with government restrictions on the acquisition or purchase of firearms. *See* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS 31-53 (1994); Stephen P. Halbrook, THE FOUNDER'S SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 329-30 (2008).[9]

"Between the Restoration and the Glorious Revolution, the Stuart Kings" used disarmament as a means of "suppress[ing] political dissidents." *Heller*, 554 U.S. at 592. As Justice Scalia explained in *Heller*, "what the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists." *Id.* at 594. King George's efforts to strip his subjects of firearms included a "ban on import of arms and ammunition" by the colonies and a prohibition on the sale of pis-

---

[9] The Supreme Court found Professor Malcolm's historical research particularly compelling and relied on it repeatedly. *See, e.g., Heller*, 554 U.S. at 592-93.

tols. Halbrook, FOUNDERS at 121-22 & n.38; 329-30.[10]  Militia colonel and law professor St. George Tucker, who later penned a leading treatise on the Bill of Rights, smuggled firearms in from the West Indies at the behest of Governor Patrick Henry to evade the British ban on commercial trade in firearms. *Id.* at 310. Foreshadowing the rationale for the Second Amendment a decade later, colonial "patriots perceived the right to bear arms [was] being infringed when British troops … used entrapment to ferret out persons seeking to obtain arms." *Id.* at 330.  The colonial newspapers of the day contain "scores of references to such items as" the import trade in firearms from Great Britain being prohibited and "pistols" being "forbidden … for sale." *Id.* at 121 n.38.  These measures "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms," and confirm that the Founding generation understood the right to bear arms to include the right to obtain arms.  *Heller*, 554 U.S. at 594.  In the words of Thomas Jefferson: "Our citizens have always been free to make, vend, and export arms.  It is the con-

---

[10] *See also id.* at 53, 58-74 (England imposed an "embargo against import of arms into the colonies" and Americans circumvented it because "in the worldview of the patriots, possession of arms by the populace was necessary for both individual and common defense"); *id.* at 55-56 (discussing royal punishment for purchasing firearms);  STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED 63 & n.51 (1994) ("Reports of seizures of arms by the British, and of attempts of Americans to obtain arms, fill the newspapers of the mid-1770s.") (citing 2 L. Cappon & S. Duff., VIRGINIA GAZETTE INDEX 1736-1780 (1950)).

stant occupation and livelihood of some of them." Thomas Jefferson, 6 WRITINGS 252-53 (P. Ford ed. 1895).[11]

The early history of the militia confirms this understanding of the Second Amendment. The militia comprised all males capable of bearing arms and membership in the militia presupposed individual acquisition and possession of firearms. This Court recognized as much in *Emerson*. *See* 270 F.3d at 234-36 (" '[I]n all the colonies … the militia systems … implied the *general obligation of all adult male inhabitants to possess arms*' … The militia consisted of the people *bearing their own arms*.") (second emphasis added). If these men were required to arm themselves, they had to have a means of doing so, and it follows that a prohibition on the regular commercial trade in firearms with such militiamen would not have

---

[11] *See also* CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ("What law forbids the veriest pauper, *if he can raise a sum sufficient for the purchase of it*, from mounting his Gun on his Chimney Piece, with which he may not only defend his Personal Property from the Ruffian, but his Personal Rights, from the invader of them….") (emphasis added) (*quoted in Heller*, 554 U.S. at 583 n.7, as persuasive authority for the original meaning of "Keep … arms"); VA. STAT. AT LARGE, 2 HENING 403 (1823) (assembly order from February session, 1676-77) ("It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony, and that the Indians of the Easterne shore have like and equall liberty of trade or otherwayes with any other our friends and neighboring Indians."); HALBROOK, FOUNDERS' at 62 ("A New Hampshire patriot … describe[d] the import ban as a violation of the right to keep and bear arms."); *id.* at 65 ("A Philadelphian wrote to a member of Parliament … 'The late Proclamation forbidding the exportation of gun-powder and firearms to America seemed intended to take away from the colonies the power of defending themselves by force.' ").

been tolerated. *Emerson*, 270 F.3d at 235 ("If the people were disarmed there could be no militia.").

This accounts for the BATF's failure to identify a single Founding-Era law that resembles the sales ban imposed by Section 922(b)(1). Even the *Heller* dissent, which cited what it said were "important examples of the kinds of gun regulation that citizens would then have thought compatible with the 'right to keep and bear arms,' " could not find any restrictions on firearms sales that were remotely comparable to the laws at issue here. 554 U.S. at 682-87.

### 2.    *Congress May Not Circumvent a Constitutional Right to Possession by Banning Acquisition.*

It is a fundamental principle of both law and logic that, where the exercise of a right requires the acquisition of a particular item or service, a ban on commercial transactions in that thing or service is an unconstitutional infringement of the right. As the Seventh Circuit has explained, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). "[T]he core right wouldn't mean much without" the corollaries that make it meaningful, *id.,* including the right to acquire the firearms that make exercise of Second Amendment rights possible. *See also id*. at 708-09. Accordingly, the Third Circuit has recognized that a law "prohibiting the commercial sale of firearms" is "a result [that] would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92

n.8 (3d Cir. 2010).  The statute upheld there posed no threat to the right to bear arms because it outlawed sales only of guns whose serial numbers had been filed off—a form of contraband useful only to criminals—without impairing commercial access to handguns by law-abiding individuals.  *United States v. Marzzarella*, 595 F.Supp.2d 596, 600-03 & n.3 (W.D. Pa. 2009), *aff'd*, 614 F.3d 85, 95, 98-99.  The court explained that the law did not "burden[] the 'core' Second Amendment right recognized in *Heller*" because legal "firearms with intact serial numbers" remain "readily available in our society through ordinary commercial channels." 595 F. Supp. 2d at 599; 614 F.3d at 97.  Yet it is precisely those "ordinary commercial channels" that Section 922(b)(1) denies to law-abiding adults under 21.  Indeed, *Section 922(b)(1) denies Plaintiffs access to the entire commercial handgun market.  See also Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984) (recognizing that banning the commercial sale of firearms would amount to the functional equivalent "a handgun ban" and would thus be impermissible in the face of a right "allow[ing] … citizens to possess handguns."). One cannot "keep" arms if one cannot lawfully purchase them:  a severe restriction on acquisition is a functional ban on possession.

This principle—that a restriction on distribution of an item necessary to the exercise of a constitutional right is tantamount to an impermissible restriction on exercise of the right—has been articulated by the Supreme Court many times.  For

example, *Carey v. Population Services International*, 431 U.S. 678 (1977), in-
volved not an outright ban on contraceptives, but merely a significant restriction on
their sale: the statute made it "a crime … for anyone other than a licensed phar-
macist to distribute contraceptives to persons 16 or over." *Id.* at 681. The Court
noted that prior cases established "the constitutionally protected right of decision in
matters of childbearing" and the "freedom to choose contraception" under that
right. *Id.* at 688. As the Court explained, a significant restriction on the "sale of
contraceptives … would intrude upon individual decisions in matters of procrea-
tion and contraception as harshly as a direct ban on their use…. This is so not be-
cause there is an independent fundamental 'right of access' … but because such
access is essential to exercise of the constitutionally protected right." *Id.* at 687-
88.

The Court explicitly noted that, although the burden of the statutory restric-
tion was "*not as great as that under a total ban* on distribution," it was nonetheless
unconstitutional: "the restriction of distribution channels to a small fraction of the
total number of possible retail outlets renders contraceptive devices considerably
less accessible to the public." *Id*. at 689 (emphasis added). Furthermore, the Court
addressed a potential alternative channel for contraceptives that has important im-
plications for Section 922(b)(1). The Court examined the ameliorative impact of a
statutory exception allowing physicians to supply their patients with contracep-

28

tives, but concluded that it was insufficient to save the law because it "obviously does not significantly expand the number of *regularly available, easily accessible retail outlets* for nonprescription contraceptives." *Id*. at 689 n.7 (emphasis added). Section 922(b)(1) ousts 18-20-year-olds from the entire commercial handgun market far more comprehensively than the restrictions on contraceptives that were struck down in *Carey*, and a "parental gift" channel for handguns (urged by the BATF) is no more sufficient here than the "physician prescription" channel for contraceptives was in *Carey*.

In *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008), this Court considered a Texas statute that "criminalize[d] the selling, advertising, giving, or lending of a device designed or marketed for sexual stimulation." *Id.* at 741. The Court explained that "bans on commercial transactions involving a product can unconstitutionally burden individual substantive due process rights." *Id.* at 743 & nn.21-22 (citing *Carey*, 431 U.S. at 683-91). The Court acknowledged the "right to engage in private intimate conduct of [one's] choosing" and struck down the restriction on sales of sex toys because, although it was not a "total ban," it nevertheless "heavily burden[ed] a constitutional right." *Id.* at 741, 742 & n.16, 744.[12]

---

[12] *En banc* rehearing was denied over the dissents of seven judges, but the dissenters did not question the principle that, where a fundamental right is at stake, a restriction on sales amounts to an unconstitutional burden on possession. Instead,

First Amendment cases are equally instructive:  restrictions on speaking or distributing information are unconstitutional not just because they infringe the speaker's right, but also because they infringe the *recipient's* right to acquire that information.  *See Lamont v. Postmaster General*, 381 U.S. 301 (1965); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.* 425 U.S. 748, 757 (1976).  The fact that the purveyor of the information is engaging in a commercial enterprise makes no difference to the Constitution.  "The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise."  *McConnell v. FEC*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part and dissenting in part).

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007), parallels this case.  New York City's anti-graffiti law restricted sales of broad-tipped indelible markers and cans of spray paint to those under 21 and was challenged on behalf of those aged

---

the dissenters disagreed only as to the existence of a fundamental right of intimate sexual conduct. *See Reliable Consultants Inc. v. Earle*, 538 F.3d 355, 360-62 (5th Cir. 2008) (Garza, J., dissenting from denial of rhr'g).  Indeed, the *Reliable Consultants* dissenters specifically cited to the Eleventh Circuit's reasoning in a similar case that came out the other way.  *See id.* at 360-61 (citing *Williams v. Attorney General of Alabama*, 378 F.3d 1232 (11th Cir. 2004)).  The *Williams* Court rejected the notion that there was a fundamental right to use sexual devices, but it *agreed* that "[f]or purposes of constitutional analysis, *restrictions on the ability to purchase an item are tantamount to restrictions on the use of that item.*" *Id.* at 1242 (emphasis added); *see also id.* ("Because a prohibition on the distribution of sexual devices would burden an individual's ability to use the devices, our analysis must be framed not simply in terms of whether the Constitution protects a right to *sell* and *buy* sexual devices, but whether it protects a right to *use* such devices.").

18-to-20, who were classified as adults under state law. *Id*. at 76. The law con-

tained a legislative finding that those aged 12-20 were the source of the graffiti

problem, and the court, applying intermediate scrutiny, did not disturb that finding.

*Id*. at 86, 88. The city argued that the law did not impose a constitutionally signifi-

cant limit on access to materials integral to the exercise of free speech because art-

ists aged 18-to-20, who could not buy the spray paint and markers themselves,

could "have friends, older relatives, or an art school purchase" the items "for

them," or "use unregulated materials" such as other types of markers. *Id*. at 88.

The Second Circuit panel (which included then-Judge Sotomayor) unanimously

held that these alternative channels for acquiring the tools of artistic expression did

not excuse the constitutional violation. *Id*. Because this restriction "hinder[ed] …

access to the materials … need[ed] for … lawful artistic expression," it trans-

gressed the First Amendment. *Id.* at 89. The same is true of the BATF's argument

here that adults under 21 can ask their relatives to buy handguns and present them

as gifts or can purchase rifles or shotguns instead. The court below did not even

try to distinguish these authorities.

The Second Amendment right stands on equal footing with other fundamen-

tal, enumerated constitutional rights. *See Heller*, 554 U.S. at 634-35; *McDonald*,

130 S. Ct. at 3043. Therefore, just as in other constitutional contexts where the

government may not stifle sales as a means of frustrating use or possession, here

the government may not severely burden the right to keep and bear arms by drasti-

cally restricting the means of acquiring them.

> **3.** ***The Decision Below Erroneously Rests on a Single Pre-*Heller*** ***Decision That Is Both Outdated and Inapposite.***

The court below quoted the Supreme Court's statement in *Heller* that "noth-

ing in our opinion should be taken to cast doubt on longstanding … laws imposing

conditions and qualifications on the commercial sale of arms."  554 U.S. at 626-27

(quoted at USCA5 1104).  The district court apparently believed that, by this

statement, the Supreme Court immunized all "conditions and qualifications on the

commercial sale of arms as presumptively lawful regulatory measures." *Id.*  That

is a fantastic overreading of *Heller.*   As Judge Easterbrook put it, this passage of

*Heller* is merely "precautionary language" that "warns readers not to treat *Heller*

as containing broader holdings than the Court set out to establish." *United States v.*

*Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).  "While courts may be free to 'presume'

that many regulations (including those listed) will ultimately be declared lawful, it

does not eliminate the need to conduct a careful constitutional analysis.  The Sec-

ond Amendment, after all, is now clearly an important individual right, which

should not be given short shrift." *United States v. Tooley*, 717 F.Supp.2d 580, 585

(S.D.W.Va. 2010).

On the critical point of whether Section 922(b)(1) is an unconstitutional re-

striction on handgun sales to law-abiding adults who are legally entitled to possess

handguns, the district court predicated its holding on a case decided 30 years before *Heller* wrought a sea change in Second Amendment jurisprudence. USCA5 1105 (citing *United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976)). Although the district court conceded that *King* was outdated, the court was nonetheless impressed by the fact that, in *King*, this Court "held that at least one statutory scheme related to dealing in firearms is not violative of the Second Amendment." *Id*. The district court then concluded that, even though it preceded *Heller* by three decades, *King*'s holding is nevertheless "likely of the nature contemplated" by the Supreme Court in *Heller*. *Id*.

At any rate, *King* is a far cry from this case. The defendant in *King* was a police sergeant caught engaging in unlicensed sales of more than 150 firearms (some of which were later recovered from crime scenes 500 miles away), including Saturday Night Specials and even his own police-issued service revolver, to gun buyers who told the sergeant that they were criminals fresh out of prison. 532 F.2d at 506-08. Sometimes the defendant even met with his customers at the police station and sold the firearms out of the trunk of his police patrol car. *Id*. at 507-08. The sergeant and his coconspirators were convicted under Section 922(a)(1)(A) of dealing in firearms without a license. *Id*. at 506. It is hardly shocking that this Court proclaimed itself "unimpressed" by the defendants' Second Amendment defense, *id*. at 510, but the fate of that frivolous argument says nothing about how

33

this Court should evaluate Section 922(b)(1) here.  Plaintiffs are not corrupt gun

traffickers; they are law-abiding adults who seek only the opportunity to purchase

handguns from federally licensed FFL dealers, in order to obtain the handguns that

Section 922(x) entitles Plaintiffs to possess and use.   A decision for Plaintiffs here

would not impair congressional power to mandate that all firearms dealers be li-

censed, nor hinder federal prosecution of those who traffic in handguns without a

license.

> **4.**     ***Section 922(b)(1)'s Ban on Sales by FFLs is Unconstitutional Even Though It Permits Occasional Unlicensed Handgun Sales By Private Parties.***

The BATF tries to redefine the right asserted by Plaintiffs as a supposed

right to buy a handgun from a particular source—a commercial firearms merchant

holding an FFL.  The BATF thus attempts to reduce Plaintiffs' constitutional claim

to a gripe that Section 922(b)(1) closes off merely one of many channels through

which one might obtain a handgun.

This argument is foreclosed by the plain text of Section 922(b)(1), which

prohibits "*any* licensed importer, licensed manufacturer, licensed dealer, or li-

censed collector to sell or deliver" any handgun or handgun ammunition to law-

abiding adults between the ages of 18 and 20. (Emphasis added.)   Under the law,

*every* person who "engage[s] in the business of importing, manufacturing, or deal-

ing in firearms" must obtain a federal firearms license.  18 U.S.C. § 922(a)(1)(A).

And a person "engage[s] in the business" of selling firearms if he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." *Id.* § 921(a)(21)(C). In other words, everyone who regularly sells firearms must have a license and therefore falls within the ban of Section 922(b)(1).

This broadly written criminal statute is vigorously enforced by the BATF: anyone who styles himself a mere unlicensed "collector" yet stands ready to sell more than a single handgun on a single occasion does so at his peril. *See, e.g.*, *United States v. Shan*, 361 F. App'x 182, 183 (2d Cir. 2010) (conviction for selling without a license where "defendant sold two firearms within roughly one month and … had a source of supply for other weapons"); *United States v. Orum*, 106 F. App'x 972, 974 (6th Cir. 2004) (conviction for selling without a license where defendant "frequented flea markets and guns shows where he displayed and sold firearms" and "actually sold … three different firearms on two different occasions"); *United States v. Carter*, 801 F.2d 78, 81-82 (2d Cir. 1986) ("The government need not prove that dealing in firearms was the defendant's 'primary business.' Nor is there a 'magic number' of sales that need be specifically proven. Rather, the statute reaches 'those who hold themselves out as a source of firearms.' Consequently, the government need only prove that the defendant 'has guns on hand or is

ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers.' ") (citations omitted).

The BATF nevertheless insists that sufficient alternate channels of handgun acquisition are available to Plaintiffs to remove the unconstitutional sting from Section 922(b)(1):  (1) Plaintiffs' parents can buy handguns and ammunition for them, and (2) Plaintiffs can buy second-hand guns and ammunition from unlicensed private parties who happen to have a spare pistol they are willing to sell. But these supposed alternatives are insufficient substitutes for the commercial firearms market from which Section 922(b)(1) excludes all adults aged 18-20 who seek to buy a revolver or pistol.[13]

The first of the BATF's proposed ways for Plaintiffs to circumvent Section 922(b)(1)'s sales ban boils down to an argument that Plaintiffs' Second Amendment rights are fully vindicated so long as their parents will buy a handgun for them.  This gambit fails for several independent reasons.

First, this is not how rights work.  Adults like Plaintiffs here do not need the consent of other adults to exercise their fundamental rights.  If one has a constitutional right to speak as one pleases, to worship at the church of one's choice, or to

---

[13] To be sure, 18-to-20-year-olds may purchase a rifle or shotgun directly from an FFL dealer.  But this cannot save Section 922(b)(1) because *Heller* made it clear that access to long guns is not a constitutionally acceptable substitute for access to handguns.  *See* 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.").

keep and bear arms, one does not need to bring along a permission slip from one's parent.

Second, the BATF's supposed parental bypass ruse is cold comfort to those who do not have living parents, who are estranged from their parents, who do not live in the same state as their parents, or whose parents are legally ineligible, financially unable, or, for whatever reason, unwilling to purchase a handgun for their son or daughter as a gift. *See, e.g.,* USCA5 627. *See Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 894 (1992) ("The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.").

Third, even if an 18-to-20-year-old managed to secure parental munificence and cooperation with respect to a handgun purchase, there would remain the problem of ammunition. The 18-to-20-year-old would have to rely on the continued generosity of her parents every time she needed ammunition for the gun.

Fourth, and finally, such parental-access alternatives were argued in *Vincenty* and flatly rejected. 476 F.3d at 88. A sales restriction on an item necessary to exercise a constitutional right will be struck down if it reduces "distribution channels to a small fraction of the total number of possible retail outlets" and thereby renders said item "considerably less accessible to the public." *Carey*, 431 U.S. at 689.

The second back channel for handguns touted by the BATF is the possibility that an 18-to-20-year-old adult might buy a second-hand pistol in a private, unlicensed sale from an individual who happens to have a spare handgun.  But Section 922(b)(1) expressly outlaws handgun transfers not only by any "licensed dealer" but also by any "licensed collector" and, as the cases discussed above show, even occasional sales by collectors without licenses can lead to criminal conviction.  So the alternate channel hypothesized by the BATF is less a stream of commerce than a dry riverbed.  Furthermore, the BATF's recommendation that Plaintiffs resort to the unregulated, unlicensed, under-the-radar market as the appropriate venue for handgun purchases by 18-to-20-year-olds is at war with the very purpose of the FFL regime (screening out those who should not have firearms) and with the supposed purpose of Section 922(b)(1).

In any event, the BATF has not submitted a shred of evidence that this market of one-off gun sales offers anything other than irregular and unreliable access to handguns and ammunition.  To the contrary, the BATF expressly contends that "Congress did not consider them to be the major source of firearms for this age group."  USCA5 148.  Unsurprisingly, none of the Plaintiffs has found this mode of random scrounging for second-hand pistols from unlicensed individual gun owners to be a satisfactory avenue for acquiring reliable, safe, and popular hand-

（）

guns.[14]  Moreover, purchases of used handguns made through such backdoor chan-
nels do not come with product warranties or any of the advantages of the licensed
commercial market, such as assurances of quality, safety, regular availability, var-
ied inventory, or competitive pricing.  *See* USCA5 671; *id.* at 674.  And once a
handgun is obtained in such an *ad hoc* transaction, the buyer must hope that she
can track down an ever-changing cast of other gun owners who will happen to
have, and to be willing to sell, spare ammunition of the precise caliber needed for
the gun.  That's a dicey enterprise, because a *repeat* seller of ammunition, just like
a repeat seller of guns, must be licensed by the BATF or face criminal prosecution.
Even if she could locate a willing gun owner with an excess of the precise ammu-
nition she required, our hypothetical purchaser could but hope that such resale
ammunition was still in safe condition and had not been adulterated or corroded.
Relegating Plaintiffs to this irregular, unreliable, and potentially unsafe trade in
second-hand firearms and ammunition is simply not consistent with the robust pro-
tection of the right to keep and bear arms guaranteed by the Second Amendment.

If Section 922(b)(1) does what the BATF says—sharply limits access to
handguns and ammunition—then it is not just a harmless ban on a particular source
of acquisition.  It is a severe restriction on the ability to acquire a handgun (and
ammunition) and thus is tantamount to a severe restriction on the right to keep and

---

[14] *See* USCA5 609-10; *id.* at 616-17; *id.* at 622-23; *see also id.* at 678; *id.* at 682.

bear arms.   The fact that Section 922(b)(1) leaves, at least theoretically, some random, occasional, alternate channels of handgun acquisition does not save the statute from invalidation.   "It is of no moment that the statute does not impose a complete prohibition.  The distinction between laws burdening and laws banning … is but a matter of degree."  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000).  *See also Carey*, 431 U.S. at 689; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 427-28 (1993) ; *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 336 (5th Cir. 1981); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 n.5 (9th Cir. 2010).

All told, then, the BATF is simply wrong to point to these limited alternatives to the licensed firearms market as sufficient to vindicate the Second Amendment right to acquire arms—a notion is at odds with the purported justification for Section 922(b)(1).  But let us suppose, for argument's sake, that gifts and occasional second-hand sales by unlicensed gun owners provide 18-to-20-year-olds with access to handguns that is comparable to that provided by the commercial market.  If that is true, then, as discussed more fully below, Section 922(b)(1) is fatally underinclusive and is an irrational and arbitrary restriction that cannot pass muster "[u]nder any of the standards of scrutiny that … appl[y] to enumerated constitutional rights."  *Heller*, 554 U.S. at 628.

**II.    EVEN IF SECTION 922(b)(1) WERE TO BE JUDGED UNDER THE INTEREST-BALANCING TEST REJECTED IN *HELLER*,  IT WOULD BE STRUCK DOWN.**

**A.    Section 922(b)(1) Requires Exacting Judicial Scrutiny.**

If we assume *arguendo* that *Heller*'s approach is to be displaced by one of the familiar levels of scrutiny, that level of scrutiny must be strict, not intermediate.

First, judicial scrutiny here must be strict because the right to bear arms was enumerated in the constitutional text and deemed "fundamental by those who drafted and ratified the Bill of Rights." *McDonald*, 130 S. Ct. at 3037.  Indeed, *McDonald* confirmed that "*Heller* points unmistakably to [an affirmative] answer to the question of "whether the right to keep and bear arms is fundamental to our scheme of ordered liberty." *Id.* (emphasis omitted).  And it is well established that "strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983).  *See also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973) (when a law interferes with enumerated "fundamental constitutional rights," it is subject to "strict judicial scrutiny"); *id.* at 17 (if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution, [it] thereby requir[es] strict judicial scrutiny"); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental

41

that strict scrutiny must be applied"); *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2003) ("[r]ights are fundamental if their source, explicitly or implicitly, is the Constitution," and "[s]trict scrutiny is appropriate" when a law "implicates … a fundamental right") (quotation marks omitted); *Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995) ("Strict scrutiny is required" if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution.").

Furthermore, the Supreme Court has expressly rejected the notion "that the Second Amendment should be singled out for special—and specially unfavorable—treatment." 130 S. Ct. at 3043. *See also id.* at 3044 (plurality) (rejecting argument that the Second Amendment right should be "treat[ed] … as a second-class right").

Second, *Heller* itself forecloses the application of intermediate scrutiny here. In his dissenting opinion, Justice Breyer argued that the proper standard of review should be drawn from "cases applying intermediate scrutiny" in the First Amendment context, such as *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997). *Heller*, 554 U.S. at 704 (Breyer, J., dissenting); *see also id.* at 689-90, 696. He contended that "[t]here is no cause here to depart from the standard set forth in *Turner*." *Id.* at 705.[15] Justice Breyer called his test "interest-balancing," rather

---

[15] It is equally revealing that Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Heller*, 554 U.S. at 690 (Breyer, J., dissenting). That is the case on which the United States, appearing as an *amicus* in *Heller*, principally relied in

than intermediate scrutiny, not because he was adopting a less demanding test, but because of his view that the government's interest in regulating firearms—some version of protecting the safety and lives of the public—would always be important or compelling.  In Justice Breyer's view, the government interest would always be sufficient and application of the test would involve a search for the appropriate degree of fit—that is, interest-balancing.  *See id.* at 689 ("I would simply adopt such an interest-balancing inquiry explicitly.").  Thus Justice Breyer's proposed interest-balancing test was nothing other than intermediate scrutiny, and the Supreme Court rejected it, however it might be labeled.  *See Heller*, 554 U.S. at 634-35; *see also McDonald*, 130 S. Ct. at 3050 (plurality) ("[W]hile [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion.").  Therefore, *Heller* forbids the application of mere intermediate scrutiny to a regulation, such as that here, that impinges upon law-abiding adults' core Second Amendment right of armed self-defense.

Third, it is undisputed that the Plaintiffs are law-abiding adults and model citizens; they have no criminal records, no drug addictions, no mental illnesses, no histories of domestic violence that might categorically place them outside the scope of the Second Amendment.  This distinguishes them, and this case, from virtually every precedent offered by the BATF in support of its plea for intermediate

unsuccessfully urging the Court to adopt intermediate scrutiny.  *See* Brief of United States in No. 07-290, at 8, 24, 28.

scrutiny.  The Second Amendment rights of upstanding citizens may not be in-fringed as if they were part of the sad parade of felons, drug addicts, and wife-beaters to whom the BATF compares them.[16]  While "intermediate scrutiny [may be] appropriate" in cases where "the claim [is] *not* made by a 'law-abiding, respon-sible citizen' as in *Heller*," *Ezell*, 651 F.3d at 708 (emphasis added), this case pre-sents precisely such a claim, and intermediate scrutiny is manifestly inappropriate here.

Fourth, the laws challenged here are broadly prohibitory.  Section 922(b)(1) does not merely hinder or impede the purchase of antiques, relics, or other firearms curios; it expels the Plaintiffs from the entire American commercial marketplace for handguns—the very weapon that the Supreme Court recognizes as "the most preferred firearm in the nation to 'keep' and use for protection" of oneself and

---

[16] *See, e.g., United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010) (apply-ing intermediate scrutiny to uphold a ban on contraband firearms with obliterated serial numbers, but explaining that Second Amendment rights are "susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of [conduct] at issue"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (rejecting challenge to felon-in-possession law without "determining … the precise test applicable to [other types of] gun restrictions"); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (felons); *United States v. McRobie*, No. 08-4632, 2009 WL 82715, at *1 (4th Cir. Jan. 14, 2009) (inmates of mental asylums); *United States v. Rozier*, 598 F.3d 768, 769 (11th Cir. 2010) (career felon drug dealer); *United States v. Yancey*, 621 F.3d 681, 683-84 (7th Cir. 2009) (drug addicts); *United States v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003) (felons); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (defendant was subject to restraining order and deemed "likely to engage in domestic violence"); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc) (misdemeanor do-mestic violence).

one's home. *Heller,* 554 U.S. 628-29.  According to the Seventh Circuit, "[b]oth

*Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core

Second Amendment right … are categorically unconstitutional." *Ezell*, 651 F.3d at

703.  For less burdensome laws, a court is "left to choose an appropriate standard

of review from among the heightened standards of scrutiny the Court applies to

governmental actions alleged to infringe enumerated constitutional rights," *id.*, in-

cluding, of course, strict scrutiny.  Laws that impose "a severe burden on the core

Second Amendment right of armed self-defense will require an extremely strong

public-interest justification and a close fit between the government's means and its

end." *Id.* at 708.  At a *minimum*, then, Section 922(b)(1) should be subject to strict

scrutiny if not flatly struck down.   Indeed, the Seventh Circuit rejected intermedi-

ate scrutiny and applied "rigorous" if "not quite 'strict scrutiny' " to enjoin a statu-

tory provision that did *not* restrict sales, use, or possession of firearms, but merely

banned shooting ranges inside the City of Chicago.  *Id.*

## B.    Even Traditional "Intermediate Scrutiny" Is A Hurdle That Section 922(b)(1) Cannot Clear.

1.    Even assuming *arguendo* that intermediate scrutiny is the appropriate

standard of judicial review, Section 922(b)(1) cannot meet that test.  To satisfy in-

termediate scrutiny, the BATF "must demonstrate an 'exceedingly persuasive justi-

fication' " for the challenged law.  *United States v. Virginia*, 518 U.S. 515, 531

(1996).  Section 922(b)(1)'s discrimination against 18-to-20 year olds must be

45

"substantially related" to the government's objective, *id.* at 533, and the Court

must approach the fit between means and end with "skeptical scrutiny," *id.* at 531.

And although intermediate scrutiny does not require the *least* restrictive alternative

to achieve its stated purpose, it does require that a restriction be "narrowly tai-

lored." *Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 45

(1983); *see also Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S.

557, 566 (1980) (challenged regulation must not be "more extensive than is neces-

sary to serve that [state] interest").

Moreover, only the government's genuine objectives will do; "*post hoc*" ra-

tionales "invented … in response to litigation" are insufficient, and intermediate

scrutiny does not permit the government to "rely on overbroad generalizations"

about groups to allocate benefits and burdens among individuals. *United States v.*

*Virginia*, 518 U.S. at 533.

2.    The BATF, referring to the Senate Report, states that the principal

purpose of Section 922(b)(1) is " 'to keep firearms out of the hands of those who

are not entitled to possess them because of *age*.' " USCA5 809 (quoting S. Rep.

No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113) ("SENATE RE-

PORT") (emphasis added by the BATF).  *See also id.* at 2114, 2164, 2198.  But that

makes absolutely no sense, because law-abiding adults aged 18-to-20 *are entitled*

*to possess handguns*.  Although Section 922(b)(1) bans handgun *sales* to 18-20-

year-olds, it does not bar *possession*. Section 922(x) expressly provides that *only "juvenile[s]"* – defined as those "less than 18 years of age" – are subject to federal restrictions on *possession*, *use or receipt* of handguns. 18 U.S.C. § 922(x)(1), (2) & (3)(D)(5). Indeed, the court below went out of its way to "emphasize[] that the ban [in Section 922(b)(1)] does *not* prohibit the possession of handguns or handgun ammunition by 18-to-20-year-olds." USCA5 1096 n.2. Thus, only juveniles under 18, not adults aged 18-20, are barred from possessing handguns. This disconnect is the polar opposite of the "substantial relation" and "narrow tailoring" required under intermediate scrutiny. Section 922(b)(1) does not remotely fit the legislative purpose proffered by the Government and therefore must be struck down.

3.     In a similar vein, the BATF contends that the purpose of Section 922(b)(1) is to prevent "the clandestine purchase of handguns by individuals under 21." USCA5 808; *see also id*. at 806, 812; SENATE REPORT at 2167; 82 Stat. 197, 225. *But this goal is thwarted*, not advanced, by Section 922(b)(1), which *not only permits clandestine handgun purchases, it positively encourages them* by closing off the entirety of the federally licensed commercial handgun market to adults aged 18-20. They are thereby relegated to legal, but unreported, unlicensed, and un-regulated channels.

There are two such channels identified by the BATF. First, another person – parent, friend, or none of the above – purchases the handgun from an FFL and

gives it or lends it to the 18-to-20-year-old.  The Government stresses that this is perfectly legal. USCA5 749 n.2, 754 n.5, 758-59 & nn.8-9, 768, 807.  Second, the 18-to-20-year-old herself buys a pistol second-hand from a private gun owner in an unreported transaction; this, too, the BATF and the court below confirm, is entirely legal.  USCA5 1096 n.2; USCA5 749 n.3, 813-14, 816-17.  No background checks are conducted on these clandestine acquisitions to screen out criminals, drug addicts, or the insane.

The combined effect of Section 922(x)'s authorization of handgun possession by 18-20-year-olds with Section 922(b)(1)'s ban on FFL handgun sales to that group is the following federal policy: it is perfectly fine for those aged 18-20 to have handguns, *so long as they get them through unlicensed channels*, be it a "gift" from a relative, a "loan" from a friend, or a furtive cash purchase out of the trunk of  a stranger's car in a darkened parking lot.  This regime makes no sense.

Section 922(b)(1) thus virtually *guarantees* that this class of adults will procure their handguns by "clandestine" means.  By expelling law-abiding 18-20-year-olds from America's licensed handgun market, Section 922(b)(1) wars with its original purpose which, Congress took pains to explain, was "not … to place any undue or unnecessary Federal restrictions or burdens *on law-abiding citizens* with respect to the *acquisition*, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other

lawful activity, [nor] to discourage or eliminate the private ownership or use of firearms by *law-abiding citizens* for lawful purposes." 82 Stat. 197, 226 (emphasis added).

Congress is free to approach problems incrementally, but given that the purpose of Section 922(b)(1) is to stamp out clandestine sales, Section 922(b)(1)'s approach is not "incremental"—it is *incoherent*. The only federal court to examine Section 922(b)(1) post-*Heller* found this arrangement bizarre and deeply troubling: "it appears as though the law would rather an 18 to 20 year old purchase a handgun from an unlicensed seller than from a licensed seller." *United States v. Bledsoe*, Criminal No. SA-08-CR-13(2)-XR, 2008 WL 3538717, at *6 (W.D. Tex. Aug. 8, 2008).

Such blaring dissonance between a statute's purpose and operation is fatal under intermediate scrutiny. Section 922(b)(1)'s ban on licensed handgun sales "cannot directly and materially advance its asserted interest" in preventing clandestine handgun acquisitions "because of the overall irrationality of the Government's regulatory scheme." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995). Driving 18-to-20-year-olds out of the licensed handgun market "makes no rational sense if the Government's true aim is to suppress" unreported, private, clandestine sales. *Id.* A "law cannot be regarded as protecting an interest 'of the highest order,' and thus as justifying a restriction … when it leaves appreciable damage to

he

that supposedly vital interest unprohibited." *Florida Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring). Section 922(b)(1) fails *a fortiori* because it subverts its own legislative purpose and exacerbates the problem it purportedly addresses.

4. The ultimate goal of Section 922(b)(1) was to decrease violent crime by denying firearms "to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior." 82 Stat. at 225-26. There are a host of inherent flaws here. First, the Plaintiffs are neither "juveniles" nor "minors;" they are adults aged 18 to 20. Second, the statute bars only handgun sales—it leaves 18-to-20-year-olds free to buy shotguns and rifles. Third, the legislative record does not support the premise that adults aged 18 to 20 present a particular problem. The hearings were conducted by a Senate subcommittee on "Juvenile Delinquency" and the most alarming testimony concerned guns in the hands of "juveniles" (who are under 18) or "children." *See, e.g., Federal Firearms Act: Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854 Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. On the Judiciary*, 90th Cong., 1st Sess., at 11, 44, 47, 49, 57, 59, 333, 409-11, 433, 877, 879, 1019 (1967) ("HEARING"). Attorney General Ramsey Clark, a leading proponent of the bill, explained that the crime statistics cited in support of the bill pertained primarily to those *under 18* rather than to those aged 18-20. HEARING at 940-41. *See also id.* at 940 ("It seems incredibly

careless to me that we let children under 18 buy rifles and pistols if they choose to do so.  I do not believe that is tolerable.").

Whatever the precise degree of heightened scrutiny applied here, these statistics and legislative findings about the problem of *juvenile* crime are hardly a solid foundation for a statute that distinguishes between 18-year-olds and 21-year-olds with respect to an enumerated, fundamental, individual right.  A government defending a law challenged as a violation of the Second Amendment (i) "must supply actual, reliable evidence to justify" the restriction, (ii) "cannot get away with shoddy data or reasoning," and (iii) will suffer an injunction against the law if the government's "empirical support for the ordinance [is] too weak." *Ezell*, 651 F.3d at 709 (citations and quotation marks omitted) (collecting First Amendment precedents).

Here, the BATF has not even come close to meeting the burden of intermediate scrutiny.  The Congress that enacted the ban on FFL handgun sales to adults aged 18 to 20 did not even try to specify the supposed threat presented by that group, instead relying, as the BATF did below, on generic references to troubled youth.  But the state "may not rely on 'overbroad' generalizations to make 'judgments about people' " based on their membership in a group that is thought to have particular characteristics or to present particular risks. *United States v. Virginia*, 518 U.S. at 542.  Intermediate scrutiny does not tolerate "categorical exclusion, in

total disregard of th[e] individual merit" of a given individual. *Id*. at 546.  In licensed handgun purchases, individual merit (or individual disqualification) for owning a gun is revealed by the background check that FFLs are required to conduct.  By denying the ability to purchase a handgun from a licensed dealer, Section 922(b)(1) perversely drives this supposedly volatile and untrustworthy 18-to-20-year-old cohort to obtain handguns through unregulated, clandestine purchases from unlicensed private sellers who care only about cash, not background checks.

     5.    Under intermediate scrutiny, a law must "directly and materially advance its asserted interest." *Rubin v. Coors*, 514 U.S. at 488.  The BATF has offered no evidence that Section 922(b)(1) even marginally advances its goal of reducing violent crime by those aged 18 to 20.  In truth, *all of the empirical evidence shows that Section 922(b)(1) has not reduced crime by this age group.*  The only statistical study of Section 922(b)(1) of which we are aware concluded that the provision has had no discernible effect on violent crime by 18-to-20-year-olds.  Indeed, the proportion of violent crime committed by that age group *went up* after enactment of Section 922(b)(1) in 1968.  *See* Gary Kleck, *The Impact of the 1968 Gun Control Act's Restriction on Handgun Purchases by Persons Age 18 to 20* (May 7, 2011) at 4, *available at* Social Science Research Network, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1843526.

**III.   SECTION 922(b)(1) DENIES 18-TO-20-YEAR-OLDS THE EQUAL PROTECTION OF THE LAW.**

Because Section 922(b)(1)'s ban on federally licensed handgun sales burdens 18-to-20-year-olds' fundamental right to keep and bear arms, it is subject to strict scrutiny under Fifth Amendment, a standard that the statute cannot meet.

The Fifth Amendment's due process guarantee includes an equal protection component, *see Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954), and "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment," *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).  Equal protection analysis requires strict scrutiny of "classifications affecting fundamental rights," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), and the Supreme Court has held that the right to keep and bear arms is fundamental.  *McDonald*, 130 S. Ct. at 3037. Unlike the felons whose claim merited only rational-basis review in *United States v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003), law-abiding adults aged 18 to 20 are not "exclude[d] … from the Second Amendment's protection" and their claim is therefore entitled to strict scrutiny.

Section 922(b)(1)'s sales ban cannot be justified by the unfortunate fact that some adults between the ages of 18 and 20 commit crimes with guns.   A law-abiding adult's membership in a particular *group* cannot form the basis for a classification that infringes her fundamental "*individual* right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added).

Are there more criminals in the 18-to-20 cohort than in other age brackets? Perhaps, but resolution of that factual issue is not necessary in this case.  For if that were sufficient to disarm the entire population of 18-to-20-year-olds, then the government could disarm other demographic groups simply because some number of that cohort commits crimes with handguns at a higher rate than the general population.  The most obvious examples might be differentially higher gun-violence rates by males or by the poor.  Could these entire groups therefore be disarmed? Surely not.

Moreover, the demographic that Section 922(b)(1) attempts to disarm is the very group that is most in need of the tools to exercise the Second Amendment right of armed self-defense. As the BATF concedes, "those aged 18 to 20 ha[ve] higher rates of victimization by armed offenders,"  USCA5 140, and self-defense is "the *central component*" of the Second Amendment right.  554 U.S. at 599. Accordingly, even if we ignore *Heller*'s admonition that the interest balancing was settled by ratification of the Second Amendment, the BATF's scales here fail to weigh the fact that, based on the BATF's own statistics, 18-to-20-year-olds have a greater need for armed self-defense.

This fact points to another problem with Section 922(b)(1): vast, and thus fatal, overinclusiveness.  Only a miniscule fraction of 18-to-20-year-olds engage in criminal violence:  FBI and Census Bureau data report that fewer than 1% of 18-

to-20-year-olds were arrested for violent crimes in 2009.[17]   The Government thus

classifies all 18-to-20-year-olds and strips them of their fundamental rights because

of the sins of a very, very few.  That is not how rights work under our Constitution.

*See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("deeply

etched in our law [is the theory that] a free society prefers to punish the few who

abuse rights of speech *after* they break the law than to throttle them and all others

beforehand") (emphasis added); *Hodgson v. Minnesota*, 497 U.S. 417, 446-47

(1990) (" 'The statist notion that governmental power should supersede parental

authority in *all* cases because *some* parents abuse and neglect children is repugnant

to American tradition.' ").

      This is amply demonstrated by *Craig v. Boren*, 429 U.S. 190 (1976), where

the Supreme Court struck down an Oklahoma law that prohibited the sale of "

'nonintoxicating' 3.2% beer" to men under 21 but permitted sales to women 18

and over.  The Court rejected Oklahoma's attempt to rely on statistics showing that

---

[17] The calculation proceeds as follows, with an adjustment for the number of 18-to-20-year-olds to reflect the portion of the total U.S. population covered by the FBI arrest statistics:

66,357 violent crime arrests ÷ (13,212,495 x .781) 18-to-20-year-olds = .0064, or **0.64%**

*See* FBI, *Crime in the United States 2009*, Table 38:  Arrests by Age, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_38.html#overview; U.S. Census Bureau, *Monthly Postcensal Resident Population, by single year of age, sex, race, and Hispanic origin*, July 1, 2009 data, *available for download at* http://www.census.gov/popest/national/asrh/2009-nat-res.html.

18-to-20-year-old men were over *ten times* more likely (2% vs. .18%) than their female counterparts to have been arrested for "alcohol-related driving offenses." *Id.* at 192, 201-02. Although "such a disparity is not trivial in the statistical sense," the Court reasoned that "it hardly can form the basis for employment of a gender line as a classifying device." *Id.*; *see also id.* at 202 ("Certainly if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.' "). Because "the principles embodied by the [fundamental right to keep and bear arms] are not to be rendered inapplicable by statistically measured but loose-fitting generalities," *id.* at 208-09, Section 922(b)(1) must be struck down under the Fifth Amendment as well as the Second.

## CONCLUSION

For these reasons, this Court should REVERSE the judgment below and re-mand for entry of summary judgment in favor of the Plaintiffs.

Dated: December 5,  2011          Respectfully submitted,


                                  s/ Charles J. Cooper
Brian Koukoutchos                 Charles J. Cooper
28 Eagle Trace                    David H. Thompson
Mandeville, LA 70471              Howard C. Nielson, Jr.
Tel: (985) 626-5052               Peter A. Patterson
Email: bkoukoutchos@gmail.com     COOPER & KIRK, PLLC
                                  1523 New Hampshire Ave., NW
                                  Washington, D.C.  20036
                                  Tel: (202) 220-9600
                                  Fax: (202) 220-9601
                                  Email: ccooper@cooperkirk.com


*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2011, I electronically filed the forego-

ing with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF system, which will send notice of such fil-

ing to the following registered CM/ECF user:

Anisha Sasheen Dasgupta
U.S. Department of Justice
Room 7533
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0000
anisha.dasgupta@usdoj.gov


s/ Charles J. Cooper
Charles J. Cooper

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32

   (a)(7)(B) because this brief contains 13,828 words, excluding the parts of the

   brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P.

   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

   this brief has been prepared in proportionately spaced typeface using Micro-

   soft Office Word 2007 with 14-point Times New Roman type.


                                        s/ Charles J. Cooper
                                        Charles J. Cooper
                                        *Attorney for Plaintiffs-Appellants*

                                        Dated:  December 5, 2011

# EXHIBIT A

# Early State Militia Laws

| State | Relevant Statutory Text | Source |
|---|---|---|
| Connecticut | Be it Enacted…That all male Persons, from sixteen Years of Age to Forty-five, shall constitute the Military Force of this State…And be it further Enacted, That all such as belong to the Infantry Companies, and Householders under fifty-five Years of Age, shall, at all Times be furnished at their own Expence, with a well fixed Musket, the Barrel not less than three Feet and an Half long, and a Bayonet fitted thereto, with a Sheath and Belt or Strap for the same, with a Ram-rod, Worm, Priming-wire and Brush, one Cartouch-box carrying fifteen rounds of Cartridges, made with good Musket Powder and Ball, fitting his Gun, six good Flints, and each Militia Man one Canteen holding not less than three Pints, upon Penalty of forfeiting and paying a Fine of Three Shillings for want of such Arms and Ammunition as is hereby required, and One Shilling for each Defect, and the like Sum or Sums for every four Weeks he shall remain unprovided….And be it further enacted, That every Light-Dragoon shall always be provided with…a Case of good Pistols…one Pound of good Powder, three Pounds of sizable Bullets, twelve Flints, a good pair of Boots and Spurs, on Penalty of Three Pounds for want of such Horse, and the Value of each other Article in which he shall be deficient. | An Act for Forming, Regulating, and Conducting the Military Force of this State (Conn. 1786) *in* ACTS AND LAWS OF THE STATE OF CONNECTICUT IN AMERICA 144, 150 (1786). |
| Delaware | §7 And be it enacted, That every person between the ages of eighteen and fifty, or who may hereafter attain to the age of eighteen years, except as before excepted, whose public taxes may amount to twenty shillings a year, shall at his own expence, provide himself; and every apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock, with a bayonet, a cartouch box to contain twenty three cartridges, a priming wire, a brush and six flints, all in good order, on or before the first day of April next, under the penalty of forty shillings, and shall keep the same by him at all times, ready and fit for service, under the penalty of two shillings and six pence for each neglect or default thereof on every muster day, | An Act for Establishing a Militia, §§7-8, 1785 Del. Laws 59. |

1

| | | |
|---|---|---|
| | to be paid by such person if of full age or by the parent or guardian of such as are under twenty-one years, the same arms and accoutrements to be charged by the guardian to his ward, and allowed at settling the accounts of his guardianship.<br><br>….<br><br>§8 And be it enacted, That every male white person within this state, between the ages of eighteen and fifty, or who shall hereafter attain to the age of eighteen years ,except as before excepted, shall attend at the times and places appointed in pursuance of this act for the appearance of the company or regiment to which he belongs, and if any non-commissioned officer or private, so as aforesaid required to be armed and accoutered with his firelock and accoutrements aforesaid in good order, or if any male white person between the ages aforesaid although not required to be so armed and accoutered, shall neglect or refuse to appear on the parade and answer to his name when the roll is called over….shall forfeit and pay the sum of four shillings for every such neglect or refusal. | |
| Georgia | [A]ny male free inhabitant, between the age of sixteen and fifty years, who shall refuse or neglect to attend such company muster, shall be liable to a fine of two dollars….And any private who shall attend such company muster without a gun, in good order, or shall misbehave or disobey while under arms, shall be liable to a fine of six dollars, and shall have powder and lead equal to six common cartridges, or be liable to a fine not exceeding one dollar. | An Act for Regulating the Militia of the State, and for Repealing the Several Laws Heretofore Made for that Purpose, 1786 Ga. Laws. |
| Maryland | §II Be it enacted, by the General Assembly of Maryland, That a lieutenant in each county of this state, of undoubted courage, zeal and attachment to the liberties and independence of America….within ten days after the receipt of their several and respective commissions, shall, by warrant under their hand and seal, appoint fit and proper persons in every county, to make a true and exact list of the names of all able bodied white male persons, between sixteen and fifty years of age.<br><br>…. | An Act to Regulate the Militia, ch. XVII., §§ II, VI, 1777 Md. Laws 361-62. |

2

| | | |
|---|---|---|
| | §VI And be it enacted, That the whole of the militia, so enrolled as aforesaid, shall be subject to be exercised in companies…on each of which days every militia man, so enrolled, shall duly attend, with his arms and accoutrements in good order… | |
| Massachusetts | Whereas the laws now in force for regulating the militia of the Commonwealth, are found to be insufficient for the said purpose:<br><br>I. Be it therefore enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, That the several laws heretofore made for regulating the militia aforesaid, be and herby are repealed. Provided nevertheless, That all actions and processes commenced and depending in any Court within this Commonwealth, upon or by force of the said laws, shall, and may be sustained and prosecuted to final judgment and execution; and that all officers elected, appointed and commissionated agreeably to law, shall be continued in commission, and hold their respective commands in the militia, in the same manner as they would in case the said laws were still in force.<br><br>II. And be it further enacted by the authority of the aforesaid, That the said militia shall be formed into a train-band, and alarm-lift; the train-band to contain all able-bodied men, from sixteen to forty years of age, and the alarm-list all other men under fifty years of age, excepting in both cases such as shall be hereafter by this act exempted.<br><br>….<br><br>XIII. And be it further enacted by the authority aforesaid, That every non-commissioned officer and private folder of the said militia, not under the control of parents, masters or guardians, and being of sufficient ability therefore in the judgment of the selectmen of the town in which he shall dwell, shall equip himself, and be constantly provided with a good fire-arm, with a steel or iron ramrod, a spring to retain the same, a worm, priming wire and brush, a bayonet fitted to his fire-arm, and a scabbard and belt for the fame, a cartridge-box that will hold fifteen cartridges at least, six flints, one pound of powder, forty leaden balls suitable for this | An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose (Mass. 1785) *in* THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, 338, 340-41, 346-47 (1789). |

firearm, a haversack, blanket, and canteen; and if any
non-commissioned officer or private soldier shall
neglect to keep himself so armed and equipped, he shall
forfeit and pay a fine not exceeding three pounds, is
proportion to the value of the article or articles in which
he shall be deficient, at the direction of the Justice of the
Peace before whom trial shall be at hand.

XIV. And be it further enacted by the authority
aforesaid, That all parents, masters and guardians, shall
furnish those of the said militia who shall be under their
care and command, with the arms and equipments afore-
mentioned, under the like penalties for any neglect.

XV. And be it further enacted by the authority aforesaid,
That whenever the selectmen of any town shall judge
any inhabitant thereof, belonging to the said militia,
unable to arm and equip himself in manner as aforesaid,
they shall, at the expense of the town, provide for and
furnish such inhabitant [sic] with the aforesaid arms and
equipments, which shall remain the property of the town
at the expence of which they shall be provided; and if
any soldier shall embezzle or destroy the arms and
equipments, or any part thereof, with which he shall be
to furnished, he shall upon conviction before some
Justice of the Peace in the county where such offender
shall live, be adjudged to replace the article or articles
which shall be by him so embezzeled or destroyed, and
to pay the cost arising from the process against him; and
in café he (hall not within fourteen days after such
adjudication against him perform the same, it shall be in
the power of the selectmen of the town to which he shall
belong, to bind him out to service or labour, for such
term of time as shall in the discretion of the said Justice,
be sufficient to procure a sum of money equal to the
amount of the value of the article or articles embezzeled
or destroyed, and to pay the cost arising as aforesaid…

….

XXXV. And be it further enacted by the authority
aforesaid, That the non-commissioned officers and
private soldiers belonging to the said corps of artillery,
shall be armed and equipped in the same manner as the
train-band of the said militia are in this act directed to
arm and equip themselves.

| | | |
|---|---|---|
| | …. <br><br> XXXVIII. And be it further enacted by the authority aforesaid, That every officer, non-commissioned officer and private, belonging to the said cavalry, shall keep himself provided with a good horse, not less than fourteen hands and a half high, a saddle, bridle, holsters, pistols, sword, boots and spurs, carbine with a spring and sling, a cartouch-box, with twelve rounds of cartridge and ball for his carbine, and fix for each pistol, nine flints, a cloak and canteen. <br><br> …. <br><br> XL. And be it further enacted by the authority aforesaid, That the officers, non-commissioned officers and privates belonging to the said corps of artillery and cavalry, shall be subject to the same rules and regulations as are by this act provided for the train-band in the militia aforesaid; and the several companies belonging to the said corps shall be subject to the immediate orders of the major-neral commanding the division within which the same shall be raised. | |
| New Hampshire | Whereas it is the duty and interest of every State, to have the militia thereof properly armed, trained, and in complete readiness to defend against every violence or invasion whatever: And Whereas the laws now in force respecting the regulation of the militia are insufficient for those purposes: Be it therefore enacted…That the training band, so called, shall consist of all the able bodied male persons within the State, from sixteen years old to forty… <br><br> …. <br><br> And be it further enacted by the authority aforesaid, That every non-commissioned officer and soldier, both in the alarm list and training band, shall be provided and have constantly in readiness, a good musquet and bayonet fitted thereto, with a good scabbard and belt, a worm, priming-wire and brush, a cartridge-box that will hold, at least twenty-four rounds, six flints, and a pound of powder, forty leaden balls fitted to his gun, a knapsack, a blanket, and a canteen that will hold one quart. | An Act for Forming and Regulating the Militia within this State, and for Repealing All the Laws Heretofore Made for that Purpose (N.H. 1786) *in* THE LAWS OF THE STATE OF NEW HAMPSHIRE 356-57, 359-60 (1792). |

| | | |
|---|---|---|
| | Such of the training band as are under the care of parents, masters, or guardians, are to be furnished by them with such arms and accoutrements; and such of the training band, or alarm list, as shall be unable to furnish themselves, shall make application to the selectmen of the town, who are to certify to his captain, or commanding officer, that he is unable to equip himself; and the said selectmen shall, at the expense of the town, provide for, and furnish such person with arms and equipments; which arms and equipments shall be the property of the town at whose expense they are provided… | |
| New Jersey | And Be It Enacted, That the Captain or Commanding Officer of each Company shall keep a true and perfect List or Roll of all effective Men between the Ages of sixteen and fifty Years, residing within the District of such Company….And Be It Enacted, That every Person enrolled as aforesaid shall constantly keep himself furnished with a good Musket, well fitted with a Bayonet, a Worm, a Cartridge-Box, twenty-three Rounds of Cartridges sized to his Musket, a Priming-Wire, Brush, six Flints, a Knapsack and Canteen, under the Forfeiture of Seven Shillings and Sixpence for Want of a Musket, and One Shilling for Want of any other of the aforesaid Articles, whenever called out to Training or Service….Provided always, That if any Person be furnished as aforesaid with a good Rifle-Gun, the Apparatus necessary for the same, and a Tomahawk, it shall be accepted in Lieu of the Musket and the Bayonet and other Articles belonging thereto. | An Act for the Regulating, Training, and Arraying of the Militia and for Providing More Effectually for the Defence and Security of the State, ch. XIII, §§10-11 1781 N.J. Acts 39, 42-43. |
| New York | Be it enacted by the people of the State of New-York, represented in Senate and assembly, and it is hereby enacted by the authority of the same, That every able-bodied male person, being a citizen of this state, or of any of the United States, and residing in this state…and who are of the age of sixteen, and under the age of forty-five years, shall, by the captain or commanding officer of the beat in which such citizens shall reside, within four months after the passing of this act, be enrolled in the company of such beat. That every captain or commanding officer of a company, shall also enroll every citizen as aforesaid, who shall, from time to time, arrive at the age of sixteen years, or come to reside within his beat, and without delay notify such enrolment | An Act to Regulate the Militia (N.Y. 1786) *in* Thomas Greenleaf, ed., 1 LAWS OF THE STATE OF NEW YORK 227-28 (1792). |

| | | |
|---|---|---|
| | to such citizen so enrolled, by some non-commissioned officer of the company, who shall be a competent witness to prove such notice.…That every citizen so enrolled and notified, shall within three months thereafter, provide himself, at his own expence, with a good musket or firelock, a sufficient bayonet and belt, a pouch, with a box therein to contain not less than twenty-four cartridges suited to the bore of his musket or firelock, each cartridge containing a proper quantity of powder and ball, two spare flints, a blanket and knapsack; and shall appear so armed, accoutered and provided when called out to exercise or duty, as herein after directed. | |
| North Carolina | §2 Be it therefore enacted by the General Assembly of the State of North Carolina, and it is hereby enacted by the authority of the same, that the Militia of this State be divided into six Brigades, viz.: One in each of the Districts of Edenton, New Bern, Wilmington, Halifax, Salisbury and Hillsborough. And each Brigade to be commanded by a Brigadier General. And the Militia of every County shall consist of all the effective men from sixteen to fifty years of age inclusive.<br><br>….<br><br>§4. And be it further enacted, that each Militia soldier shall be furnished with a good Gun, shot bag and powder horn, a Cutlass or Tomahawk, and every Soldier neglecting to appear at any muster, accoutered as above, shall forfeit for every such offence two shillings and six pence (unless he can make it appear that they were not to be procured) to be recovered as other fines. And where any person shall appear to the Field Officers not possessed of sufficient property to afford such arms and accouterments, the same shall be procured at the expence of the County, and given to such persons on muster Days, or when ordered into service, which Guns and Accouterments after such service, shall be returned to the Captain of the Company, and by him carefully preserved for future occasions. | An Act to Establish a Militia in this State, ch. 1, §§2, 4, 1777 Laws of N.C. 1-2. |
| Pennsylvania | § I. Whereas a militia law upon just and equitable principles hath ever been regarded as the best security of liberty and the most effectual means of drawing forth and exerting the natural strength of a state… | An Act to Regulate the Militia of the Commonwealth of Pennsylvania, ch. |

| | | DCCL, §§I, III-IV, X, 1776-77 Penn. Stat. 75-78, 80. |
|---|---|---|
| | …. | |
| | §III. Be it enacted…, and it is hereby enacted by the Representatives of the Freemen of the Commonwealth of Pennsylvania in the General Assembly met, and by the authority of the same, That the president or in his absence [the] vice-president of the supreme executive council of this commonwealth shall commissionate one reputable freeholder in the city of Philadelphia and one in each county within this state to serve as lieutenant of the militia for the said city and counties respectively. | |
| | …. | |
| | § IV. And be it further enacted….That the said lieutenant or sub-lieutenants as aforesaid shall issue his or their warrant to the constable of each township, borough, ward, or district in the said city and counties respectively or to some other suitable person, commanding him in the name of this commonwealth to deliver to him or them…a true and exact list of the names and surnames of each and every male white person usually inhabiting or residing within his township, borough, ward, or district between the ages of eighteen and fifty-three years capable of bearing arms. | |
| | …. | |
| | § X. And be it further enacted…That the whole of the militia so enrolled as aforesaid shall be subject to be exercised in companies under their respective officers…and on each of which days every militia-man so enrolled shall duly attend with his arms and accoutrements in good order. | |
| Rhode Island | [A]ll effective Males between the Ages of Sixteen and Fifty . . .  shall constitute and make the military Force of this State….And be it further Enacted by the Authority aforesaid, That each and every effective Man as aforesaid shall provide, and at all times be furnished, at his own Expense (excepting such persons as the Town-Councils of the Towns in which they respectively dwell or reside shall adjudge unable to purchase the same) with one good Musquet, and a Bayonet fitted thereto….Be it further enacted that every Person who | An Act for the Better Forming, Regulating and Conducting the Military Force of this State, 1780 R.I. Acts 29, 31-32, 35. |

| | | |
|---|---|---|
| | shall at any Time be found deficient in any of the Arms, Accoutrements and Equipage, as by this act prescribed and directed, excepting those before excepted, such Delinquent shall forfeit and pay a Fine for every such delinquency….All Male Persons between the Ages of Fifty and Sixty, if able in the Judgment of the respective Town-Councils, shall be  at all Times armed, accoutered and equipped, in Manner aforesaid upon the same Penalty as though they were held to military Duty. | |
| South Carolina | [I]t shall be lawful for the Governor, or Commander in Chief of this State, to order the Militia of this State to assemble once in every six months in the City of Charleston, and once in every twelve months in the other districts throughout the state…That every person who, on being summoned,  shall willfully neglect to turn out at a regimental muster, properly armed and accoutered…shall be fined in a sum not exceeding four dollars….And be it enacted by the authority aforesaid, that the following persons shall be excused from militia duty…all persons under the age of eighteen years, or above the age of fifty years. | An Act for the Regulation of the Militia in this State, 1784 S.C. Acts 68-69. |
| Vermont | And that every able-bodied male person, being a citizen of this state, or of any of the united states and residing in this state…who are of the age of sixteen and under the age of fortyfive [sic] years, shall by the captain or commanding officer of the beat in which such citizen shall reside, within four months after passing of this act, be enrolled in the company of such beat….And every citizen, so enrolled and notified, shall within nine months there after, provide himself, at his own expence with a good musket or firelock, with a priming wire and brush, a sufficient bayonet and belt, with a cartouch box, with three pounds of lead bullets suitable to the bore of his musket or firelock, a good horn containing one pound of powder, and four spare flints; and shall appear so armed, accoutred and provided, when called out to exercise or duty, if thereto required. | An Act Regulating the Militia of the State of Vermont. for Regulating the Militia of this State (Vt. 1787) *in* STATUTES OF THE STATE OF VERMONT REVISED AND ANNOTATED, 107 (1791). |
| Virginia | Be it enacted, That all free male persons between the ages of eighteen and fifty years…shall be enrolled or formed into [militia] companies….Every Officer and soldier shall appear…armed, equipped, and accoutered as follows: The County Lieutenants, Lieutenant Colonels Commandant and Majors with a sword: the | An Act for Amending the Several Laws for Regulating and Disciplining the |

|  | Captains, Lieutenants, and Ensigns, with a sword and espontoon; every non-commissioned officer and private, with a good clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen; and moreover, each non-commissioned officer and private shall have at every muster, one pound of good powder and four pounds of lead; including twenty blind cartridges. | Militia, and Guarding against Invasions and Insurrections, ch. LXVII, 1784 Va. Acts 16. |