No. 11-10959

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

NATIONAL RIFLE ASSOCIATION OF AMERICA, INCORPORATED;
ANDREW M. PAYNE; REBEKAH JENNINGS; BRENNAN HARMON,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; B.
TODD JONES, In His Official Capacity as Acting Director of the Bureau of
Alcohol, Tobacco, Firearms, and Explosives; ERIC H. HOLDER, JR., U.S.
ATTORNEY GENERAL,

*Defendants-Appellees*.

_____

On Appeal from United States District Court for the Northern District of Texas
Civil Case No. 5:10-cv-00140-C (Honorable Sam Cummings)

_____

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

_____

Brian Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052

Charles J. Cooper
David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
COOPER AND KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600; (202) 220-9601 Fax

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. National Rifle Association of America, Inc. ("NRA"), Plaintiff-Appellant. The NRA has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

2. Rebekah Jennings, Brennan Harmon, and Andrew Payne, Plaintiffs-Appellants.

3. Paul White, owner and operator of My Favorite Gun Store in Richmond, Utah. *See* USCA5 670.

4. Roger Koeppe, owner and operator of Armory Management and Supply Services in Houston, Texas. *See* USCA5 673.

5. Cooper & Kirk, PLLC, Counsel for Plaintiffs-Appellants (Charles J. Cooper, David H. Thompson, Howard C. Nielson, Jr., Peter A. Patterson)

6. Law Offices of Fernando M. Bustos, P.C., Counsel for Plaintiffs-Appellants (Fernando M. Bustos)

7. Brian S. Koukoutchos, Counsel for Plaintiffs-Appellants

8. National Shooting Sports Foundation, Inc., Amicus for Plaintiffs-Appellants

9. Lawrence G. Keane, Of Counsel for National Shooting Sports Foundation

10. Kasowitz, Benson, Torres & Friedman, LLP, Counsel for Amicus for Plaintiffs-Appellants (Christopher Paul Johnson and Meredith Anne Wholley)

11. Brady Center to Prevent Gun Violence, Amicus for Defendants-Appellees

12. Graduate Student Assembly and Student Government of the University of Texas at Austin, Amicus for Defendants-Appellees

13. Mothers Against Teen Violence, Amicus for Defendants-Appellees

14. Students For Gun-Free Schools In Texas, Amicus for Defendants-Appellees

15. Texas Chapters of the Brady Campaign to Prevent Gun Violence, Amicus for Defendants-Appellees

16. Texas Civil Rights Project, Counsel for Amici for Defendants-Appellees (Scott Charles Medlock)

17. Hogan Lovells US LLP, Counsel for Amici for Defendants-Appellees (Jonathan L. Diesenhaus and S. Chartey Quarcoo)

18. Brady Center, Counsel for Amici for Defendants-Appellees (Jonathan E. Lowy and Daniel R. Vice)

Dated: February 16, 2012       Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS

TABLE OF AUTHORITIES ......................................................................... ii

I.    PLAINTIFFS HAVE STANDING. ........................................................... 1

II.   HISTORY FORECLOSES THE GOVERNMENT'S SALES BAN. ................................. 6

III.  THE GOVERNMENT'S SALES BAN FAILS UNDER ANY SECOND
      AMENDMENT ANALYSIS. ................................................................ 18

      A.    Plaintiffs' Claims Should Be Resolved Based on Text
            and History. ........................................................ 18

      B.    In the Alternative, Strict Scrutiny Applies. ........................................ 19

      C.    The Government's Sales Ban Fails Even Intermediate Scrutiny ........ 21

IV.  THE SALES BAN VIOLATES EQUAL PROTECTION. .......................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page**

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................................... 7

*Bellotti v. Baird*, 443 U.S. 622 (1979) ................................................................... 16

*Biffer v. City of Chicago*, 116 N.E. 182 (1917) ..................................................... 17

*Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729 (2011) ...................... 12

*Carey v. Population Serv. Int'l*, 431 U.S. 678 (1977) .............................................. 7

*City of Salina v. Blaksley*, 83 P. 619 (Kan. 1905) ........................................... 17, 18

*Coleman v. State*, 32 Ala. 581 (1858) ................................................................... 17

*Commonwealth v. Gamble*, 11 Serg. & Rawle 93 (Pa. 1824) ........................... 9, 10

*Craig v. Boren*, 429 U.S. 190 (1976) ............................................................... 1, 2, 3

*District of Columbia v. Heller*, 554 U.S. 570 (2008)6, 8, 9, 12, 13, 17, 18, 19, 21, 24

*Doe v. Bolton*, 410 U.S. 179 (1973) ......................................................................... 3

*Gabree v. King*, 614 F.2d 1 (1st Cir. 1980) ........................................................... 26

*H.L. v. Matheson*, 450 U.S. 398 (1981) ............................................................... 3, 5

*Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148
(D.C. Cir. 2004) ............................................................................................... 17

*Heller v. District of Columbia*, No. 10–7036, __ F.3d __, 2011 WL 4551558
(D.C. Cir. Oct. 4, 2011) ............................................................. 13, 17, 18, 19, 20

*Huddleston v. United States*, 415 U.S. 814 (1974) ............................................... 20

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ................. 1

*In re Gault*, 387 U.S. 1 (1967) ............................................................................. 22

*In re Opinion of the Justices*, 39 Mass. 571 (1838) ................................................ 9

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) .................................... 19, 20

*National Treasury Employees Union v. U.S. Dep't of Treasury*, 25 F.3d 237
(5th Cir. 1994) .................................................................................................... 1

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ............................................................. 15

*Parman v. Lemmon*, 244 P. 227 (Kan. 1925) ....................................................... 17

*Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52 (1976)..............17

*Powell v. McCormack*, 395 U.S. 486 (1969) ...........................................13

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) ..........................5

*Richardson v. Ramirez*, 418 U.S. 24 (1974) ..............................................13

*Roe v. Wade*, 410 U.S. 113 (1973)..........................................................6

*Roper v. Simmons*, 543 U.S. 551 (2005)...............................................15, 16

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) ...............................................24

*Schall v. Martin*, 467 U.S. 253 (1984)......................................................16

*State v. Callicutt*, 69 Tenn. 714 (1878) ....................................................17

*Stiles v. Blunt*, 912 F.2d 260 (8th Cir. 1990) .........................................21

*United States v. Bainbridge*, 24 F. Cas. 946 (C.C.D. Mass. 1816) ..................9, 10

*United States v. Blakeney*, 44 Va. 405 (1847) ...............................................9

*United States v. Coil*, 442 F.3d 912 (5th Cir. 2006) ...................................1

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003)...................................20

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001)....................................8

*United States v. Jones*, 132 S. Ct. 945 (2012) .........................................13

*United States v. Moore*, 84 F.3d 1567 (9th Cir. 1996) .................................4

*United States v. Olson*, 473 F.2d 686 (8th Cir. 1973) .........................................26

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................19, 22, 23

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*,
425 U.S. 748 (1976)..............................................................3, 4, 5

## Constitutional and Legislative Materials

U.S. Const. amend. XXVI ...................................................15

10 U.S.C. § 505 ..................................................................16

18 U.S.C. § 922(b)(1)...........................................................1

18 U.S.C. § 922(t) ...............................................................22

18 U.S.C. § 922(x)(3)(A)(ii) ................................................25

18 U.S.C. § 922(x)(5).........................................................22

50 U.S.C. app. § 453...........................................................16

S. Rep. 90-1097 ................................................................21, 22, 23

1 STAT. 271 ........................................................................................8

1882 W. VA. ACTS 421 ...................................................................15

1890 WYO. SESS. LAWS 127, 140 ...................................................15

KY. REV. STAT. § 2.015 (1994) .......................................................18

ME. REV. STAT. ch. 143, § 2 (1904) ...............................................15

ME. REV. STAT. ch. 143, § 22 (1904) .............................................15

TEX. FAM. CODE § 101.003 ............................................................15

TEX. FAM. CODE § 151.001(a) ........................................................17

## Other

1 BLACKSTONE COMMENTARIES (1765) ......................................10, 17

Age of Majority By State and United States Possessions, DoD Financial
    Management Regulation, Volume 7B, Appendix H (Jan. 2012), *at*
    http://comptroller.defense.gov/fmr/07b/07b_appendix_h.pdf ............15

Akhil Reed Amar, *The Fifteenth Amendment and "Political Rights,"*
    17 CARDOZO L. REV. 2225 (1996) ........................................16

BLACK'S LAW DICTIONARY (9th ed. 2009) .....................................15, 22

Charles Lee, *A Friendly Address to all reasonable Americans, on the Subject
    of our Political Confusions* (Feb. 3, 1775), *in* MEMOIRS OF THE LIFE OF
    THE LATE CHARLES LEE, ESQ. 136 (1792) ..........................................7

FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 166 (2005), *at*
    http://www.atf.gov/publications/download/p/atf-p-5300-4.pdf ...........4

HOMER H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES
    § 8.1 (2d ed. 1988) ..............................................................22

Journal of Convention: Wednesday, February 6, 1788, *reprinted in* DEBATES
    AND PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF
    MASSACHUSETTS 86 (1856) .....................................................14

Larry Barnett, *The Roots of Law*, 15 AM. U. J. GENDER SOC. POL'Y & L. 613
    (2007) ..............................................................................15

*Lowering the Voting Age to 18*, S. Rep. 92-26 (March 8, 1971) ...........16

Op. Att'y Gen. Ky. 94-14 (Mar. 3, 1994) ......................................18

Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 LAW & CONTEMP. PROBS. 125 (1986) ............................................................14

*The Address and Reasons of Dissent of the Pennsylvania Minority of the Convention of the State of Pennsylvania and their Constituents* (1787), *reprinted in* 2 B. SCHWARTZ, THE BILL OF RIGHTS 665 (1971) .........................14

The Twelve United Colonies, by their Delegates in Congress, to the Inhabitants of Great Britain (July, 1775), *in* 2 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789 (1905) .................................................................................7

## I. PLAINTIFFS HAVE STANDING.

Under controlling precedent, *either* a potential vendor *or* a potential purchaser has standing to challenge a restriction on the vendor that burdens the purchaser's constitutional rights. Accordingly, the NRA has standing to challenge Section 922(b)(1) on behalf of its members who are firearms dealers subject to that statute's criminal prohibition. And both the Individual Plaintiffs and the NRA have standing to bring this suit as, or on behalf of, 18-20-year-olds whose constitutional rights are burdened by the statute.[1]

1. "The Supreme Court has consistently upheld the standing of vendors to challenge the constitutionality of statutes on their customers' behalf where those statutes are directed at the activity of the vendors." *United States v. Coil*, 442 F.3d 912, 915 n.2 (5th Cir. 2006). "[V]endors … have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market." *Craig v. Boren*, 429 U.S. 190, 195

---

[1] The NRA has standing to sue for its members if: (1) any of its members would have standing to sue individually, (2) the interests it seeks to vindicate are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977); *National Treasury Employees Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 241 (5th Cir. 1994). As demonstrated in the text, both the NRA's FFL members and its 18-20-year-old members have standing to sue individually. There is no dispute that the remaining requirements for associational standing are satisfied here, where the NRA seeks declaratory and injunctive relief to vindicate Second Amendment rights.

(1976).  In *Craig* the Court held that a licensed vendor of low-alcohol beer had standing to challenge an Oklahoma statute barring vendors from selling to 18-to-20-year-old men but allowing sales to women that age:

> The legal duties created by the statutory sections under challenge are addressed directly to vendors such as appellant.  She is obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyers' market, or to disobey the statutory command and suffer, in the words of Oklahoma's Assistant Attorney General, 'sanctions and perhaps loss of license.'  This Court repeatedly has recognized that such injuries establish the threshold requirements of a 'case or controversy' mandated by Art. III.

*Id*. at 194 (citations omitted).

The Government claims that in relying on this case to uphold Plaintiffs' standing, the district court "conflated the constitutional and prudential requirements for standing."  Gov't Br. 26.  Nonsense:  *Craig* squarely held that the "operation of [the challenged law] plainly has inflicted 'injury in fact' upon appellant sufficient to guarantee her 'concrete adverseness,' and to satisfy the *constitutionally based standing requirements imposed by Art. III*."  429 U.S. at 194 (emphasis added) (citations omitted).

Here also, FFLs are forced to choose between "direct economic injury through the constriction of [their] buyers' market" and violating a criminal statute and risking "sanctions and perhaps loss of license."  *Id*.  Although the Government

claims the FFLs have not demonstrated economic loss, *see* Gov't Br. 25, they have

shown far more than the vendor in *Craig*, identifying specific sales that would

have occurred but for section 922(b)(1), *see* USCA5 671-72. The Government

cannot identify even a single case—let alone a controlling precedent from the

Supreme Court or this Court—holding that such concrete allegations of injury are

insufficient (or even required) to establish standing for a vendor to challenge a

statute that restricts its operations.

    2. Nor is such a vendor or service provider the only party who can challenge

laws such as these. The Supreme Court has repeatedly upheld the ability of

individual consumers who are burdened by such restrictions to sue as well. In *Doe*

*v. Bolton*, for example, the Supreme Court held that not only "Georgia-licensed

doctors consulted by pregnant women" but also a pregnant woman herself had

standing to challenge a statute criminalizing most abortions, even though "[t]he

physician [was] the one against whom these criminal statutes directly operate[d]."

410 U.S. 179, 188 (1973); *see also H.L. v. Matheson*, 450 U.S. 398, 400-01, 405-

07 (1981) (holding that 15-year-old girl had standing to challenge a criminal

statute requiring physicians to notify the parents or guardians of minors seeking to

obtain abortions). Similarly, *Virginia State Board of Pharmacy v. Virginia*

*Citizens Consumer Council* allowed a challenge to a statute prohibiting

pharmacists from advertising their prices for prescription drugs brought "not by

one directly subject to its prohibition, that is, a pharmacist, but by prescription drug consumers who claim that they would greatly benefit if the prohibition were lifted and advertising freely allowed." 425 U.S. 748, 749, 753 (1976).

The Government argues that 18-20-year-old adults who are barred by Section 922(b)(1) from purchasing handguns from licensed dealers do not suffer any injury because the statute does not bar them from possessing or using handguns and because they may receive handguns as gifts from their parents or other adults. *See* Gov't Br. 19-23.[2] This argument is doomed by its own logic: if federal law, for example, required a wife to get her husband's permission before buying a gun, or applied Section 922(b)(1)'s age restriction only to certain minorities, *surely women and minorities would have standing to challenge these measures in court.*

_____

[2] Below, the Government asserted that "Plaintiffs are prohibited from purchasing a handgun directly from the dealer of their choosing, without being the recipient of a gift." USCA5 758. The Government now asserts that Plaintiffs also could have their parents purchase handguns for them with Plaintiffs' own money. Gov't Br. 19. This is immaterial to Plaintiffs' standing or the merits of this case, as even if true Section 922(b)(1) still would impermissibly subject Plaintiffs' fundamental Second Amendment rights to parental veto.

Furthermore, the Government's position resurrects a view that it abandoned in its official publications nearly 20 years ago and is contrary to current ATF guidance indicating that the source of funds distinguishes a legal gift purchase from an illegal straw purchase, even if the ultimate recipient is not prohibited from acquiring the firearm. FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 166 (2005), *at* http://www.atf.gov/publications/download/p/atf-p-5300-4.pdf. *United States v. Moore*, 84 F.3d 1567 (9th Cir. 1996), which the Government cites on this point, was reversed by the *en banc* court (albeit on different grounds) and is thus of little significance, *see* 109 F.3d 1456.

As this Court has recognized, "Supreme Court cases hold that ... *restricting the ability to purchase* an item is tantamount to restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008). Regulation that stops short of a total ban is nonetheless subject to constitutional scrutiny. In *Virginia State Board*, prescription-drug consumers were permitted to challenge a statute prohibiting pharmacists from advertising prices even though consumers could obtain such information by other methods, including by simply phoning the pharmacies. *See* 425 U.S. at 752, 757 n.15.[3] Similarly, in *Matheson*, the plaintiff was permitted to challenge a statute that did not impose an absolute bar on access to abortion, but only required parental notification. *See* 450 U.S. at 400.

If a consumer has standing to challenge a law that bars a vendor from merely providing pricing information about a product unless the consumer requests it, *see Virginia State Board*, he surely has standing to challenge a law that bars the vendor from actually selling him that product. And if a *minor* has standing to challenge a statute that requires merely that her parents be notified of, but not necessarily consent to, an abortion, *see Matheson*, then surely an *adult* has standing to

---

[3] *Virginia State Board* asserted a right to receive pricing information about a product rather than a right to the product itself. *See* Gov't Br. 24. But the fact that plaintiffs were allowed to challenge the statute restricting their access to prices even though other avenues of obtaining that information remained available surely forecloses the Government's argument that a significant restriction on access to a product to which a plaintiff claims a constitutional right does not impose a judicially cognizable injury.

challenge a statute that does not permit her to obtain a handgun from a licensed dealer (even *with* parental consent) unless her parents themselves purchase the handgun and then give it to her.  Under these and other precedents, there can be no doubt that Plaintiffs have standing to sue as, and on behalf of, 18-20-year-olds "thwarted by the [Federal] criminal ... laws" that prohibit licensed dealers from selling them handguns, to which they claim a constitutional right.  *Roe v. Wade*, 410 U.S. 113, 124 (1973).

## II.  HISTORY FORECLOSES THE GOVERNMENT'S SALES BAN.

The right to keep and bear arms "belongs to all Americans," and "the central component of the right" is "self-defense."  *District of Columbia v. Heller*, 554 U.S. 570, 581, 599 (2008).  "[T]he narrower purpose that prompted codification of the right," however, was "to prevent elimination of the militia"—"those who were male, able-bodied, and *within a certain age range*."  *Id*. at 580, 599-600 (emphasis added).  The age range the founding generation understood to constitute the militia unquestionably included 18-20-year-olds, placing them squarely within the class of Americans whose protection motivated adoption of the Second Amendment.  *See* Pl. Br. 13-20.  It follows that 18-20-year-olds have a fundamental right to keep and bear firearms—including handguns—for self-defense.  *See Heller*, 554 U.S. at 634-35.  And it also follows that this fundamental right includes the right to

*purchase* firearms.  *See* Pl. Br. 22-32; *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them").[4]

The Government nevertheless contends that banning 18-20-year-olds from the commercial handgun market "comport[s] with historical understandings of the Second Amendment right."  Gov't Br. 29.  The Government, however, has produced nothing to undermine our showing that the founding generation understood the right to keep and bear arms to extend to 18-20-year-olds.

1.  The Government first points to the fact that, at common law, the age of majority was 21 and thus, at the founding, 18-20-year-olds were "minors" or "infants."  *See* Gov't Br. 36.  But the label "infant" or "minor," standing alone, does not imply that 18-20-year-olds were understood to have a restricted right to arms.  *See* Pl. Br. 21-22.[5]

---

[4] The Government fails in its attempt to distinguish *Carey v. Population Serv. Int'l*, 431 U.S. 678 (1977), because that case equated restricting access to an item "essential to the exercise" of a constitutional right (in that case, birth control), to a direct ban on use of that item, *see id.* at 688-89.  Indeed, the Court stated that a sales ban "might have an even more devastating effect" than a direct ban on use because a sales ban is "more easily and less offensively enforced."  *Id*. at 688.

[5] *See also* The Twelve United Colonies, by their Delegates in Congress, to the Inhabitants of Great Britain (July, 1775), *in* 2 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 163, 169 (1905) ("Should Victory declare in your Favour, yet Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest."); Charles Lee, *A Friendly Address to all reasonable Americans, on the Subject of our Political Confusions* (Feb. 3, 1775), *in* MEMOIRS OF THE LIFE OF THE LATE CHARLES LEE, ESQ. 136, 150 (1792) ("The yeomanry of America … are accustomed from their infancy to fire arms").

Second, the Government points to a few colonial and State laws purportedly exempting 18-20-year-olds from militia service.[6] None of these laws was in force when the Second Amendment was ratified. But more importantly, their existence does not call into question the founding generation's understanding that the right to keep and bear arms extended to 18-20-year-olds. The people's militia that the Second Amendment was designed to protect was a pre-existing body that consisted *not* of "state- and congressionally-regulated military forces," but rather of "all able-bodied men." *Heller*, 554 U.S. at 596. Both the State militia laws in force at the ratification of the Second Amendment and the Federal Militia Act of 1792, which required enrollment at "the age of eighteen years," 1 STAT. 271, are powerful evidence that 18-20-year-olds were understood to be part of this body, an understanding that is not undercut by the fact that at other times a handful of states chose not to include 18-20-year-olds in their organized militias. *Heller,* 554 U.S.

_____

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), does not compel a contrary conclusion. *See* Pl. Br. 20-22.

[6] There is less to these laws than the Government implies. The Government identifies one colony (Virginia), one pre-ratification State (New Jersey), and seven post-ratification States (Delaware, Georgia, Kansas, New Jersey, North Carolina, Ohio, and Pennsylvania) that enacted such laws. But the 1778 New Jersey law permitted 18-20-year-olds to enroll; it simply did not require enrollment until 21. *See* USCA5 935. And it was not a general militia law but rather a special enactment to supply militiamen for a specific, limited time and purpose. *See id.* Of the seven post-ratification laws, only three were enacted within 50 years of the Second Amendment's ratification. And those three did not suspend enrollment of 18-20-year-olds; they merely exempted them from their militia responsibilities during peacetime. *See id.* at 921 (Delaware); *id.* at 922 (New Jersey); *id.* at 923 (Pennsylvania).

at 596 ("Although the militia consists of all able-bodied men, the federally organized militia may consist of a subset of them.").[7]

Third, the Government points to a 1755 Pennsylvania colonial law and three post-ratification State laws (from 1818, 1835, and 1863) that required parental consent for 18-20-year-olds to enroll in the militia. *See* Gov't Br. 39, 40-41. None of these laws was in force when the Second Amendment was ratified, and the Government has no evidence that such requirements were common or customary. *See United States v. Bainbridge*, 24 F. Cas. 946, 950 (C.C.D. Mass. 1816) (Story, J.) ("the state legislature ... has, without the consent of parents, obliged minors to be enrolled in the militia"); *United States v. Blakeney*, 44 Va. 405, 411 (1847) ("The common law of England has never interfered with the free and voluntary enlistment of minors capable of bearing arms [into the armed forces]"); *Commonwealth v. Gamble*, 11 Serg. & Rawle 93, 93-94 (Pa. 1824) ("common law of England" provides that "a minor be at liberty to enter into a contract to serve the state, ... and there is nothing in the constitution of the government, or of the circumstances of the people of this country, to afford a reason why it should not be

---

[7] *In re Opinion of the Justices*, 39 Mass. 571 (1838), as the Government concedes, held that the Militia Act of 1792 permitted a State to "'exempt from enrolment in the militia, all persons under twenty-one and over thirty years of age.'" Gov't Br. 39 (quoting *id.* at 576). Rather than implying that the Second Amendment applies only to people over 21 (and under 30), the case simply recognizes that the Militia Act did not require States to enroll the entire portion of the population that was understood to constitute the militia.

the common law here").  Furthermore, these laws did not restrict 18-20-year-olds'

right to acquire firearms or subject that right to parental control; they simply

required parental consent before permitting minors to make an enlistment

commitment that could have serious consequences for the parent-child

relationship.  *See Bainbridge*, 24 F.Cas. at 950 (wartime service could "expose

minors to the constant perils and labors of regular soldiers, and altogether deprive

their parents of any control over their persons or services").

Fourth, the Government points to militia laws—three of which were in place

when the Second Amendment was ratified—that required parents to acquire arms

for minor children under their care and control.  *See* Gov't Br. 37 & n.14.  But

these laws provide scant evidence that 18-20-year-olds had no Second Amendment

rights.  These laws did nothing to *restrict* 18-20-year-olds' access to arms; rather,

they *facilitated* arming those who may have had difficulty acquiring arms on their

own, whether on account of their minority status or for another reason.  *See* 1

BLACKSTONE COMMENTARIES *453 ("It is generally true, that an infant can[not] ...

make ... any manner of contract, that will bind him."); *id.* at *441 ("A father ... may

receive the profits [of his child's estate] during the child's minority" and "may

indeed have the benefit of his children's labour").

Indeed, many of the same States enacted laws providing arms for the poor at

public expense.  *See, e.g.*, USCA5 687, 689.  Surely these laws do not provide a

founding-era foothold for barring the poor from purchasing handguns on the commercial market.

This connection between minors and the poor is illustrated by the very legislative history cited by the Government; specifically, a discussion of a failed amendment to the Militia Act that would have provided that those who cannot provide their own firearms "shall be furnished at the expense of the United States." USCA5 930. The discussion started with the poor and then turned to minors, and it shows that the Framers believed that having parents arm minors was preferable to having the government do so, because if the government provided arms it could later take them away. *See id.* at 931 (Rep. Wadsworth) ("The motion at first appeared to be in favor of poor men, who are unable to purchase a firelock; but now it seems, minors and apprentices are to be provided for. Is there a man in this House who would wish to see so large a proportion of the community, perhaps one-third, armed by the United States, and liable to be disarmed by them? Nothing would tend more to excite suspicion, and rouse a jealously dangerous to the Union."). It shows, in other words, the jealously with which the founding generation guarded the right to arms of even minor 18-20-year-olds.

In sum, the Government has not pointed to any founding-era antecedent to a governmental ban on 18-20-year-olds purchasing handguns in the commercial market. As the Supreme Court explained in striking down a ban on selling violent

video games to minors, this failure dooms the Government's effort to ground its

ban in the Framers' understanding of the Constitution:

> Most of [the] dissent is devoted to the proposition that parents have
> traditionally had the power to control what their [minor] children hear
> and say. This is true enough.... But it does not follow that the state
> has the power to prevent children from hearing and saying anything
> *without their parents' prior consent*.... Such laws do not enforce
> *parental* authority over children's speech and religion; they impose
> *governmental authority*, subject only to a parental veto.

*Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2736 n.3 (2011); *see*

*also* Tr. of Oral Arg. at 77, *Heller*, 554 U.S. 570 (Chief Justice Roberts: "[Y]ou

would define 'reasonable' in light of the restrictions that existed at the time the

amendment was adopted.... [P]resumably there are lineal descendants of the

restrictions as well.").

2. Moving beyond the framing, the Government cites laws of 22 States and

the District of Columbia enacted between 1856 and 1923 (only two of which were

enacted before the Civil War) that restricted minors under 21 years of age from

purchasing or using certain types of firearms. *See* Gov't Br. 31-32. *Heller*, to be

sure, reviewed some late-19th century sources, but it cautioned that such sources

"do not provide as much insight into … original meaning as earlier sources." 554

U.S. at 614. Indeed, the Court stressed that "[c]onstitutional rights are enshrined

with the scope they were understood to have when the people adopted them,

whether or not future legislatures or (yes) even future judges think that scope too

broad." *Id.* at 634-35. Thus, given the clear evidence that the Second Amendment was originally understood to extend to 18-20-year-olds, these later legislative enactments are of little moment. *The Government cannot cite any precedent for overruling the understanding of a constitutional right held by the Founding Generation in favor of what some state legislators believed a century later—yet that is precisely what the Government urges this Court to do here. See United States v. Jones*, 132 S. Ct. 945, 953 (2012) (Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted"); *Powell v. McCormack*, 395 U.S. 486, 546-47 (1969) ("That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date."); *Heller v. District of Columbia*, __ F.3d __, No. 10–7036, 2011 WL 4551558, *25 n.6 (D.C. Cir. Oct. 4, 2011) (Kavanaugh, J., dissenting) (hereinafter, *Heller II*).[8]

It therefore matters not whether the restrictions on 18-20-year-olds cited by the Government have deeper roots than the restrictions on felons that *Heller* deemed "longstanding" and "presumptively lawful." 544 U.S. at 626-27 & n.26. Society has long drawn a common-sense distinction between the law-abiding and convicted felons. *See, e.g.*, *Richardson v. Ramirez*, 418 U.S. 24 (1974) (rejecting

---

[8] *Heller II* did not reject the Founders' understanding in favor of more modern laws, because in that case there simply was no founding-era "historical record" that was relevant to the statutes being challenged. 2011 WL 4551558, at *7.

constitutional challenge to felon disenfranchisement law). Whether or not the founding generation enacted this principle into positive law, there certainly is no evidence that the Second Amendment was understood to foreclose the option. To the contrary, there is evidence that restrictions on firearms possession by violent criminals and others who threatened public safety were understood to be consistent with the right to arms.[9]

3. Because the Second Amendment was originally understood to extend to 18-20-year-olds, late-19th and early-20th century restrictions inconsistent with this understanding were simply unconstitutional. But even if history were not so clear on this point, and even if the laws cited by the Government were relevant to determining the Second Amendment's scope, they support, at most, restrictions on *children* purchasing firearms. Indeed, the laws themselves make plain that this minority practice[10] was focused on *minors*.[11] They provide no support for placing

---

[9] *See The Address and Reasons of Dissent of the Pennsylvania Minority of the Convention of the State of Pennsylvania and their Constituents* (1787), *reprinted in* 2 B. SCHWARTZ, THE BILL OF RIGHTS 665 (1971) ("no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals"); Journal of Convention: Wednesday, February 6, 1788, *reprinted in* DEBATES AND PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS 86 (1856) (proposal by Samuel Adams that "the said Constitution be never construed to authorize Congress ... to prevent the people of the United States, who are peaceable citizens, from keeping their own arms"); *see also* Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 LAW & CONTEMP. PROBS. 125, 130 (1986).

[10] By 1923, there were 48 States in the Union. The Government claims that "[w]ithin the same time-frame … twenty-one other States imposed age

14

such restrictions on law-abiding *adults*—a class that today includes 18-20-year-olds.

Plaintiffs are legal adults, as are 18-20-year-olds virtually throughout the nation. *See* TEX. FAM. CODE § 101.003; BLACK'S LAW DICTIONARY (9th ed. 2009), age of majority ("The age, usu. defined by statute as 18 years, at which a person attains full legal rights, esp. civil and political rights such as the right to vote.").[12] The Constitution vests 18-20-year-olds with the right to vote, *see* U.S. CONST. amend. XXVI, an important index of maturity and responsibility in a democratic polity.[13] The Supreme Court has recognized that the "age of 18 is the point where society draws the line for many purposes between childhood and adulthood," and

qualifications on the purchase or use of certain firearms, setting the minimum age between twelve and twenty." *See* Gov't Br. 32. But in fact, those States imposed minimum ages between twelve and *eighteen*, thus providing no support for the Government's position. *See id.* and sources cited therein; *see also* ME. REV. STAT. ch. 143, §§ 2 & 22 (1904).

[11] Of the 23 laws cited by the Government, 18 make express reference to minors, three refer to minors in their titles (Indiana, Louisiana, and Nevada), and two otherwise note their connection to minors (West Virginia and Wyoming). *See* Gov't Br. 32 and sources cited therein; 1882 W. VA. ACTS 421 (marginally labeled "[s]elling certain weapons to minors"); 1890 WYO. SESS. LAWS 127, 140 (marginally labeled "[s]elling weapons to minors"). More importantly, the age of majority was 21 in each of these jurisdictions when they adopted the cited restrictions. And in most, the legal age for possession or sale fell to 18 when (or soon after) the age of majority was lowered to 18.

[12] *See also* Age of Majority By State and United States Possessions, DoD Financial Management Regulation, Volume 7B, Appendix H (Jan. 2012), *at* http://comptroller.defense.gov/fmr/07b/07b_appendix_h.pdf; Larry Barnett, *The Roots of Law*, 15 AM. U. J. GENDER SOC. POL'Y & L. 613, 681 (2007).

[13] Any bearing *Oregon v. Mitchell*, 400 U.S. 112 (1970), could have on the issues here has been superseded by the 26th Amendment.

therefore held that 18 is "the age at which the line for death eligibility ought to rest" under the 8th Amendment. *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *id.* at 569 (distinguishing between "juveniles under 18" and "adults").

Denying Second Amendment rights to 18-20-year-olds would be worse than merely ironic. The extension of the constitutional right to vote to 18-20-year-olds was motivated by the arms-bearing of that age group. *See Lowering the Voting Age to 18*, S. Rep. 92-26, at 6 (March 8, 1971) ("[O]ur 18-year-old citizens have earned the right to vote because ... tens of thousands of young people have paid the supreme sacrifice in the Indochina War.").[14] It would be perverse to say to 18-20-year-olds "because you have borne arms in defense of your country, you deserve the right to vote, but not the right to bear arms in defense of yourselves." *See* Akhil Reed Amar, *The Fifteenth Amendment and 'Political Rights'*, 17 CARDOZO L. REV. 2225, 2226 (1996) ("In Republican theory, those who vote traditionally bear arms.").

Furthermore, the doctrine that children have lesser constitutional rights than adults is a reflection of parental duties. *See, e.g.*, *Bellotti v. Baird*, 443 U.S. 622, 634, 638-39 (1979) (plurality); *Schall v. Martin*, 467 U.S. 253, 265 (1984). Perhaps, then, one could argue for subordinating the Second Amendment rights of

---

[14] Today, 18 is the age at which Americans may enlist in the military without parental consent, *see* 10 U.S.C. § 505, and also the age at which young men must register with the Selective Service System, *see* 50 U.S.C. app. § 453.

minor children to those of the adults charged with their protection.[15] *See, e.g.*, 1 BLACKSTONE COMMENTARIES *434 (1765) ("duties of parents" include "protection" of minor children); TEX. FAM. CODE § 151.001(a) (charging parents of children under 18 with "the duty of … protection … of the child"). It makes *no* sense, however, to extend this reasoning to legal adults responsible for their own well-being. *See Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.) ("We are rightly skeptical of paternalistic arguments when it comes to classifications addressing adults.").

In sum, the Government provides no support for banning 18-20-year-old adults from the commercial handgun market.[16] *Heller* mandates an historical

---

[15] Note, however, that in the context of the unenumerated abortion right, the Court has held that parents cannot be given an "absolute … veto" over even a minor child's abortion decision. *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 74 (1976).

[16] Nor do the cases cited by the Government advance its argument. *State v. Callicutt*, 69 Tenn. 714 (1878), reasoned that Tennessee's right-to-arms provision was limited to "the right of citizens … to bear arms for their common defense" and relied on *Aymette v. State, id.* at 716—a case the Supreme Court criticized and dismissed, *Heller*, 554 U.S. at 613. *Coleman v. State*, 32 Ala. 581 (1858), affirmed a conviction for selling a pistol to a minor, but did not address the law's constitutionality. *Parman v. Lemmon*, 244 P. 227 (Kan. 1925), initially opined that a law banning minors from possessing firearms was constitutional, but on rehearing decided the case on statutory-interpretation grounds and did not reach the constitutional question, *see id.* at 233. *Biffer v. City of Chicago*, 116 N.E. 182 (1917), rejected a challenge to Chicago's licensing scheme for the sale of firearms that happened to include a ban on gun permits for minors. But the court did not address that provision, and it based its holding on the dubious proposition "that the sale of deadly weapons may be absolutely prohibited," *id.* at 185, relying on cases such as *City of Salina v. Blaksley*, 83 P. 619 (Kan. 1905), which held that the right

inquiry, and it is impossible to evade the historical facts that: (1) the Militia Act of 1792 deemed 18-20-year-olds to be part of the militia and within the scope of the Second Amendment; (2) State militia laws contemporaneous with the Second Amendment uniformly set the minimum militia age at 16 to 18; (3) not even a single State exempted 18-20-year-olds from militia service. *See* Pl. Br. 16-19.

## III.   THE GOVERNMENT'S SALES BAN FAILS UNDER ANY SECOND AMENDMENT ANALYSIS.

### A.   Plaintiffs' Claims Should Be Resolved Based on Text and History.

The Government insists that *Heller* mandates application of one "'of the traditionally expressed levels [of scrutiny] (strict scrutiny, intermediate scrutiny, rational basis).'"  Gov't Br. 41 (quoting *Heller*, 554 U.S. at 634).  The Government, however, quotes *Heller* out of context; in that passage the Court rejected Justice Breyer's "judge-empowering 'interest-balancing inquiry'" that "explicitly at least, [was not one] of the traditionally expressed levels" of scrutiny.

to bear arms is not an individual right but "only to the right to bear arms as a member of the state militia," *id.* at 620.  The section of Cooley's treatise cited by the Government addresses the police power of the States, not the Second Amendment, and it bases its assertion that "the State may prohibit the sale of arms to minors" solely on *Callicutt*, discussed above.  USCA5 917.  Finally, when the Kentucky Attorney General addressed minors possessing handguns, the age of majority in Kentucky was 18—meaning that law affected only *juveniles* and not the 18-20-year-old *adults* whose rights are at issue here.  *See* KY. REV. STAT. § 2.015 (1994).  Furthermore, the opinion rests on the conclusions (a) that the "Second Amendment does not guarantee an individual right to keep and bear arms," and (b) that "[i]f the right to bear arms does extend to minors, it likely is a more limited right *than that possessed by adults*."  Op. Att'y Gen. Ky. 94-14 (Mar. 3, 1994) (emphasis added).  Plaintiffs, of course, are adults, not minors.

*Heller*, 554 U.S. at 634.[17]  The Court did not hold that Second Amendment cases should be judged under those "traditionally expressed levels."  To the contrary, the Court directed a textual and historical analysis and struck down D.C.'s handgun ban without engaging in "levels-of-scrutiny" review.  *See* Pl. Br. 10-13; *Heller II*, 2011 WL 4551558, at *22-*35 (Kavanaugh, J., dissenting).  Indeed, the Court's examples of presumptively constitutional firearms regulations were grounded in history, not any tier of means-ends scrutiny.  *Heller*, 554 U.S. at 635 ("there will be time enough to expound upon the historical justifications for the exceptions we have mentioned").  As demonstrated above, Section 922(b)(1) cannot survive this textual and historical analysis.

## B. In the Alternative, Strict Scrutiny Applies.

If some level of scrutiny is to apply here, it must be strict.  *See* Pl. Br. 41-45.  The Government first argues that *Heller*'s identification of presumptively lawful regulations implicitly rejected strict scrutiny, under which laws are presumptively invalid.  But the same is true under intermediate scrutiny, *see United States v. Virginia*, 518 U.S. 515, 533 (1996), so that argument proves too much.  The better explanation is that presumptively lawful regulations are those that fall outside the scope of the Second Amendment as originally understood.  *See McDonald v. City*

---

[17] Justice Breyer's rejected proposal was essentially intermediate scrutiny.  *See* Pl. Br. 43.

*of Chicago*, 130 S. Ct. 3020, 3056 (2010) (Scalia, J., concurring) ("[T]raditional restrictions go to show the scope of the right.").

Second, the Government argues that "laws imposing conditions and qualifications on the commercial sale of arms" are presumptively constitutional. Gov't Br. 43 (quotation marks omitted). But the law at issue here is not a mere regulation of the firearms business—it bans outright the sale of handguns to law-abiding, 18-20-year-old adults. Surely *Heller* cannot be read to mandate a lesser standard of review simply because the Government has conscripted firearms dealers into its infringement of Second Amendment rights. *See Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("The principal agent of federal enforcement is the [firearms] dealer.").

Third, the Government argues that courts have not "invariably" applied strict scrutiny in Second Amendment cases, citing *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003) and *Heller II*. Gov't Br. 43. But *Darrington* declined to apply strict scrutiny to the federal felon-in-possession prohibition because "felons as a class [are excluded] from the Second Amendment's protection." 351 F.3d at 635. It did not purport to rule out strict scrutiny when the Second Amendment *does* apply. And *Heller II* applied intermediate scrutiny "precisely because," in the court's view, the challenged laws did "*not* affect the core right protected by the Second Amendment." 2011 WL 4551558 at *18 (emphasis added). Whether or

not that view was correct, it does not support applying intermediate scrutiny to a law, like the statute here, that *does* affect the Second Amendment's core right.

Finally, citing *Stiles v. Blunt*, 912 F.2d 260 (8th Cir. 1990), the Government argues that intermediate scrutiny should apply because the sales ban is temporary—*i.e.*, it ceases to apply once a person turns 21. But *Stiles* distinguishes itself, for the right at issue there, unlike the Second Amendment, was "not … a fundamental right." *Id.* at 265. Furthermore, the Second Amendment protects "the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. It would be particularly bizarre to hold that a "temporary" restriction on the exercise of *this* right merits *less* stringent scrutiny, given that the ability to purchase a handgun several years in the future is of no value to an 18-, 19-, or 20-year-old seeking to exercise her fundamental constitutional right of armed self-defense now.

### C. The Government's Sales Ban Fails Even Intermediate Scrutiny.

Section 922(b)(1) fails even intermediate scrutiny. *See* Pl. Br. 45-52.

First, the Government acknowledges that in 1968 Congress enacted the ban in an attempt "to address '[t]he clandestine acquisition of firearms by juveniles and minors.'" Gov't Br. 47 (quoting S. Rep. 90-1097, at 79); *see also* S. Rep. 90-1097, at 79 ("The controls proposed in the title are designed to meet *this problem*.") (emphasis added). It is *this* purpose that the Government must defend if it is to

justify the law.  *See Virginia*, 518 U.S. at 533.  The problem for the Government is that even if the ban were substantially related to this goal in 1968 (and we do not concede that it was), it plainly is not today.

Most obviously, today 18-20-year-olds are adults, not "minors."[18]  By the end of the 1970s the vast majority of States had reduced the age of majority to 18. *See* HOMER H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 8.1 (2d ed. 1988).  Furthermore, while the goal of reducing "clandestine acquisition" has always been subverted by cutting off access to the fully licensed commercial market while permitting access to unlicensed, unrecorded, second-hand sources, the disconnect has grown even more stark now that federal law requires licensed dealers to conduct background checks on handgun purchasers. *See* 18 U.S.C. § 922(t).

Second, despite the fact that the sales ban was enacted "[f]ollowing a multi-year inquiry into violent crime that included field investigation and public hearings,"  Gov't Br. 45 (quotation marks omitted), the Government cites just one statistic from the legislative history that actually relates to 18-20-year-olds:  a statement that "'juveniles account for some 49 percent of the arrests for serious crimes in the United States and minors account for 64 percent of the total arrests in

---

[18] Then, as now, "juvenile" meant under 18.  *See In re Gault*, 387 U.S. 1, 37 n.60 (1967); 18 U.S.C. § 922(x)(5); BLACK'S LAW DICTIONARY (9th ed. 2009), juvenile.

this category,'" Gov't Br. 45 (quoting S. Rep. 90-1097, at 77), implying that 18-20-year-olds accounted for 15% of arrests for "serious crime." The quoted statement gives no indication where this figure comes from and no basis for comparing the arrest records of 18-20-year-olds with members of other groups—whether defined by gender, socioeconomic status, or race—that have disproportionately high arrest rates but are not affected by the sales ban. It gives no indication of how likely an 18-20-year-old was to be arrested for a "serious crime."

This last point is telling. The Government has not disputed that fewer than 1% of 18-20-year-olds were arrested for a violent crime in 2009. *See* Pl. Br. 54-55. Thus, regardless whether 18-20-year-olds accounted for a disproportionate number of arrests, it is plain that any particular 18-20-year-old is exceedingly unlikely to commit a violent crime. This dooms the sales ban under intermediate scrutiny, which prohibits the Government from relying on "overbroad generalizations" and stereotypes in classifying among individuals. *Virginia*, 518 U.S. at 533.[19]

Third, although the sales ban has been in place for over 40 years, the Government offers no evidence whatsoever that it has improved public safety. The Government does not deny that *all of the empirical evidence shows that Section*

---

[19] The Government's citation to other, more recent data regarding the supposed threat to public safety posed by 18-20-year-olds is subject to the same criticism. *See* Gov't Br. 48 n.20.

*922(b)(1) has not even marginally reduced violent crime by those aged 18 to 20.*

Pl. Br. 52.  Under intermediate scrutiny, a law must "directly and materially

advance its asserted interest."  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488

(1995).  The Government's sales ban does neither.

Fourth, the Government observes that handguns are often a weapon of

choice for criminals.  Gov't Br. 47-48.  The District of Columbia stressed the same

point in *Heller*, *see* Brief for Petitioners at 49-55, *Heller*, No. 07-290 (U.S. Jan. 4,

2008), and got nowhere.  *See* 554 U.S. at 629.  The Second Amendment guarantees

18-20-year-olds the right to possess—and hence to purchase—the type of weapon

"that is overwhelmingly chosen by American society for [the] lawful purpose" of

self-defense.  *Id*. at 628.

Finally, the Government attempts to refashion the sales ban as part of a

measured scheme that treats the ages of 18 to 20 as a transitional period during

which individuals may possess handguns but only with parental consent.  *See*

Gov't Br. 49-50.  This argument is unavailing because the Constitution does not

permit the Government to treat 18-20-year-old adults as children requiring a

permission slip from their parents to exercise their fundamental rights.  Moreover,

despite random remarks by a few legislators, the *text* of Section 922 makes plain

that it is *not* a parental-consent statute.  The word "parent" appears nowhere in the

provision banning sales to 18-20-year-olds.[20]  And while a parent lawfully may give a handgun to an 18-20-year-old child as a gift, *so may any other lawful purchaser—whether a cousin, a friend, an accomplice, or a complete stranger.*[21] Thus, even if a parental-consent regime were constitutionally permissible (and it is not), that is not what Congress enacted.

## IV.   THE SALES BAN VIOLATES EQUAL PROTECTION.

The Government's Equal Protection defense is based on the argument that age-based classifications are subject only to rational-basis review.  That is true enough, but as the Government itself acknowledges, "equal protection analysis requires strict scrutiny of a legislative classification ... when the classification impermissibly interferes with the exercise of a fundamental right."  Gov't Br. 52. Here the sales ban interferes with the fundamental right to keep and bear arms and is therefore subject to strict scrutiny.  As we have demonstrated, the ban cannot

---

[20] In contrast, the ban on handgun possession by under-18 *juveniles* exempts "the possession or use of a handgun … by a juvenile … if the handgun .... [is] possessed and used by the juvenile … with the prior written consent of the juvenile's parent or guardian…."  18 U.S.C. § 922(x)(3)(A)(ii).

[21] Longstanding guidance provided by the ATF makes this clear.  *See* USCA5 903 (In "a situation where the actual purchaser, a person of legal age, is acquiring the firearm for the purpose of loaning or giving it to an underage person[,] [n]either the sale nor the minor's subsequent receipt and possession of the firearm would violate Federal law").

pass intermediate scrutiny, much less strict scrutiny, and therefore must be struck down.[22]

Dated: February 16, 2012

Respectfully submitted,

s/ Charles J. Cooper

Brian Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052
Email: bkoukoutchos@gmail.com

Charles J. Cooper
David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

---

[22] Neither *Gabree v. King*, 614 F.2d 1 (1st Cir. 1980), nor *United States v. Olson*, 473 F.2d 686 (8th Cir. 1973), helps the Government's cause. *Gabree* distinguishes itself: unlike the right to bear arms, "[i]t … cannot be seriously argued that there exists a fundamental interest in drinking alcoholic beverages." *Gabree*, 614 F.2d at 1. *Olson* is even more inapposite. It rejected a challenge to a verdict rendered by jurors who were all 21 or older. Noting that "the difference in viewpoint between ages eighteen to twenty and twenty-one to twenty-five" is not "of any great significance," the court held that "persons aged eighteen to twenty are not an identifiable group the exclusion of which renders a jury list … violative of the Fifth and Sixth Amendments." *Olson*, 473 F.2d at 688 (quotation marks, brackets, and ellipses omitted). This obviously does not support drawing a line at age 21 for purposes of Second Amendment rights.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2012, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of Appeals for

the Fifth Circuit by using the appellate CM/ECF system, which will send notice of

such filing to the following registered CM/ECF users:

Anisha Sasheen Dasgupta
U.S. Department of Justice
Room 7533
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0000

Christopher Paul Johnson
Meredith Anne Wholley
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019-0000

Scott Charles Medlock
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

s/ Charles J. Cooper
Charles J. Cooper

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains 6,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Office Word 2007 with 14-point Times New Roman type.

s/ Charles J. Cooper
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*

Dated:  February 16, 2012