No. 11-10959

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NATIONAL RIFLE ASSOCIATION OF AMERICA, INCORPORATED;
ANDREW M. PAYNE; REBEKAH JENNINGS; BRENNAN HARMON,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; B.
TODD JONES, In His Official Capacity as Acting Director of the Bureau of
Alcohol, Tobacco, Firearms, and Explosives; ERIC H. HOLDER, JR., U.S.
ATTORNEY GENERAL,

*Defendants-Appellees.*

On Appeal from United States District Court for the Northern District of Texas
Civil Case No. 5:10-cv-00140-C (Honorable Sam Cummings)

**PETITION FOR REHEARING EN BANC**

Brian Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052

Charles J. Cooper
David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
COOPER AND KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600; (202) 220-9601 Fax

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. National Rifle Association of America, Inc. ("NRA"), Plaintiff-Appellant. The NRA has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

2. Rebekah Jennings, Brennan Harmon, and Andrew Payne, Plaintiffs-Appellants.

3. Paul White, owner and operator of My Favorite Gun Store in Richmond, Utah. *See* USCA5 670.

4. Roger Koeppe, owner and operator of Armory Management and Supply Services in Houston, Texas. *See* USCA5 673.

5. Cooper & Kirk, PLLC, Counsel for Plaintiffs-Appellants (Charles J. Cooper, David H. Thompson, Howard C. Nielson, Jr., Peter A. Patterson)

6. Law Offices of Fernando M. Bustos, P.C., Counsel for Plaintiffs-Appellants (Fernando M. Bustos)

7. Brian S. Koukoutchos, Counsel for Plaintiffs-Appellants

8. National Shooting Sports Foundation, Inc., Amicus for Plaintiffs-Appellants

9. Lawrence G. Keane, Of Counsel for National Shooting Sports Foundation

10. Kasowitz, Benson, Torres & Friedman, LLP, Counsel for Amicus for Plaintiffs-Appellants (Christopher Paul Johnson and Meredith Anne Wholley)

11. Brady Center to Prevent Gun Violence, Amicus for Defendants-Appellees

12. Graduate Student Assembly and Student Government of the University of Texas at Austin, Amicus for Defendants-Appellees

13. Mothers Against Teen Violence, Amicus for Defendants-Appellees

14. Students For Gun-Free Schools In Texas, Amicus for Defendants-Appellees

15. Texas Chapters of the Brady Campaign to Prevent Gun Violence, Amicus for Defendants-Appellees

16. Texas Civil Rights Project, Counsel for Amici for Defendants-Appellees (Scott Charles Medlock)

17. Hogan Lovells US LLP, Counsel for Amici for Defendants-Appellees (Jonathan L. Diesenhaus and S. Chartey Quarcoo)

18. Brady Center, Counsel for Amici for Defendants-Appellees (Jonathan E. Lowy and Daniel R. Vice)

Dated: November 27, 2012      Respectfully submitted,

<u>s/ Charles J. Cooper</u>
Charles J. Cooper
*Attorney for Plaintiffs-Appellants*

**RULE 35(b)(1) STATEMENT**

The panel decision conflicts with decisions of the United States Supreme Court, *see, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *Craig v. Boren*, 429 U.S. 190 (1976), and consideration by the en banc Court is therefore necessary to secure uniformity in the Court's decisions.

The proceeding also involves issues of exceptional public importance. Whether the Constitution permits the Government to ban 18-to-20-year-olds from purchasing a handgun from a licensed dealer is exceptionally important, as it implicates the fundamental, enumerated right to keep and bear arms. And the panel's decision has implications that reach beyond deciding this exceptionally important question, for it establishes a framework for reviewing Second Amendment claims that conflicts with *Heller* and *McDonald*, and it applies that framework in a manner that also conflicts with Supreme Court authority.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ....................................................................... 1

I.  INTRODUCTION. ................................................................................. 1

II. CHALLENGED PROVISIONS. .............................................................. 3

III. COURSE OF PROCEEDINGS ................................................................ 3

STATEMENT OF THE FACTS .................................................................... 4

ARGUMENT .................................................................................................. 4

I.  THE PANEL ERRED BY HOLDING THAT THE GOVERNMENT CAN JUSTIFY
    INFRINGEMENTS OF SECOND AMENDMENT RIGHTS BY SATISFYING A
    JUDICIALLY DEVISED INTEREST-BALANCING TEST. ......................... 4

II. THE PANEL ERRED BY FINDING THE SALES BAN CONSTITUTIONAL. ............... 8

    A.  History Forecloses the Sales Ban. ......................................... 8

    B.  The Sales Ban Cannot Satisfy Heightened Scrutiny. .......... 11

CONCLUSION .............................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

*Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011) ........................................13

*Craig v. Boren*, 429 U.S. 190 (1976)..................................................................12, 13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Hedgepeth v. Wash. Metro. Area Transit Auth.*,
    386 F.3d 1148 (D.C. Cir. 2004)........................................................................11

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).........................7, 11

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) .........................14, 15

*Houston v. City of New Orleans*, 675 F.3d 441 (5th Cir. 2012),
    *opinion withdrawn and superseded on rehearing on other grounds*,
    682 F.3d 361 (5th Cir. 2012) ..............................................................................7

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ...............................1, 2, 5, 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)...............11

*Roper v. Simmons*, 543 U.S. 551 (2005)..................................................................11

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).............................................8

*United States v. Jones*, 132 S. Ct. 945 (2012) ..........................................................11

*United States v. Virginia*, 518 U.S. 515 (1996).................................................12, 14

## Statutes

18 U.S.C. § 921(a)(11).................................................................................................3

18 U.S.C. § 921(a)(21).................................................................................................3

18 U.S.C. § 922(a)(1)(A) .............................................................................................3

18 U.S.C. § 922(b)(1)...................................................................................................3

18 U.S.C. § 922(t) ......................................................................................................14

Militia Act of 1792, 1 Stat. 271 ..................................................................................8

## Other

Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second
    Amendment*, 80 GEO. WASH. L. REV. 703, 706-707 (2012) .............................7, 8

FBI, *Crime in the United States, 2010*, Table 38: Arrests, by Age, 2010 (Sept. 2011), *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl38.xls ......................................12, 13

Gary Kleck, *The Impact of the 1968 Gun Control Act's Restrictions on Handgun Purchases by Persons Age 18 to 20*, (May 7, 2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1843526 .......................15

Larry Barnett, *The Roots of Law*, 15 AM. U. J. GENDER, SOC. POL'Y & L. 613 (2007) ..........................................................................................................11

S. REP. NO. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112 .......................14

U.S. CENSUS BUREAU, *Monthly Postcensal Resident Population, by single year of age, sex, race, and Hispanic origin*, July 1, 2010 data, *available for download at* http://www.census.gov/popest/data/national/asrh/2009/2009-nat-res.html ........................................................................................................................12, 13

## STATEMENT OF THE ISSUES

1.     Whether Second Amendment claims are to be resolved by a judicially devised balancing test rather than the textual and historical method of analysis the Supreme Court applied in *Heller* and *McDonald*.

2.     Whether banning law-abiding, 18-to-20-year-old adults from purchasing handguns in the commercial market violates the Second Amendment and the equal protection component of the Fifth Amendment.

## STATEMENT OF THE CASE

### I.     INTRODUCTION.

The panel's decision in this case is unprecedented.  No case in American constitutional history, until now, has upheld a law restricting an adult's exercise of a specifically enumerated, fundamental constitutional right solely on account of the adult's age.  If it is true that Second Amendment rights "are enshrined with the scope they were understood to have when the people adopted them," *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008), and that they are not "second-class right[s], subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3044 (2010) (plurality), then the panel plainly erred in holding that the Constitution permits the federal government to prohibit law-abiding, 18-to-20-year-old adults from purchasing handguns in the commercial firearms market.

1

As the Supreme Court noted in *McDonald*, adoption of the Second Amendment "was prompted by fear that the federal Government would disarm and thus disable the militias." *Id.* at 3048. It follows, then, that the right to keep and bear arms was understood to extend, at a minimum, to members of the militias. And when the people adopted the Second Amendment, all able-bodied 18-to-20-year-old males were *required* under the laws of every state to enroll in the militia and *to be armed*, and Congress placed the same requirements in federal law just months later.

It is true, as the panel noted, that "we no longer have a founding-era-style militia." Op. 29 n. 17. But *Heller* makes clear that "the conception of the militia at the time of the Second Amendment's ratification" is what matters: "[T]he fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change [the Court's] interpretation of the right." 554 U.S. at 627-28. The scope of the right to keep and bear arms enshrined at the time of the Second Amendment's adoption thus included all law-abiding 18-year-olds, "whether or not future legislatures *or (yes) even future judges* think that scope too broad." *Heller*, 554 U.S. at 634-35 (emphasis added).

In short, the panel decision is not faithful to the text and history of the Second Amendment, nor to the recent Supreme Court decisions interpreting it. The en banc Court, accordingly, should reconsider this case.

## II.    CHALLENGED PROVISIONS.

Plaintiffs challenge federal law barring Federal Firearms Licensees ("FFLs") from "sell[ing] … any firearm or ammunition … if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age,"  18 U.S.C. § 922(b)(1), and other provisions of federal law that reflect this restriction.  *See* Second Amended Complaint ¶¶ 18-24, USCA5 705-07.  Because everyone who engages in the firearms business must be an FFL, the challenged laws effectively shut 18-to-20-year-olds out of the entire commercial market for handguns.  *See* 18 U.S.C. §§ 922(a)(1)(A), 921(a)(11) & (21).

## III.    COURSE OF PROCEEDINGS.

This suit was filed in district court on September 8, 2010.  The parties filed cross-motions for summary judgment and, on September 29, 2011, the district court denied Plaintiffs' motion, granted the Government's, and entered judgment for the Government.  USCA5 1093 & 1110.

On October 25, 2012, a panel of this Court affirmed.  The panel established a two-step framework for reviewing Second Amendment claims:  "the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment"; "the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law

survives the proper level of scrutiny." Op. 11. The panel resolved Plaintiffs' Second Amendment claim at the second step, holding that "the challenged federal laws trigger nothing more than 'intermediate' scrutiny," Op. 30, and concluding that the laws "pass[] constitutional muster" under that standard, *id.* at 33. The panel also rejected Plaintiffs' equal protection claim, relying on "the same reasons" that it invoked in rejecting Plaintiffs' Second Amendment claim. Op. 40.

## STATEMENT OF THE FACTS

At the time they joined this suit, the individual Plaintiffs were all between the ages of 18 and 20. While two of them have since turned 21, the third, Andrew Payne, has not and thus remains subject to the sales ban. But for the challenged laws, Payne would purchase a handgun from an FFL. USCA5 622.

The National Rifle Association ("NRA") is also a plaintiff. Thousands of NRA members are 18-to-20-years-old or will be that age during this litigation. USCA5 604. NRA members who hold licenses to sell firearms are also harmed because the ban outlaws sales to would-be customers. *See, e.g.*, USCA5 670.

## ARGUMENT

**I. THE PANEL ERRED BY HOLDING THAT THE GOVERNMENT CAN JUSTIFY INFRINGEMENTS OF SECOND AMENDMENT RIGHTS BY SATISFYING A JUDICIALLY DEVISED INTEREST-BALANCING TEST.**

In both *Heller* and *McDonald*, the Supreme Court resolved Second Amendment claims by employing a textual and historical analysis, and in neither

case did the Court weigh the challenged law's restrictions against its purported public-safety justifications.  To the contrary, *Heller* insisted that any cost-benefit analysis would be inappropriate:  "The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. at 634.  "We know of no other enumerated constitutional right," the Court emphasized, "whose core protection has been subjected to a freestanding 'interest-balancing' approach."  *Id.*  *McDonald* reiterated that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."  130 S. Ct. at 3047 (plurality).  Indeed, *McDonald* emphatically denied that judicial review under the Second Amendment "will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise."  *Id.* at 3050.  Accordingly, the *McDonald* Court specifically refused to consider the "controversial public-safety implications" of incorporating Second Amendment rights, noting that "[a]ll of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes" likewise have "disputed public safety implications."  *Id.* at 3045.

Interest balancing is nevertheless the central feature of the two-step framework established by the panel.  The first step, which "look[s] to whether the

5

[challenged] law harmonizes with the historical traditions associated with the Second Amendment guarantee," Op. 12, is entirely proper and, indeed, ought to be both the beginning and the end of the analysis. The second step, however, calls for interest balancing twice over. A court must first "determine whether to apply intermediate or strict scrutiny to the law." *Id.* at 11. This determination is made by balancing interests, as "the appropriate level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 12-13 (quotation marks omitted). Once a level of scrutiny is selected, a court must then balance interests again, "to determine whether the law survives the proper level of scrutiny." *Id*. at 11.

The panel reasoned that the interest-balancing prong of its framework is consistent with *Heller* because the majority in that case stated that Justice Breyer's dissent " 'proposes … none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but *rather* a judge empowering "interest-balancing inquiry" …. ' " *Id*. at 16 (emphasis and ellipses added by panel opinion). According to the panel, "[t]he Court's use of the word 'rather' demonstrates that, in the Court's view, the familiar scrutiny tests are not equivalent to interest balancing." *Id.* But the panel has excised a key phrase from this passage. According to the *Heller* majority, Justice Breyer "proposes, *explicitly at least*, none of the traditionally expressed levels (strict scrutiny, intermediate

scrutiny, rational basis), but rather a judge-empowering 'interest-balancing inquiry' …. " *Heller*, 554 U.S. at 634 (emphasis added). Thus, labels aside, *Heller* recognized that Justice Breyer's interest-balancing test substantively may be "equivalent" to one of the "familiar scrutiny tests." Op. 16. And Justice Breyer, like the panel here, expressly relied upon "First Amendment cases applying intermediate scrutiny," finding "no cause … to depart from the standard" they applied. *Heller*, 554 U.S. at 704-05 (Breyer, J., dissenting). The panel erred by following Justice Breyer's dissent rather than the majority in *Heller*.

Finally, that "[a] two-step inquiry has emerged as the prevailing approach" in the courts of appeal does not make the interest-balancing prong of the approach any more consistent with *Heller* and *McDonald*. Op. 11. Nor is judicial support for this prong unanimous. Judge Kavanaugh of the D.C. Circuit, for example, has recognized that "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). And Judge Elrod of this Court has concluded that "Judge Kavanaugh is correct." *Houston v. City of New Orleans*, 675 F.3d 441, 448 (Elrod, J., dissenting) (5th Cir. 2012), *opinion withdrawn and superseded on rehearing on other grounds*, 682 F.3d 361 (5th Cir. 2012). This Court should grant rehearing en banc to correct the panel's error in

following other circuits that have "effectively embraced the sort of interest-balancing approach that Justice Scalia condemned" in *Heller*. Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 706-707 (2012).

## II. THE PANEL ERRED BY FINDING THE SALES BAN CONSTITUTIONAL.

### A. History Forecloses the Sales Ban.

1. The sales ban is *not* "firmly historically rooted." Op. 28. The animating purpose for including the Second Amendment in the Bill of Rights was to "prevent elimination of the militia." *Heller*, 554 U.S. at 599; *see United States v. Emerson*, 270 F.3d 203, 226 (5th Cir. 2001). As noted earlier, when the Second Amendment was adopted, 18-to-20-year-olds were universally understood to be members of this protected body. This understanding is reflected both in State laws regulating the militia, *see* Pl. Br., Ex. A, and in the federal Militia Act of 1792, 1 Stat. 271. Indeed, under the latter 18-to-20-year-olds across the land were *required* to procure their own arms for militia service. Banning 18-to-20-year-olds from purchasing handguns in the commercial market simply cannot be squared with this history, and under *Heller* that is the end of the matter. *See* 554 U.S. at 634-35.

The panel relegated this dispositive historical evidence to a footnote, *see* Op. 28-29 n.17, and its reasons for discounting this evidence are meritless. First, the panel noted that "the right to arms is not co-extensive with the duty to serve in the

militia." *Id.* True enough; the Second Amendment by its terms protects not only the militia but "the people." Indeed, *Heller* expressly stated that "the 'militia' in colonial America consisted of a *subset* of 'the people.' " 554 U.S. at 580 (emphasis added). But there can be no doubt – *none whatsoever* – that the subset of the people comprising the militia, which included all able-bodied 18-to-20-year-old males, were universally understood to be within the scope of the Second Amendment's protection.

Second, that "sixteen-year-olds were obligated to serve in the militia [in some colonies]" does not mean that our argument "proves too much." Op. 28-29 n.17. At the time the Second Amendment was ratified, several states drew the line for militia eligibility at 18, not 16, *see* Pl. Br. Ex. A, and Congress, of course, also drew the line at 18 in the Militia Act of 1792. The historical evidence supporting extending full Second Amendment rights to 16-year-olds is thus quite weak. But we are not aware of *any* historical evidence, and neither the Government nor the panel has presented any, suggesting that 18-to-20-year-olds were understood to be excluded from the protection of the Second Amendment in 1791.

Third, that some States at some times chose not to enroll 18-to-20-year-olds in the organized militia is wholly beside the point. There is no doubt at all that 18-to-20-year-olds were among the able-bodied men that Congress and the States could draw from when organizing the citizens' militia.

2.     The panel committed at least two other errors in conducting its historical analysis.  First, in reviewing "[f]ounding-[e]ra [a]ttitudes," Op. 21, the panel described the scope of potentially permissible regulation at a level of generality that could potentially justify almost any law that "only" disarms a certain group of citizens rather than the entire populace.  *See, e.g.*, Op. 21 ("revolutionary and founding-era gun regulations … targeted particular groups for public safety reasons"); *id.* at 22 ("In the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms.").  Indeed, if founding-era laws expressly *requiring* 18-to-20-year-olds to exercise their right to keep and bear arms are not sufficient to demonstrate that members of this "particular group[]" cannot be "targeted" for purported "public safety reasons," *id.* at 21, then no groups' arms rights are safe.

Second, the work of "Nineteenth-Century [l]egislators, [c]ourts, and [c]ommentators," Op. 24, cannot be used to *restrict* the Second Amendment's scope.  Again, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."  *Heller*, 554 U.S. at 634-35 (emphasis added).  Thus, 19th-century laws in a minority of states restricting the arms rights of 18-to-20-year-olds cannot overcome dispositive evidence from the founding that 18-to-20-year-olds were understood to be protected by the Second

Amendment.  *See United States v. Jones*, 132 S. Ct. 945, 953 (2012); *Heller*, 670 F.3d at 1274 n.6 (Kavanaugh, J., dissenting).

3.      The 19th-century materials relied on by the panel are unpersuasive for an additional reason:  today, unlike in the 19th century, 18-to-20-year-olds in Texas and almost everywhere else are fully emancipated *adults*, responsible for their own actions and their own self-defense.  *See Roper v. Simmons*, 543 U.S. 551, 574 (2005); Larry Barnett, *The Roots of Law*, 15 AM. U. J. GENDER, SOC. POL'Y & L. 613, 681 (2007).  Laws subjecting *minors* to unique burdens offer scant support for a law that bans law-abiding, 18-to-20-year-old *adults* from the commercial handgun market.  *Cf. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.).

**B.      The Sales Ban Cannot Satisfy Heightened Scrutiny.**

1.      Even assuming that an interest-balancing analysis should apply here, the sales ban cannot survive any level of heightened scrutiny.  As an initial matter, *Heller* and *McDonald* establish that the right to keep and bear arms is fundamental, and it is well settled that "strict scrutiny [is] applied when government action impinges upon a fundamental right."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983).  Yet, despite recognizing that "[a] law that burdens the core of the Second Amendment guarantee … would trigger strict scrutiny," Op. 29, the panel elected to apply intermediate scrutiny here.  This was error.

First, the panel relied on its historical analysis which, as we have demonstrated, was flawed. *See* Op. 30.

Second, the panel reasoned that the ban does not strike at the Second Amendment's "central concern" because "[t]he Second Amendment, at its core, protects 'law abiding, *responsible*' citizens," and "Congress found that persons under 21 tend to be relatively irresponsible." *Id*. at 31 (quoting *Heller*, 554 U.S. at 635) (emphasis added by panel). The implications of this reasoning are breathtaking. The Supreme Court has rejected just this type of "overbroad generalization[]," *United States v. Virginia*, 518 U.S. 515, 533 (1996), and "statistically measured but loose-fitting generalit[y]," *Craig v. Boren*, 429 U.S. 190, 208-09 (1976), for it threatens the right to arms of *all* members of *any* group that may be condemned as "relatively irresponsible" because of disproportionate crime statistics, groups such as men, the poor, and certain racial minorities.

Indeed, the overbreadth of the panel's sweeping condemnation of 18-to-20-year-old adults is staggering. Any particular 18-to-20-year-old is extremely *unlikely* to be arrested for a violent crime. FBI and Census Bureau data, for example, demonstrate that far fewer than one percent of 18-to-20-year-olds were arrested for a violent crime in 2010.[1] In *Craig*, the Supreme Court held that "if

---

[1] The calculation proceeds as follows, with an adjustment for the number of 18-to-20-year-olds to reflect the fact that the FBI arrest statistics cover about 77.5% of the total 2010 U.S. population:

maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.' " *Id.* at 201-02. It follows that if age is to serve as a proxy for violent criminality among adults, a correlation of *less than 1%* surely cannot suffice to sustain a restriction on a fundamental, enumerated constitutional right.[2]

Third, the panel reasoned that the ban does not "severely burden the presumptive Second Amendment rights" of 18-to-20-year-olds for various reasons, including that the ban only has a "temporary effect" and that it leaves 18-to-20-year-olds free to "acquire handguns from responsible parents or guardians." Op. 31-32. But this reasoning cannot be squared with Supreme Court authority. In the First Amendment context, for example, the Court applied strict scrutiny to strike down a law prohibiting the direct sale of violent video games to minors, expressly rejecting the notion that "the state has the power to prevent children from hearing or saying anything without their parents' prior consent." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2736 n.3 (2011). If a law prohibiting *children* from buying

---

59,921 violent crime arrests ÷ (13,256,712 x .775) 18-20-year-olds = .0058, or **0.58%**.

*See* FBI, *Crime in the United States, 2010*, Table 38: Arrests, by Age, 2010 (Sept. 2011), *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl38.xls; U.S. CENSUS BUREAU, *Monthly Postcensal Resident Population, by single year of age, sex, race, and Hispanic origin*, July 1, 2010 data, *available for download at* http://www.census.gov/popest/data/national/asrh/2009/2009-nat-res.html.

[2] The panel likened age restrictions on adult purchases of handguns to such restrictions on purchases of alcohol and lottery tickets. But nowhere in the Constitution is there a fundamental, specifically enumerated right to consume alcohol or to gamble.

violent *video games* is subject to the strictest judicial scrutiny, surely a law that prohibits *adults* from buying "the quintessential self-defense weapon" is as well. *Heller*, 554 U.S. at 629.

2.     Even under intermediate scrutiny, the Government must meet the demanding burden of showing that the sales ban actually "advances important governmental interests."  *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2723 (2010); *see also Virginia*, 518 U.S. at 533.  The Government cannot meet its burden here because the sales ban in fact works at cross-purposes with its asserted goal of combating "clandestine acquisition of firearms" by 18-to-20-year-olds.  S. REP. NO. 90-1097, at 79 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2167.  It bans 18-to-20-year-olds from participating in the open and highly regulated commercial handgun market, where background checks are required to complete a sale, *see* 18 U.S.C. § 922(t), while leaving them free to purchase handguns without such scrutiny on the unregulated secondary market.  This precludes responsible, law-abiding 18-to-20-year-olds from acquiring a handgun for self-defense from a reputable licensed dealer, *see, e.g.*, USCA5 622, while perversely encouraging clandestine transactions by 18-to-20-year-olds bent on acquiring a handgun for unlawful purposes.

It thus should come as no surprise that after 40-plus years the federal sales ban has not actually "*advance[d]* important governmental interests."  *Holder*, 130

S. Ct. at 2723 (emphasis added). Empirical analysis has shown that the ban "do[es] not appear to have reduced the 18-to-20 year old share of violent crime"; indeed, the data "indicat[es] that the upward trend in the 18-to-20 year old share of arrests became *even stronger* after" the ban went into effect. Gary Kleck, *The Impact of the 1968 Gun Control Act's Restrictions on Handgun Purchases by Persons Age 18 to 20*, at 4 (May 7, 2011) (emphasis added), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1843526. For these reasons, the sales ban fails intermediate scrutiny under both the Second Amendment and the equal protection component of the Fifth Amendment. The panel's reliance on recent statistical data, Op. 36-38, thus only underscores that the ban has been wholly ineffective. It also embroiled the panel in the "difficult empirical" questions that *McDonald* said should not be resolved by judges in Second Amendment cases. 130 S. Ct. at 3050 (plurality).

In sum, even if an interest-balancing analysis were appropriate, the sales ban cannot survive any level of heightened scrutiny. This Court therefore should grant en banc review to correct the panel's errors.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' petition for rehearing en banc.

Dated: November 27, 2012        Respectfully submitted,

s/ Charles J. Cooper

Brian Koukoutchos                Charles J. Cooper
28 Eagle Trace                  David H. Thompson
Mandeville, LA 70471          Howard C. Nielson, Jr.
Tel: (985) 626-5052              Peter A. Patterson
Email: bkoukoutchos@gmail.com   COOPER & KIRK, PLLC
                                1523 New Hampshire Ave., NW
                                Washington, D.C.  20036
                                Tel: (202) 220-9600
                                Fax: (202) 220-9601
                                Email: ccooper@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will send notice of such filing to the following registered CM/ECF users:

Anisha Sasheen Dasgupta
U.S. Department of Justice
Room 7533
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0000

Christopher Paul Johnson
Meredith Anne Wholley
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019-0000

Scott Charles Medlock
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

<u>s/ Charles J. Cooper</u>
Charles J. Cooper

**CERTIFICATE OF COMPLIANCE WITH FILING STANDARD A(6)**

I hereby certify that:

(1) any required privacy redactions have been made;

(2) the electronic submission is an exact copy of the paper document; and

(3) the document has been scanned for viruses with Kaspersky Antivirus 2010 and

is free of viruses.


November 27, 2012                    s/ Charles J. Cooper
                                     Charles J. Cooper
                                     *Counsel for Plaintiffs-Appellants*

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 25, 2012

Lyle W. Cayce
Clerk

No. 11-10959

NATIONAL RIFLE ASSOCIATION OF AMERICA, INCORPORATED;
ANDREW M. PAYNE; REBEKAH JENNINGS; BRENNAN HARMON,

                              Plaintiffs–Appellants

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES;
B. TODD JONES, In His Official Capacity as Acting Director of the Bureau of
Alcohol, Tobacco, Firearms, and Explosives; ERIC H. HOLDER, JR., U.S.
ATTORNEY GENERAL,

                              Defendants–Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before KING, PRADO, and HAYNES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal concerns the constitutionality of 18 U.S.C. §§ 922(b)(1) and
(c)(1), and attendant regulations, which prohibit federally licensed firearms
dealers from selling handguns to persons under the age of 21. Appellants—the
National Rifle Association and individuals who at the time of filing were over the
age of 18 but under the age of 21—brought suit in district court against several
federal government agencies, challenging the constitutionality of the laws. The
essence of their challenge is that the laws violate the Second Amendment and

the equal protection component of the Fifth Amendment by preventing law-abiding 18-to-20-year-old adults from purchasing handguns from federally licensed dealers.  The district court rejected their constitutional claims and granted summary judgment for the government.  We AFFIRM.

## I. Background

### A.    Procedural Background

Appellants filed suit in district court against the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), ATF's Acting Director, and the Attorney General of the United States, challenging the constitutionality of 18 U.S.C. §§ 922(b)(1) and (c)(1), as well as attendant regulations, 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b).  These provisions prohibit licensed dealers—i.e., federal firearms licensees ("FFLs")—from selling handguns to persons under the age of 21.  Appellants include: (i) Andrew M. Payne, Rebekah Jennings, and Brennan Harmon, who were between the ages of 18 and 21 when the suit was filed; and (ii) the National Rifle Association ("NRA") on behalf of (a) 18-to-20-year-old members who are prevented from purchasing handguns from FFLs, and (b) FFL members who are prohibited from making such sales.  Appellants asserted that the federal laws are unconstitutional because they infringe on the right of 18-to-20-year-old adults to keep and bear arms under the Second Amendment and deny them equal protection under the Due Process Clause of the Fifth Amendment.  Appellants sought a declaratory judgment that the laws are unconstitutional, as well as injunctive relief.

Before the district court, the government filed a motion for summary judgment, arguing that Appellants lacked standing to challenge the federal laws and that their constitutional claims failed on the merits.  The district court concluded that Appellants had standing, but then determined that Appellants failed to make out either a viable Second Amendment claim or a viable equal protection claim.  Appellants timely appealed.

No. 11-10959

## B.    Statutory Framework

The federal laws at issue—18 U.S.C. §§ 922(b)(1) and (c)(1), 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b)—were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197. Together, the laws regulate the sale of firearms by FFLs and are part of a larger statutory package that prohibits persons from "engag[ing] in the business of importing, manufacturing, or dealing in firearms," unless a person is a "licensed importer, licensed manufacturer, or licensed dealer." 18 U.S.C. § 922(a)(1)(A). To "engage[] in th[is] business" means to "devote[] time, attention, and labor" to the manufacture, sale, or importation of firearms or ammunition "as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." *Id*. § 921(21)(A)–(E).

The first contested provision, 18 U.S.C. § 922(b)(1), provides that:

> It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age . . . .

This provision is paired with § 922(c)(1), which prevents an FFL from selling a firearm to a person "who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer)" unless the person submits a sworn statement that "in the case of any firearm other than a shotgun or a rifle, [he or she is] twenty-one years or more of age."

These provisions are the statutory authority for several implementing regulations that Appellants also contest. First, 27 C.F.R. § 478.99(b)(1) provides that an FFL

3

No. 11-10959

> shall not sell or deliver . . . any firearm or ammunition to any
> individual who the importer, manufacturer, dealer, or collector
> knows or has reasonable cause to believe is less than 18 years of
> age, and, if the firearm, or ammunition, is other than a shotgun or
> rifle, or ammunition for a shotgun or rifle, to any individual who the
> importer, manufacturer, dealer, or collector knows or has reasonable
> cause to believe is less than 21 years of age.

Second, 27 C.F.R. §§ 478.96(b) and 478.124(a) prohibit FFLs from selling firearms unless they obtain a signed copy of Form 4473 from the purchaser. Form 4473 is used, among other purposes, to establish a purchaser's eligibility to possess a firearm by establishing his or her date of birth. *Id.* § 478.124(c)(1). It also requires the execution and dating of a sworn statement indicating that if "the firearm to be transferred is a firearm other than a shotgun or rifle, the transferee is 21 years or more of age." *Id.* § 478.124(f).

Congress later supplemented this regulatory scheme with the Violent Crime Control and Law Enforcement Act of 1994, which prohibits persons under the age of 18 from possessing handguns and bars the transfer of handguns to them, with limited exceptions. Pub. L. No. 103-322, § 110201, 108 Stat. 1796, 2010 (adding 18 U.S.C. § 922(x)). The parties agree that the network of federal laws amounts to the following. Eighteen-to-twenty-year-olds may possess and use handguns. Parents or guardians may gift handguns to 18-to-20-year-olds.[1]

---

[1] *See, e.g.*, S. Rep. No. 90-1097, at 79 (1968) ("[A] minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian."); *accord* S. Rep. No. 89-1866, at 58 (1966). As explained *infra*, Section III.B, "minor" in the 1968 Act refers to a person under the age of 21, while "juvenile" refers to a person under the age of 18.

The government also points the court to an ATF Chief Counsel Opinion, which advises—in response to a private inquiry—that an FFL may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor provided that the minor is not otherwise prohibited from receiving or possessing a firearm. Letter from Daniel Hartnett, Asst. Dir., Criminal Enforcement, ATF, to Sig Shore, 23362 (Dec. 5, 1983).

No. 11-10959

Those not "engaged in the business" of selling firearms—that is, non-FFLs—may sell handguns to 18-to-20-year-olds; put differently, 18-to-20-year-olds may acquire handguns through unlicensed, private sales.[2] Eighteen-to-twenty-year-olds may possess and use long-guns, and may purchase long-guns from FFLs (or non-FFLs).[3] However, the parties also agree that 18-to-20-year-olds may not purchase handguns from FFLs. Appellants challenge 18 U.S.C. §§ 922(b)(1) and (c)(1), and corresponding regulations, only to the extent that these laws prohibit sales of handguns or handgun ammunition by FFLs to 18-to-20-year-olds.[4]

## II. Standing

### A.    Applicable Law

We review questions of standing de novo.  *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 635 (5th Cir. 2012).  The parties seeking access to federal

---

[2] The term "engaged in the business" of dealing in firearms does "not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Furthermore, 18 U.S.C. § 922(a)(6), which proscribes making a false statement to an FFL while purchasing a firearm, functions as an outer limit on the extent to which a person under 21 may use "straw men" to purchase a firearm. *See United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009) (unpublished) (affirming conviction of under-21 defendant who admitted to paying a third party to purchase a handgun from FFL when third party stated to the FFL that he was the "actual buyer" of the gun).

[3] *See* 18 U.S.C. § 922(b)(1) (stating that FFL may sell "shotgun or rifle" to person under 21).

[4] Most of the States have gone beyond the federal floor.  Today, all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms.  Twenty-nine States (and the District of Columbia) impose a minimum-age qualification only on the purchase or use of handguns.  Many States (and the District of Columbia) proscribe or restrict the sale of handguns to persons under 21 (by non-FFLs) or the possession of handguns by persons under 21.  *See, e.g.*, California (Cal. Penal Code § 27505); Connecticut (Conn. Gen. Stat. §§ 29-34(b), 29-36f); Delaware (Del. Code Ann. tit. 24, §§ 901, 903); District of Columbia (D.C. Code Ann. §§ 7-2502.03, 22-4507); Hawaii (Haw. Rev. Stat. § 134-2(d)); Illinois (430 Ill. Comp. Stat. §§ 65/3(a), 65/4(a)(2)(i)); Iowa (Iowa Code Ann. § 724.22); Maryland (Md. Code Ann., Pub. Safety §§ 5-101(p), 5-133, 5-134); Massachusetts (Mass. Gen. Laws ch. 140, § 130); New Jersey (N.J. Stat. Ann. § 2C:58-6.1); Ohio (Ohio Rev. Code Ann. § 2923.211(B)); Rhode Island (R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-37); *see also* New York (N.Y. Penal Law §400.00(1)(a)).

No. 11-10959

court bear the burden of establishing their standing. *Id.* "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The first is an "injury in fact," which is a "concrete and particularized . . . invasion of a legally protected interest." *Id.* (citations omitted). The second is that "there must be a causal connection between the injury and the conduct complained of[;] the injury has to be fairly . . . trace[able] to the challenged action of the defendant." *Id.* (second alteration in original) (citation and quotation marks omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation and internal quotation marks omitted). Only injury-in-fact is at issue in this appeal.

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citations omitted). Mootness, however, is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (citation omitted). When "named plaintiffs will not benefit from a favorable ruling on the question implicating injunctive relief, we hold that th[e] question is moot as to them." *Pederson v. La. State Univ.*, 213 F.3d 858, 874 (5th Cir. 2000).

Under the doctrine of associational standing, an association may have standing to bring suit on behalf of its members when:

> [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

No. 11-10959

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citation omitted). The first prong requires that at least one member of the association have standing to sue in his or her own right. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587–88 (5th Cir. 2006).

## B.    Application

Before oral argument in this case, counsel for Appellants notified us that Rebekah Jennings and Brendan Harmon had turned 21.  Because they have aged out of the demographic group affected by the ban at bar, the issues on appeal are moot as to them. *See Pederson*, 213 F.3d at 874.  Andrew Payne, the third individual Appellant, will remain under the age of 21 throughout the appeal.  Mootness does not affect his claim.  In addition, the NRA has asserted associational standing on behalf of its members who are between the ages of 18 and 21.  The NRA submitted a sworn declaration that it had over 11,000 members who would be covered by the ban, and NRA members between the ages of 18 and 21 submitted sworn declarations that they cannot purchase handguns from FFLs because of the ban.  However, the government contends that Payne and the NRA's under-21 members have not suffered an injury-in-fact.

We disagree and hold that Payne and the NRA, on behalf of its under-21 members, have standing to bring this suit.  The government is correct that the challenged federal laws do not bar 18-to-20-year-olds from possessing or using handguns.  The laws also do not bar 18-to-20-year-olds from receiving handguns from parents or guardians.  Yet, by prohibiting FFLs from selling handguns to 18-to-20-year-olds, the laws cause those persons a concrete, particularized injury—i.e., the injury of not being able to purchase handguns from FFLs. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 750–57, 755 n.12 (1976) (finding standing for prospective customers to challenge constitutionality of state statute prohibiting pharmacists from advertising

prescription drug prices, despite customers' ability to obtain price quotes in another way—over the phone from some pharmacies).[5]

Standing may be satisfied by the presence of "at least one individual plaintiff who has demonstrated standing to assert the[] [contested] rights as his own." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *see also Horne v. Flores*, 557 U.S. 433, 446–47 (2009). Having established Payne's standing and the NRA's associational standing on behalf of its 18-to-20-year-olds members, we need not discuss the NRA's associational standing on behalf of its FFL members. We therefore proceed to the merits of this appeal.

### III. Second Amendment Claim

The crux of Appellants' position on the merits is that the federal ban at bar violates their rights under the Second Amendment, given the holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Appellants urge that, by preventing an 18-to-20-year-old from purchasing handguns from FFLs, the laws impermissibly infringe on that individual's right under the Second Amendment to keep and bear arms. The district court granted summary judgment for the government, rejecting the Second Amendment claim. We review the constitutionality of federal statutes de novo. *United States v. Portillo–Munoz*, 643 F.3d 437, 439 (5th Cir. 2011).

No other circuit court has considered the constitutionality of the challenged federal laws in light of *Heller*. Only a single district court has considered the constitutionality of the ban, upholding it under intermediate

---

[5] This injury is fairly traceable to the challenged federal laws, and holding the laws unconstitutional would redress the injury. *See Lujan*, 504 U.S. at 560. Therefore, Payne has standing to challenge the laws, and the 18-to-20-year-old NRA members have standing to sue in their own right. The NRA, in turn, has associational standing to sue on behalf of these members because (i) they have standing to sue in their own right, (ii) challenging laws preventing 18-to-20-year-olds from purchasing handguns from FFLs is germane to the NRA's purpose of safeguarding the right of law-abiding, qualified adults to keep and bear arms, and (iii) no "factual development" about the 18-to-20-year-old NRA members is necessary to evaluate the claim asserted or the relief requested. *See Am. Physicians*, 627 F.3d at 550–53.

scrutiny. *See United States v. Bledsoe*, No. SA-08-CR-13(2)-XR, 2008 WL 3538717, at *4 (W.D. Tex. Aug. 8, 2008). We affirmed the defendant's conviction in that case without reaching the constitutional issue. *See United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009) (unpublished). Consequently, this is an issue of first impression in this circuit. Because we—unlike some of our fellow circuit courts—have yet to establish a framework for evaluating post-*Heller* Second Amendment challenges, we sketch a framework here.

## A.    Analytical Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *Heller*, the Supreme Court made clear that the Second Amendment codified a pre-existing individual right to keep and bear arms. 554 U.S. at 592, 595. In *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Court further clarified that "the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," and is incorporated against the States via the Fourteenth Amendment. *Id.* at 3042.

The precise question before the Court in *Heller* was whether Washington, D.C. statutes banning the possession of usable handguns in the home—in addition to requiring residents to keep their firearms either disassembled or trigger locked—violated the Second Amendment. 554 U.S. at 573–75. The Court invalidated the laws because they violated the central right that the Second Amendment was intended to protect—that is, the "right of law-abiding, *responsible* citizens to use arms in defense of hearth and home." *Id.* at 635 (emphasis added); *see also id.* at 628–30 (distilling the Second Amendment to its "core" interest of "self-defense" and the "protection of one's home and family"). Indeed, the ban on home handgun possession squarely struck the core of the Second Amendment—a rare feat, as the Court observed that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's

No. 11-10959

handgun ban." *Id.* at 629. The Court thus noted that the ban "would fail constitutional muster" under "any of the standards of scrutiny" applicable to "enumerated constitutional rights." *Id.* at 628–29.

In a critical passage, moreover, the Court emphasized that the "right secured by the Second Amendment is not unlimited." *Id.* at 626. As the Court explained:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . . [N]othing in our opinion should be taken to cast doubt on *longstanding prohibitions on the possession of firearms by felons and the mentally ill*, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms.*

*Id.* at 626–27 (emphases added) (citations omitted). The Court hastened to add that it had listed "these presumptively lawful regulatory measures only as examples"; the list was illustrative, "not exhaustive." *Id.* at 627 n.26.[6]

Understandably, the Court did not undertake an "exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626; *see also id.* at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."). Instead, the Court identified the Second Amendment's central right as the

---

[6] The Court's decision to repeat this passage in *McDonald* underscores its importance: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We repeat those assurances here." 130 S. Ct. at 3047 (citation and internal quotation marks omitted).

No. 11-10959

right to defend oneself in one's home, and concluded that an absolute ban on home handgun possession—a gun-control law of historic severity—infringed the Second Amendment's core.  In so doing, *Heller* did not set forth an analytical framework with which to evaluate firearms regulations in future cases.  Nor has this court, since *Heller*, explained how to determine whether the federal laws at bar comport with the Second Amendment.[7]

But our fellow courts of appeals have filled the analytical vacuum.  A two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.  *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010) *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  *But see United States v. Skoien*, 614 F.3d 638, 641–42  (7th Cir. 2011) (en banc) (eschewing the two-step framework and resisting the "levels of scrutiny quagmire," but applying intermediate scrutiny to a categorical restriction).  We adopt a version of this two-step approach and sketch a skeleton of the framework here, leaving future cases to put meat on the bones.

---

[7] Since *Heller*, we have upheld several federal statutes against Second Amendment challenges, but we have not established a Second Amendment framework.  *See, e.g.*, *Portillo–Munoz*, 643 F.3d at 439–42 (upholding 18 U.S.C. § 922(g)(5), which prevents illegal aliens from possessing firearms); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (upholding § 922(g), which bars convicted felons from possessing firearms, based on circuit precedent); *United States v. Dorosan*, 350 F. App'x 874, 875–76 (5th Cir. 2009) (unpublished) (upholding regulation barring possession of handguns on U.S. Postal Service property).

No. 11-10959

We agree that the first inquiry is whether the conduct at issue falls within the scope of the Second Amendment right. *See, e.g.*, *Chester*, 628 F.3d at 680. To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee. *See Heller*, 554 U.S. at 577–628 (interpreting Second Amendment based on historical traditions); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[H]istorical meaning enjoys a privileged interpretive role in the Second Amendment context."). *Heller* illustrates that we may rely on a wide array of interpretive materials to conduct a historical analysis. *See* 554 U.S. at 600–26 (relying on courts, legislators, and scholars from before ratification through the late 19th century to interpret the Second Amendment); *see also United States v. Rene E.*, 583 F.3d 8, 13–16 (1st Cir. 2009) (relying on wide-ranging materials, including late 19th- and early 20th-century cases, to uphold federal ban on juvenile handgun possession).[8]

If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster. *See, e.g.*, *Marzzarella*, 614 F.3d at 89. If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny. *See id.*

We agree with the prevailing view that the appropriate level of scrutiny "depends on the nature of the conduct being regulated and the degree to which

---

[8] In exploring the "historical understanding of the scope of the right," 554 U.S. at 625, the *Heller* Court looked to a "variety of legal and other sources to determine the public understanding of [the] legal text in the period after its enactment or ratification," *id.* at 605 (emphasis omitted). These sources included "analogous arms-bearing rights," *id.* at 600, adopted by states "[b]etween 1789 and 1820," *id.* at 602, and the interpretation of these provisions by "19th-century courts and commentators," *id.* at 603. The *Heller* Court also looked to "[p]ost-Civil War [l]egislation," reasoning that because "those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens[,] their understanding of the origins and continuing significance of the Amendment is instructive." *Id.* at 614.

the challenged law burdens the right." *See Chester*, 628 F.3d at 682 (observing that a "severe burden on the core Second Amendment right of armed self-defense should require a strong justification," but "less severe burdens on the right" and "laws that do not implicate the central self-defense concern of the Second Amendment[] may be more easily justified" (quotation and citation omitted)); *accord Heller II*, 670 F.3d at 1257 ("[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify."); *Masciandaro*, 638 F.3d at 470 (observing that the analysis turns on "the character of the Second Amendment question presented"—that is, "the nature of a person's Second Amendment interest [and] the extent to which those interests are burdened by government regulation"). A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family, *see Heller*, 554 U.S. at 635—triggers strict scrutiny. *See Heller II*, 670 F.3d at 1257; *Masciandaro*, 638 F.3d at 470; *Chester*, 628 F.3d at 682. A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing. *See Heller II*, 670 F.3d at 1257; *Masciandaro*, 638 F.3d at 470; *Chester*, 628 F.3d at 682. This more lenient level of scrutiny could be called "intermediate" scrutiny, but regardless of the label, this level requires the government to demonstrate a "reasonable fit" between the challenged regulation and an "important" government objective. *See Marzzarella*, 614 F.3d at 98; *accord Chester*, 628 F.3d at 683; *see also Masciandaro*, 638 F.3d at 471 (stating that intermediate scrutiny requires government to demonstrate that the regulation is "reasonably adapted to a substantial governmental interest"). This "intermediate" scrutiny test must be more rigorous than rational basis review, which *Heller* held "could not be used

to evaluate the extent to which a legislature may regulate a specific, enumerated right" such as "the right to keep and bear arms." *See* 554 U.S. at 628 n.27; *see also id.* ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

We admit that it is difficult to map *Heller*'s "longstanding," *id.* at 626, "presumptively lawful regulatory measures," *id.* at 627 n.26, onto this two-step framework. It is difficult to discern whether "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . or laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626–27, by virtue of their presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny. *See, e.g.*, *Marzzarella*, 614 F.3d at 91 (recognizing that the designation—longstanding, presumptively lawful measure—is ambiguous). For now, we state that a longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework. *See Heller II*, 670 F.3d at 1253 ("[A] regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment.").[9] We further state that a longstanding measure

---

[9] The *Heller* Court assured that "nothing in [its] opinion should be taken to cast doubt on" longstanding, presumptively lawful measures. 554 U.S. at 626. The Court also compared its list of longstanding, presumptively lawful measures with the restriction on possessing dangerous and unusual weapons, which conduct—the Court explained—fell outside the scope of the Second Amendment right. *Id.* at 626–27.

that harmonizes with the history and tradition of arms regulation in this country would not threaten the core of the Second Amendment guarantee. Thus, even if such a measure advanced to step two of our framework, it would trigger our version of "intermediate" scrutiny. *See Masciandaro*, 638 F.3d at 470–71 (applying intermediate scrutiny to and upholding federal regulation banning possession of loaded handgun in motor vehicle within a national park, and reasoning that the "longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable").

In addition, *Heller* demonstrates that a regulation can be deemed "longstanding" even if it cannot boast a precise founding-era analogue. *See Skoien*, 614 F.3d at 640–41 ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."); *cf. Heller II*, 670 F.3d at 1253–54 (relying on early 20th-century state statutes to show that D.C. handgun registration requirement was "longstanding" and did not "impinge upon the right protected by the Second Amendment"). After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage. *See Booker*, 644 F.3d at 23–24 (explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), "bears little resemblance to laws in effect at the time the Second Amendment was ratified," as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968); *Skoien*, 614 F.3d at 640–41 (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968); Carlton F. W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376–80 (2009) (showing that a strictly originalist argument for *Heller*'s

examples—including bans on firearm possession by felons and the mentally ill, and laws imposing conditions on commercial arms sales—is difficult to make).

Having sketched our two-step analytical framework, we must emphasize that we are persuaded to adopt this framework because it comports with the language of *Heller*. As for step one, *Heller* itself suggests that the threshold issue is whether the party is entitled to the Second Amendment's protection. *See* 554 U.S. at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun . . . ."); *see also id.* at 626–27 (providing a non-exhaustive list of longstanding, presumptively lawful regulatory measures).   As for step two, by taking rational basis review off the table, and by faulting a dissenting opinion for proposing an interest-balancing inquiry *rather than* a traditional level of scrutiny, the Court's language suggests that intermediate and strict scrutiny are on the table.   *See id.* at 628 n.27; *id.* at 634 ("[Justice Breyer] proposes . . . none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but *rather* a judge-empowering 'interest-balancing inquiry' . . . ." (emphasis added) (quoting *id.* at 689 (Breyer, J., dissenting))).   The Court's use of the word "rather" demonstrates that, in the Court's view, the familiar scrutiny tests are not equivalent to interest balancing. In rejecting Justice Breyer's proposed interest-balancing inquiry, we understand the Court to have distinguished that inquiry from the traditional levels of scrutiny; we do not understand the Court to have rejected all heightened scrutiny analysis. *But see Heller II*, 670 F.3d at 1277–78 (Kavanaugh, J. , dissenting) (arguing that the *Heller* Court's rejection of Justice Breyer's interest-balancing inquiry amounted to a rejection of all balancing tests).[10]   At the very least, the Court did not expressly foreclose

---

[10]  We are further convinced that intermediate and strict scrutiny are on the table by the Court's statement that the handgun ban in *Heller* would be unconstitutional "[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights."

intermediate or strict scrutiny, but instead left us room to maneuver in crafting a framework.

Furthermore, we are persuaded to adopt the two-step framework outlined above because First Amendment doctrine informs it. *See Marzzarella*, 614 F.3d at 89 n.4 (looking toward the First Amendment for guidance in interpreting the Second Amendment and observing that "*Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment"). First, First Amendment doctrine supports commencing our analysis with a threshold inquiry into whether the Second Amendment protects the conduct at issue. Similar to the first step of our Second Amendment framework, the first step in analyzing a First Amendment challenge is to determine whether the conduct (i.e., speech) in question is protected. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245–46 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."). Second, First Amendment doctrine demonstrates that, even with respect to a fundamental constitutional right, we can and should adjust the level of scrutiny according to the severity of the challenged regulation. *See Marzzarella*, 614 F.3d at 96–97 ("[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see no reason why the Second Amendment would be any different." (citation omitted)); *Justice For All v. Faulkner*, 410 F.3d 760, 765–66 (5th Cir. 2005) (discussing different levels of scrutiny for traditional, nonpublic, and designated fora); *see also Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (applying intermediate scrutiny to commercial speech in light of its "subordinate position in the scale of

---

*Heller*, 554 U.S. at 628–29. We reason that, had the Court so intended, it would have expressly rejected application of any form of heightened scrutiny. *See Heller II,* 670 F.3d at 1265.

No. 11-10959

First Amendment values"); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restrictions on speech); *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510–12 (5th Cir. 2009) (reviewing school dress codes under intermediate scrutiny). Thus, even though the Second Amendment right is fundamental, *McDonald*, 130 S. Ct. at 3042, we reject the contention that every regulation impinging upon the Second Amendment right must trigger strict scrutiny. *See Heller II*, 670 F.3d at 1256 ("The [Supreme] Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake."); *Chester*, 628 F.3d at 682 ("We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights."); Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 697–98 (2007) (observing that "[i]t simply is not true that every right deemed 'fundamental' triggers strict scrutiny," and that "[e]ven among those incorporated rights that do prompt strict scrutiny, such as the freedom of speech and of religion, strict scrutiny is only occasionally applied"). In harmony with well-developed principles that have guided our interpretation of the First Amendment, we believe that a law impinging upon the Second Amendment right must be reviewed under a properly tuned level of scrutiny—i.e., a level that is proportionate to the severity of the burden that the law imposes on the right.

## B.    Background of the Challenged Federal Laws

Before we apply the framework described above to the challenged federal laws, we place them in context. Congress passed the Omnibus Crime Control and Safe Streets Act of 1968 following a multi-year inquiry into violent crime that included "field investigation and public hearings." S. Rep. No. 88-1340, at 1 (1964). According to the preamble to the Act, Congress had found "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or

No. 11-10959

foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power."  Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 197, 225 (1968).  The preamble further declares:

> [T]he ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

*Id.* § 901(a)(2), 82 Stat. at 225; *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974) (stating that the purpose of the 1968 Act was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency" (quoting S. Rep. No. 90-1501, at 22 (1968))).

Moreover, in a section titled "Acquisition of firearms by juveniles and minors,"[11] the Senate Report accompanying the Act provides:

> [T]he title would provide a uniform and effective means through the United States for preventing the acquisition of the specified firearms by persons under such ages. However, under the title, a minor or juvenile would not be restricted from owning, or learning the proper usage of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.
>
> The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country. The controls proposed in the title are designed to meet this problem and to substantially curtail it.

---

[11] Throughout the Act and accompanying legislative materials, the term "minor" refers to a person under the age of 21, while the term "juvenile" refers to a person under the age of 18.  As explained *infra*, Section III.C.1, the age of majority at common law was 21, not 18.  It was not until the 1970s that States lowered the age of majority to 18 for most purposes.

No. 11-10959

S. Rep. No. 90-1097, at 79 (1968).

Congress's investigation confirmed a "causal relationship between the easy availability of firearms other than a rifle or a shotgun and . . . youthful criminal behavior." Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 225–26; *see also Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen) ("The greatest growth of crime today is in the area of young people . . . . The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly."). Having found that concealable firearms had been "widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior," Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 226, Congress concluded that "only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible," *id.* § 901(a)(3), 82 Stat. at 225.

The legislative record makes clear that Congress's purpose in preventing persons under 21—including 18-to-20-year-olds—from purchasing handguns from FFLs was to curb violent crime. Essentially, then, the federal laws at issue are safety-driven, age-based categorical restrictions on handgun access.

## C.    Whether the Challenged Federal Laws Burden Conduct Protected by the Second Amendment

Having placed the challenged federal laws in their proper context, we now consider whether the laws—which combine to prevent 18-to-20-year-olds from purchasing handguns from FFLs—burden conduct that is protected by the Second Amendment.

No. 11-10959

1.    **Founding-Era Attitudes**

As the Supreme Court recognized in *Heller*, the right to keep and bear arms has never been unlimited.  554 U.S. at 626; *see also Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) (observing that the right to keep and bear arms, like other rights "inherited from our English ancestors" and protected by the Bill of Rights, has "from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case").  Since even before the Revolution, gun use and gun control have been inextricably intertwined.  The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books; these included safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service (including laws requiring militia members to attend "musters," public gatherings where officials would inspect and account for guns), laws prohibiting the use of firearms on certain occasions and in certain places, and laws disarming certain groups and restricting sales to certain groups. *See* Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 113–18 (2011); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 502–13 (2004).   It appears that when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee.

Noteworthy among these revolutionary and founding-era gun regulations are those that targeted particular groups for public safety reasons.  For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation.  *See* Cornell & DeDino, 73 Fordham L. Rev. at 507–08.  Although these Loyalists were neither criminals nor traitors, American legislators had determined that

No. 11-10959

permitting these persons to keep and bear arms posed a potential danger. *Id.* ("The law demonstrates that in a well regulated society, the state could disarm those it deemed likely to disrupt society."); *see also* Winkler, *Gunfight*, at 116 (concluding that "[t]he founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy," a group that included law-abiding slaves, free blacks, and Loyalists); Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009) ("[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms. American legislators at the time of the Bill of Rights seem to have been aware of this tradition . . . ." (footnote omitted)).

In the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally. *See* Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 231–36 (1999) (discussing Pennsylvania Anti-Federalists' support for a high level of gun regulation). Shortly after the Pennsylvania ratifying convention for the original Constitution, for example, the Anti-Federalist minority recommended the following amendment: "That the people have a right to bear arms for the defense of themselves and their own state, or the United States . . . and no law shall be passed for disarming the people or any of them, unless for crimes committed, *or real danger of public injury from individuals*." *Id.* at 233 (emphasis added) (quoting *The Address and*

No. 11-10959

*Reasons of Dissent of the Minority*, *in The Documentary History of the Ratification of the Constitution* 588, 617–24 (St. Historical Soc'y of Wis., 1976)).[12]

These categorical restrictions may have been animated by a classical republican notion that only those with adequate civic "virtue" could claim the right to arms. Scholars have proposed that at the time of the founding, "the right to arms was inextricably and multifariously linked to that of civic virtu (i.e., the virtuous citizenry)," and that "[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." Kates & Cramer, 60 Hastings L.J. at 1359–60.[13] This theory suggests that the Founders would have supported limiting or banning "the ownership of firearms by *minors*, felons, and the mentally impaired." *See* Don B. Kates, *Second Amendment*, *in* 4 *Encyclopedia of the American Constitution* 1640 (Leonard W. Levy et al. eds., 1986) (emphasis added); *see also United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) (inferring from scholarly sources that "it is clear that felons, *infants* and those of unsound mind may be prohibited from possessing firearms" (emphasis added)).

---

[12] Additionally, William Rawle—"a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights," *Heller*, 554 U.S. at 607—maintained that although the Second Amendment restrained the power of Congress to "disarm the people," the right to keep and bear arms nonetheless "ought not, . . . in any government, to be abused to the disturbance of the public peace." William Rawle, *A View of the Constitution of the United States of America* 125–26 (William S. Hein & Co. 2003) (2d ed. 1829).

[13] *See also* Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (Winter 1986) ("[T]he philosophers of republicanism were not blind to the desirability of disarming certain elements within their society . . . . Arms were 'never lodg'd in the hand of any who had not an Interest in preserving the publick Peace . . . .'" (quoting J. Trenchard & W. Moyle, *An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, And Absolutely Destructive to the Constitution of the English Monarchy* (London 1697)).

No. 11-10959

Notably, the term "minor" or "infant"—as those terms were historically understood—applied to persons under the age of 21, not only to persons under the age of 18. The age of majority at common law was 21, and it was not until the 1970s that States enacted legislation to lower the age of majority to 18. *See, e.g.*, *Black's Law Dictionary* 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority . . . ." (quoting John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878))); *id.* ("The common-law rule provided that a person was an infant until he reached the age of twenty-one. The rule continues at the present time, though by statute in some jurisdictions the age may be lower." (quoting John Edward Murray Jr., *Murray on Contracts* § 12, at 18 (2d ed. 1974)))*; see generally* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681–86 (2007). If a representative citizen of the founding era conceived of a "minor" as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18-to-20-year-olds as "minors," then it stands to reason that the citizen would have supported restricting an 18-to-20-year-old's right to keep and bear arms.

## 2.  Nineteenth-Century Legislators, Courts, and Commentators

Arms-control legislation intensified through the 1800s, *see* Cornell & DeDino, 73 Fordham L. Rev. at 512–13, and by the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of "minors" to purchase or use particular firearms while the state age of majority was set at age 21.[14] *See, e.g.*, *State v. Quail*, 92 A. 859,

---

[14]   1856 Ala. Acts 17; 16 Del. Laws 716 (1881); 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112; 1881 Ill. Laws 73; 1875 Ind. Acts 86; 1884 Iowa Acts 86; 1883 Kan. Sess. Laws 159; 1873 Ky. Acts 359; 1890 La. Acts 39; 1882 Md. Laws 656; 1878 Miss. Laws 175–76; Mo. Rev. Stat. § 1274 (1879); 1885 Nev. Stat. 51; 1893 N.C. Sess. Laws 468–69; 1856 Tenn. Pub. Acts 92; 1897 Tex. Gen. Laws 221–22; 1882 W. Va. Acts 421–22; 1883 Wis.

No. 11-10959

859 (Del. 1914) (discussing indictment for "knowingly sell[ing] a deadly weapon to a minor other than an ordinary pocket knife"); *State v. Allen*, 94 Ind. 441 (1884) (discussing prosecution for "unlawfully barter[ing] and trad[ing] to Wesley Powles, who was then and there a minor under the age of twenty-one years, a certain deadly and dangerous weapon, to wit: a pistol, commonly called a revolver, which could be worn or carried concealed about the person"); *Tankersly v. Commonwealth*, 9 S.W. 702, 702 (Ky. 1888) (discussing indictment for selling a deadly weapon to a minor); *see also Rene E.*, 583 F.3d at 14 ("During this period and soon after, a number of states enacted similar statutes prohibiting the transfer of deadly weapons—often expressly handguns—to juveniles."). By the early 20th century, three more States restricted the purchase or use of particular firearms by persons under 21.[15] By 1923, therefore, twenty-two States and the District of Columbia had made 21 the minimum age for the purchase or use of particular firearms.[16]

Meanwhile, "19th-century courts and commentators," *Heller*, 554 U.S. at 603, maintained that age-based restrictions on the purchase of firearms—including restrictions on the ability of persons under 21 to purchase

---

Sess. Laws 290; 1890 Wyo. Sess. Laws 1253. Alabama, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Tennessee, Texas, and Wyoming had Second Amendment analogues in their respective constitutions at the time they enacted these regulations.

[15] Okla. Stat. ch. 25, art. 47 §§ 1-3 (1890) (though not admitted as State until 1907); 1923 N.H. Laws 138, 139; 1923 S.C. Acts 207, 221. Oklahoma and South Carolina have Second Amendment analogues in their respective constitutions.

[16] From the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms. As one early 20th century commentator wrote of the state legislation: "The acts are quite consistent in refusing to allow the issue of licenses to young persons or criminals, and in punishing persons who sell or put into possession of the forbidden classes the forbidden weapons." J. P. Chamberlain, *Legislatures and the Pistol Problem*, 11 A.B.A. J. 596, 598 (1925).

Today—as mentioned *supra*, Section I.B.—all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms. Thirty-five States have Second Amendment analogues in their respective constitutions.

No. 11-10959

firearms—comported with the Second Amendment guarantee. To illustrate, Thomas Cooley—a "judge and professor" "who wrote a massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616—agreed that "the State may prohibit the sale of arms to minors" pursuant to the State's police power. Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883) (citing *State v. Calicutt*, 69 Tenn. 714 (1878)). Cooley recognized the validity of imposing age qualifications on arm sales, despite his acknowledgment that the "federal and State constitutions provide that the right of the people to bear arms shall not be infringed." *Id.* at 429.

In the 1878 case that Cooley referenced, the Tennessee Supreme Court upheld a conviction under a state law making it a misdemeanor to sell, give, or loan a pistol to a minor, *Calicutt*, 69 Tenn. at 714–15, when the age of majority was set at 21. The defendant argued that the law violated the state's Second Amendment analogue, reasoning that because "every citizen who is subject to military duty has the right 'to keep and bear arms,' . . . this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him." *Id.* at 716. In rejecting the defendant's challenge, the court explained that the "wise and salutary" legislation was passed to "prevent crime" and suppress "the pernicious and dangerous practice of carrying arms," and was not "intended to affect, and [did] not in fact abridge," the right to keep and bear arms. *Id.* at 715–17. Likewise, in *Coleman v. State*, 32 Al. 581, 582–83 (1858), the Alabama Supreme Court upheld a conviction for violating a state law making it a misdemeanor to sell, give, or lend a pistol to a male minor, when the age of majority was set at 21.

### 3.    Conclusion

We have summarized considerable evidence that burdening the conduct at issue—the ability of 18-to-20-year-olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition, which suggests that the

conduct at issue falls outside the Second Amendment's protection. At a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety. *See* Winkler, *Gunfight*, at 116; Cornell & DeDino, 73 Fordham L. Rev. at 507–08. More specifically, the present ban appears consistent with a longstanding tradition of age- and safety-based restrictions on the ability to access arms. In conformity with founding-era thinking, and in conformity with the views of various 19th-century legislators and courts, Congress restricted the ability of minors under 21 to purchase handguns because Congress found that they tend to be relatively immature and that denying them easy access to handguns would deter violent crime. *Compare* Kates & Cramer, 60 Hastings L.J. at 1360 (reflecting founding-era attitude that minors were inadequately virtuous to keep and bear arms), *and Calicutt*, 69 Tenn. at 716–17 (referring to prohibition on firearm sales to minors as "wise and salutary" legislation designed to "prevent crime"), *with* Pub. L. No. 90-351, § 901(a)(6), 82 Stat. 197, 226 (1968) (reflecting concern that handguns had been "widely sold by [FFLs] to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior").

This reasoning finds support in *United States v. Rene E.*, in which the First Circuit canvassed sources similar to ours and upheld the constitutionality of 18 U.S.C. § 922(x), which prohibits persons under age 18 from possessing handguns and prohibits transfers of handguns to such persons, with exceptions. 583 F.3d at 16. The court inferred that "[t]here is some evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms," and that "[i]n this sense, the federal ban on juvenile possession of handguns is part of a longstanding practice of prohibiting certain classes of individuals from possessing firearms—those whose possession poses

a particular danger to the public." *Id.* at 15. The court rested its holding that the statute was constitutional on "the existence of a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns." *Id.* at 12. However, because the line between childhood and adulthood was historically 21, not 18, the First Circuit's conclusion that there is a "longstanding tradition" of preventing persons under 18 from "receiving" handguns applies with just as much force to persons under 21.

To be sure, we are unable to divine the Founders' specific views on whether 18-to-20-year-olds had a stronger claim than 17-year-olds to the Second Amendment guarantee. The Founders may not even have shared a collective view on such a subtle and fine-grained distinction. The important point is that there is considerable historical evidence of age- and safety-based restrictions on the ability to access arms. Modern restrictions on the ability of persons under 21 to purchase handguns—and the ability of persons under 18 to possess handguns—seem, to us, to be firmly historically rooted.

Nonetheless, we face institutional challenges in conducting a definitive review of the relevant historical record. Although we are inclined to uphold the challenged federal laws at step one of our analytical framework, in an abundance of caution, we proceed to step two. We ultimately conclude that the challenged federal laws pass constitutional muster even if they implicate the Second Amendment guarantee.[17]

---

[17] Before we scrutinize the challenged federal laws, however, we address one final scope issue: Appellants' contention that a right to purchase firearms from FFLs must *vest* at age 18. Appellants offer two arguments in favor of this contention. We reject both.

Appellants first argue that 18-to-20-year-olds have a Second Amendment right to purchase firearms from FFLs because, at the time of the founding, 18-to-20-year-olds were assigned to serve in the militia and militia duty necessarily implies the right to purchase firearms. The 1792 Militia Act provided that "each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." Militia Act § 1, 1 Stat. 271. But Appellants' militia-

## D. Whether to Apply a More or Less Demanding Level of Scrutiny

Assuming that the challenged federal laws burden conduct within the scope of the Second Amendment, we must evaluate the laws under a suitable standard of constitutional scrutiny. A law that burdens the core of the Second Amendment guarantee—for example, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635—would trigger strict scrutiny, while a less severe law would be proportionately easier to justify. *See Heller II*, 670 F.3d at 1257; *Masciandaro*,

---

based attack on the federal laws at bar is unavailing. First, the right to arms is not co-extensive with the duty to serve in the militia. *See Heller*, 554 U.S. at 589–94 (decoupling the former from the latter). Second, if the right to arms and the duty to serve in the militia were linked in the manner that Appellants declare, then Appellants' argument proves too much. In some colonies, able-bodied sixteen-year-olds were obligated to serve in the militia, and yet, Appellants assure us that they are not challenging restrictions on handgun possession by or sales to persons under age 18. *E.g.*, Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 62 (assigning to militia "every able bodied male person [with exceptions] from sixteen years of age to fifty"). Third, in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need. *Compare* An Act for the Better Regulating [of] the Militia, ch. 20, §§1, 4, 1777 N.J. Acts 26 (setting minimum age at 16 in 1777), *with* An Act to embody, for a limited Time, One Thousand of the Militia of this State, for the Defence of the Frontiers thereof, ch. 24, §§ 3-4, 1778 N.J. Acts 58, 58-69 (setting minimum age at 21, but reserving right to accept age 16-21, in 1778). Such fluctuation undermines Appellants' militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later. Indeed, the 1792 Militia Act gave States discretion to impose age qualifications on service, and several States chose to enroll only persons age 21 or over, or required parental consent for persons under 21. *E.g.*, An Act to regulate the Militia, § 2, 1843 Ohio Acts 53, 53 (setting minimum age at 21). And this is all not to mention the anachronism at play: we no longer have a founding-era-style militia.

Appellants also argue that a Second Amendment right to purchase firearms from FFLs *vests* at age 18 because the age of majority is now 18. True, in the 1970s, States lowered the age of majority for most purposes from 21 to 18. But "majority or minority is a status," not a "fixed or vested right." Jeffrey F. Ghent, *Statutory Change of Age of Majority as Affecting Pre-existing Status or Rights*, 75 A.L.R. 3d 228 § 3 (1977). The terms "majority" and "minority" lack content without reference to the right at issue. Seventeen-year-olds may not vote or serve in the military, while 18-year-olds may. Twenty-year-olds may not purchase alcohol (by state statute), purchase lottery tickets in some States (*e.g.*, Ariz. Rev. Stat. § 5-515(a)), purchase handguns in some States (by state statute), or purchase handguns from FFLs (by federal statute)—while 21-year-olds may. Neither the Twenty-Sixth Amendment nor state law setting the age of majority at 18 compels Congress or the States to select 18 as the minimum age to purchase alcohol, lottery tickets, or handguns.

638 F.3d at 470; *Chester*, 628 F.3d at 682.  The latter, "intermediate" standard of scrutiny requires the government to show a reasonable fit between the law and an important government objective.

Unquestionably, the challenged federal laws trigger nothing more than "intermediate" scrutiny.  We have demonstrated that this federal scheme is not a salient outlier in the historical landscape of gun control.  And unlike the D.C. ban in *Heller*, this ban does not disarm an entire community, but instead prohibits commercial handgun sales to 18-to-20-year-olds—a discrete category.  The narrow ambit of the ban's target militates against strict scrutiny.

Indeed, *Heller*'s observation that longstanding prohibitions on firearm possession by felons and the mentally ill are presumptively valid, 554 U.S. at 626, 627 n.26, entails that the Second Amendment permits "categorical regulation of gun possession by classes of persons." *Booker*, 644 F.3d at 23; *see also Skoien*, 614 F.3d at 640, 641 (inferring from *Heller* that "statutory prohibitions on the possession of weapons by some persons are proper" and noting that "[c]ategorical limits on the possession of firearms would not be a constitutional anomaly").  Like the federal bans targeting felons and the mentally ill, the federal laws targeting minors under 21 are an outgrowth of an American tradition of regulating certain groups' access to arms for the sake of public safety. *Compare* Kates & Cramer, 60 Hastings L.J. at 1360 (arguing that the founding generation sought to disarm the unvirtuous, including minor children, felons, and the mentally ill), *with* S. Rep. No. 90-1501, at 22 (1968) (stating that the purpose of the 1968 Act was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency").  To the extent that the ban on handgun sales to minors under 21 is analogous to longstanding, presumptively lawful bans on possession by felons and the mentally ill, *see Heller*, 554 U.S. at 626, 627 n.26, the ban at bar should trigger an "intermediate" level of scrutiny.  *Cf.*

No. 11-10959

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) ("Restrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny.").

Moreover, as with felons and the mentally ill, categorically restricting the presumptive Second Amendment rights of 18-to-20-year-olds does not violate the central concern of the Second Amendment. The Second Amendment, at its core, protects "law-abiding, *responsible*" citizens. *See Heller*, 554 U.S. at 635 (emphasis added). Congress found that persons under 21 tend to be relatively irresponsible and can be prone to violent crime, especially when they have easy access to handguns. *See* Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 197, 225 (1968) (referring to "emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior"); *cf. Chester*, 628 F.3d at 682–83 (applying intermediate scrutiny to 18 U.S.C. § 922(g)(9), the federal domestic-violence-misdemeanant firearm possession ban, and holding that misdemeanant-plaintiff's claimed "right to possess a firearm in his home for the purpose of self-defense" was "not within the core right identified in *Heller*—the right of a *law-abiding*, *responsible* citizen to possess and carry a weapon for self-defense").

Granted, 18-to-20-year-olds may have a stronger claim to the Second Amendment guarantee than convicted felons and domestic-violence misdemeanants have. Culpable criminal conduct has not put 18-to-20-year-olds in the cross-hairs of the ban at bar. Still, unlike bans on felons, the mentally ill, and domestic-violence misdemeanants, this ban does not severely burden the presumptive Second Amendment rights of the targeted class's members. While the former bans extinguish the Second Amendment rights of the class members by totally preventing them from possessing firearms, this ban is not so extreme.

First, these federal laws do not severely burden the Second Amendment rights of 18-to-20-year-olds because they impose an age qualification on commercial firearm sales: FFLs may not sell handguns to persons under the age of 21. Far from a total prohibition on handgun possession and use, these laws

No. 11-10959

resemble "laws imposing conditions and qualifications on the commercial sale of arms," which *Heller* deemed "presumptively lawful." *See* 554 U.S. at 626–27 & n.26. It is not clear that the Court had an age qualification in mind when it penned that sentence, but to the extent that these laws resemble presumptively lawful regulatory measures, they must not trigger strict scrutiny.

Second, these laws do not strike the core of the Second Amendment because they do not prevent 18-to-20-year-olds from possessing and using handguns "in defense of hearth and home." *See id.* at 628–30, 635; *cf. Heller II*, 670 F.3d at 1255–58 (applying intermediate scrutiny to D.C. registration requirements that "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—the 'core lawful purpose' protected by the Second Amendment," but that do not "prevent[] an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose"). Under this federal regulatory scheme, 18-to-20-year-olds may possess and use handguns for self-defense, hunting, or any other lawful purpose; they may acquire handguns from responsible parents or guardians; and they may possess, use, and purchase long-guns. Accordingly, the scheme is sufficiently bounded to avoid strict scrutiny.

Third, these laws demand only an "intermediate" level of scrutiny because they regulate commercial sales through an age qualification with temporary effect. Any 18-to-20-year-old subject to the ban will soon grow up and out of its reach. It is useful to compare this case with *United States v. Yancey*, in which the Seventh Circuit held that 18 U.S.C. § 922(g)(3), the illegal-drug-user firearm possession ban, was "far less onerous" than the firearm-possession bans on felons and the mentally ill because "unlike those who have been convicted of a felony or committed to a mental institution and so face a lifetime ban, an unlawful drug user like [the defendant] could regain his right to possess a

32

No. 11-10959

firearm simply by ending his drug abuse." 621 F.3d 681, 686–87 (7th Cir. 2010). Similar logic applies here. The temporary nature of the burden reduces its severity. Consequently, we hold that these laws deserve what we have dubbed an "intermediate" level of scrutiny.

## E.    Whether These Laws Survive "Intermediate" Scrutiny

In applying "intermediate" scrutiny, we determine whether there is a reasonable fit between the law and an important government objective; that is, the government must show that the law is reasonably adapted to an important government interest. *See Marzzarella*, 614 F.3d at 98; *accord Chester*, 628 F.3d at 683; *see also Masciandaro*, 638 F.3d at 470. We conclude that the challenged ban passes constitutional muster under "intermediate" scrutiny.

The government has put forth evidence that, through the 1968 Act, Congress sought to manage an important public safety problem: the ease with which young persons—including 18-to-20-year-olds—were getting their hands on handguns through FFLs. As discussed *supra*, Section III.B, Congress conducted a multi-year investigation that revealed a causal relationship between the easy availability of firearms to young people under 21 and the rise in crime. *See* Pub. L. No. 90-351, § 901(a)(6), 82 Stat. 197, 225–26 (1968) (identifying a "causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior"); *id.* § 901(a)(2), 82 Stat. at 225 (identifying "ease with which" young persons could "acquire firearms other than a rifle or shotgun" as a "significant factor in the prevalence of lawlessness and violent crime in the United States"). Indeed, at a hearing held in connection with Congress's inquiry, a law enforcement official reported, "The greatest growth of crime today is in the area of young people, juveniles, and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly." *Federal Firearms Act: Hearings Before the Subcomm. to*

No. 11-10959

*Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen).

The legislative record illustrates that Congress was concerned not only with "juveniles" under the age of 18, but also with "minors" under the age of 21. *See* S. Rep. No. 90-1097, at 79 (1968) ("The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country.") Congress's investigation had shown that "juveniles account for some 49 percent of the arrests for serious crimes in the United States," while "minors account for 64 percent of the total arrests in this category." S. Rep. No. 90-1097, at 77. Specifically, "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder. *See* 114 Cong. Rec. 12279, 12309 (1968) (statement of Sen. Thomas J. Dodd, Chairman, Sen. Subcomm. on Juvenile Delinquency).

The legislative record also demonstrates that Congress was particularly concerned with the FFL's role in the crime problem. The investigation had revealed that FFLs constituted the central conduit of handgun traffic to young persons. *See Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 89th Cong. 67 (1965) (testimony of Sheldon S. Cohen) ("The vast majority, in fact, almost all of these firearms, are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government . . . . The way to end this dangerous practice is to stop these federal licensees from selling firearms to juveniles and this is one of the major things that [the proposed legislation] would do."); Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 226 (finding that concealable firearms had been "widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior"); *id.* § 901(a)(3), 82 Stat. at 225 (concluding that "only

No. 11-10959

through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible").[18]

Additionally, the legislative record reflects Congress's concern with the "particular type of weapon that is predominantly used by the criminal" and that is "principally used in the commission of serious crime"—i.e., the "handgun." S. Rep. No. 89-1866, at 4–7 (1966). The handgun's size made it easy to carry and conceal, which in turn made it susceptible to "clandestine acquisition," S. Rep. No. 90-1097, at 79, and "criminal use," S. Rep. No. 89-1866, at 4.

Overall, the government has marshaled evidence showing that Congress was focused on a particular problem: *young persons under 21*, who are immature and prone to violence, easily accessing *handguns*, which facilitate violent crime, primarily by way of *FFLs*. Accordingly, Congress restricted the ability of *young persons under 21* to purchase *handguns* from *FFLs*. *See* 18 U.S.C § 922(b)(1).

We find that the government has satisfied its burden of showing a reasonable means-ends fit between the challenged federal laws and an important government interest. First, curbing violent crime perpetrated by young persons under 21—by preventing such persons from acquiring handguns from FFLs—constitutes an important government objective. *See, e.g.*, *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted.").

---

[18] *See also Huddleston*, 415 U.S. at 825 ("From this outline of the Act, it is apparent that the focus of the federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly controls access to weapons by users. Firearms are channeled through dealers to eliminate the mail order and the generally widespread commerce in them, and to insure that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest."); *United States v. Rybar*, 103 F.3d 273, 280 (3d Cir. 1996) ("[T]he Omnibus Act channeled [sic] all interstate traffic through licensees and prohibited licensees from transferring them to persons under 21 or living out-of-state.").

No. 11-10959

Second, Congress selected means that were reasonably adapted to achieving that objective. Congress found that the ease with which young persons under 21 could access handguns—as opposed to other guns—was contributing to violent crime, and also found that FFLs—as opposed to other sources—constituted the central conduit of handgun traffic to young persons under 21. Congress, in turn, reasonably tailored a solution to the particular problem: Congress restricted the ability of persons under 21 to purchase handguns from FFLs, while allowing (i) 18-to-20-year-old persons to purchase long-guns, (ii) persons under 21 to acquire handguns from parents or guardians, and (iii) persons under 21 to possess handguns and long-guns. *See* 18 U.S.C. § 922(b)(1), (c)(1); *see also supra*, Section I.B.[19]

Alternatively, Congress could have prohibited all persons under 21 from possessing handguns—or all guns, for that matter. But Congress deliberately adopted a calibrated, compromise approach. *See* 114 Cong. Rec. at 12309 (Sen. Dodd) ("At the most [the relevant provisions] could cause minor inconveniences to certain youngsters . . . by requiring that a parent or guardian over 21 years of age make a handgun purchase for any person under 21."); *see also* S. Rep. 90-1097, at 79 (stating that "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor by the parent or guardian"); *accord* S. Rep. No. 89-1866, at 58.

Since 1968, the means-ends fit between the ban and its objective has retained its reasonableness. The threat posed by 18-to-20-year-olds with easy access to handguns endures. In 1999, for example, one senator noted:

---

[19] As discussed, it was not until 1994 that Congress prohibited persons under 18 from possessing handguns and prohibited transfers of handguns to them, with exceptions. *See* Pub. L. No. 103-322, § 110201, 108 Stat. 1796, 2010 (1994) (adding 18 U.S.C. § 922(x)).

No. 11-10959

Firearms trace data collected as part of the Youth Crime Gun Interdiction Initiative (YCGII) paint a disturbing picture of crime gun activity by persons under 21. In the most recent YCGII Trace Analysis Report, the age of the possessor was known for 32,653, or 42.8 percent, of the 72,260 crime guns traced. Of these 32,563 guns, approximately 4,840, or 14.8 percent, were recovered from 18-20 year-olds. Indeed, the most frequent age of crime gun possession was 19 years of age, and the second most frequent was 18 years of age.

At the same time, according to the 1997 Uniform Crime Reports, the most frequent age arrested for murder was 18 years of age, and the second most frequent was 19 years of age. Those aged 18-20 accounted for 22 percent of all arrest[s] for murder in 1997.

145 Cong. Rec. 7503 (1999) (statement of Sen. Charles Schumer); *see also* 145 Cong. Rec. 18119 (1999) ("Studies show that one in four gun murders are committed by people aged 18 to 20.") (statement of Rep. Grace Napolitano).

Furthermore, a 1999 report by the U.S. Department of Treasury and the U.S. Department of Justice found that "[i]n 1997, 18, 19 and 20 year olds ranked first, second, and third in the number of gun homicides committed":

Of all gun homicides where an offender was identified, 24 percent were committed by 18 to 20 year olds. This is consistent with the historical pattern of gun homicides over the past ten years.

Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over. More specifically, in 1997, 74 percent of the homicides committed by 18 to 20 year old offenders involved firearms. In contrast, only 61 percent of homicides committed by offenders 21 or over involved firearms. The under-21 offender age groups showed a significant shift toward the use of firearms in committing homicides by the mid-1980's. By the 1990's, these offender groups were using firearms to commit homicides more than 70 percent of the time. Although the proportion of 18 to 20 year olds who use firearms to commit homicides has declined since the1994 peak, it remains higher than levels recorded before 1990. Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older offender age groups. For non-lethal crimes of violence from 1992 to 1997, in cases where the weapon and

No. 11-10959

age of offender were identified, 15 percent of 18 to 20 year old offenders used a firearm, in contrast to 10 percent of adult offenders, and 5 percent of offenders 17 and under.

U.S. Dep't of the Treasury & U.S. Dep't of Justice, *Gun Crime in the Age Group 18–20*, at 2 (June 1999) (citations ommitted); *see also id.* at 3 ("Handguns comprised 85 percent of the crime guns known to be recovered from 18 to 20 year olds" in twenty-seven cities participating in the study).

Recent data confirm that preventing handguns from easily falling into the hands of 18-to-20-year-olds remains critical to public safety. An FBI Uniform Crime Report for 2009 shows that persons aged 19, 18, and 20 accounted for the first, second, and third highest percentages of arrests, respectively, for any age up to age 24 (after which data are reported by age group). U.S. Dep't of Justice & Fed. Bureau of Investigation, *Crime in the United States 2009*, Table 38: Arrests by Age (Sept. 2010), http://www2.fbi.gov/ucr/cius2009/data/table_38.html (last visited Oct. 18, 2012) ("2009 CIUS Report") (reflecting: age 18 (4.8%); age 19 (5.0%); and age 20 (4.6%). In 2009, 18-to-20-year-olds accounted for over 19% of all murder and non-negligent manslaughter arrests, 14% of all arrests for forcible rape, almost 24% of all robbery arrests, and 12% of all aggravated assault arrests, *see id.*, even though they comprised only about 4.3% of the population.[20, 21]

---

[20] The government in its summary judgment brief calculated the population figure by dividing the total estimated population in December 2009 for ages 18,19, and 20 (4,344,942 + 4,484,666 + 4,415,714) by the total estimated population for all ages in that month (308,200,409). *See* U.S. Census Bureau, Dep't of Commerce, *Population Estimates: National Population Estimates for the 2000s* (June 2010), http://www.census.gov/popest/data/national/asrh/2009/2009-nat-res.html (last visited Oct. 18, 2012); *see also* U.S. Census Bureau, Dep't of Commerce, *Statistical Abstract of the United States: 2012*, Table 11: Resident Population by Race, Hispanic Origin, and Single Years of Age: 2009 (131 ed. 2012), http://www.census.gov/compendia/statab/2012/tables/12s0011.pdf (last visited Oct. 18, 2012) (estimating the total population—as of July 1, 2009—as 307,007,000, and the population of persons aged 18, 19, and 20 as 4,389,000, 4,484,000, and 4,340,000, respectively, which yields a 4.3% population figure for 18-to-20-year olds).

The 2009 CIUS Report was not an aberration. Similar to the 2009 report, the 2010

No. 11-10959

Nonetheless, Appellants counter that the emergence of unlicensed, private gun owners who are selling handguns to young adults undermines the reasonableness of the fit between the federal scheme and its objective. We decline Appellants' invitation to strike down these laws, under intermediate scrutiny, on the ground that they do not completely prevent young adults from accessing handguns and committing violent crimes. It is well-settled that "a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (citations and internal quotation marks omitted). Congress designed its scheme to solve a particular problem: violent crime associated with

---

CIUS Report shows that 18-, 19-, and 20-year-olds accounted for the three highest percentages of arrests for any age up to 24 (after which data are reported by age group); and, like the 2009 report, the 2010 report shows that 18-to-20-year-olds accounted for a disproportionately high percentage of arrests for violent crimes. *See* U.S. Dep't of Justice & Fed. Bureau of Investigation, *Crime in the United States 2010*, Table 38: Arrests by Age (Sept. 2011), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl39.xls (last visited Oct. 10, 2012) (reflecting: age 18 (4.6%); age 19 (4.9%); age 20 (4.7%)).

[21] We add that Congress's finding that minors under 21 are prone to violent crime, especially with guns-in-hand, is entitled to some deference. "Congress is far better equipped than the judiciary" to make "predictive judgments" and "amass and evaluate the vast amounts of data" bearing upon "complex" and "dynamic" issues. *See Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 665–66 (1994) (internal quotation marks omitted).

Furthermore, even putting aside deference, modern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over. *See, e.g.*, Brief for the Am. Med. Ass'n et al. as Amici Curiae in Support of Neither Party, Miller v. Alabama, 132 S. Ct. 2455 (2012) (Nos. 10-9646, 10-9647), 2012 WL 121237, at 19–20 ("The brain's frontal lobes are still structurally immature well into late adolescence, and the prefrontal cortex is 'one of the last brain regions to mature.' This, in turn, means that 'response inhibition, emotional regulation, planning and organization . . . continue to develop between adolescence and young adulthood.'" (citations omitted)); Lawrence Steinberg et al., *Age Differences in Future Orientation and Delay Discounting*, 80 Child Dev. 28, 40–41 (2009) ("[C]hanges in impulse control and planning are mediated by a 'cognitive control' network . . . which matures more gradually and over a longer period of time, into early adulthood.").

the trafficking of handguns from FFLs to young adults. Because Congress's intended scheme reasonably fits that objective, the ban at bar survives "intermediate" scrutiny.

*        *        *

We therefore hold that the challenged federal laws are constitutional under the Second Amendment. *Heller* does not cast doubt on them.

## IV. Equal Protection Claim

We also reject Appellants' contention that the ban violates the equal protection component of the Fifth Amendment. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar advantage of a suspect class." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). First, we have demonstrated that the challenged laws do not impermissibly interfere with Second Amendment rights. Second, "age is not a suspect classification." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000).

Unlike race- or gender-based classifications, which require a "tighter fit between the discriminatory means and the legitimate ends they serve," the government may "discriminate on the basis of age without offending" the constitutional guarantee of equal protection "if the age classification in question is rationally related to a legitimate state interest." *Id.* at 83–84. "[W]hen conducting rational basis review," a court "will not overturn" the legislation "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational." *Id.* at 84 (internal quotation marks and alterations omitted). "[B]ecause an age classification is presumptively rational, the individual challenging its constitutionality bears the burden of proving the facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.*

No. 11-10959

at 84 (internal quotation marks omitted).

For the same reasons that the challenged laws are reasonably adapted to an important state interest, *see supra* Section III.E, the laws are rationally related to a legitimate state interest.  Appellants have failed to show that Congress irrationally imposed age qualifications on commercial arms sales.

**AFFIRMED.**