# In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-1269, 12-1788

MICHAEL MOORE, *et al.*, and
MARY E. SHEPARD, *et al.*,

*Plaintiffs-Appellants,*

v.

LISA MADIGAN, ATTORNEY GENERAL
OF ILLINOIS, *et al.*,

*Defendants-Appellees.*

Appeals from the United States District Courts for the
Central District of Illinois and the Southern District of Illinois.
Nos. 3:11-cv-3134-SEM-BGC and 3:11-cv-405-WDS-PMF—
**Sue E. Myerscough** and **William D. Stiehl**, *Judges.*

ARGUED JUNE 8, 2012—DECIDED DECEMBER 11, 2012

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* These two appeals, consolidated
for oral argument, challenge denials of declaratory and
injunctive relief sought in materially identical suits under
the Second Amendment. An Illinois law forbids a person,
with exceptions mainly for police and other security
personnel, hunters, and members of target shooting clubs,

720 ILCS 5/24-2, to carry a gun ready to use (loaded, immediately accessible—that is, easy to reach—and uncased). There are exceptions for a person on his own property (owned or rented), or in his home (but if it's an apartment, only there and not in the apartment building's common areas), or in his fixed place of business, or on the property of someone who has permitted him to be there with a ready-to-use gun. 720 ILCS 5/24-1(a)(4), (10), -1.6(a); see *People v. Diggins*, 919 N.E.2d 327, 332 (Ill. 2009); *People v. Laubscher*, 701 N.E.2d 489, 490–92 (Ill. 1998); *People v. Smith*, 374 N.E.2d 472, 475 (Ill. 1978); *People v. Pulley*, 803 N.E.2d 953, 957–58, 961 (Ill. App. 2004). Even carrying an unloaded gun in public, if it's uncased and immediately accessible, is prohibited, other than to police and other excepted persons, unless carried openly outside a vehicle in an unincorporated area and ammunition for the gun is not immediately accessible. 720 ILCS 5/24-1(a)(4)(iii), (10)(iii), -1.6(a)(3)(B).

The appellants contend that the Illinois law violates the Second Amendment as interpreted in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and held applicable to the states in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). *Heller* held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. But the Supreme Court has not yet addressed the question whether the Second Amendment creates a right of self-defense outside the home. The district courts ruled that it does not, and so dismissed the two suits for failure to state a claim.

The parties and the amici curiae have treated us to hundreds of pages of argument, in nine briefs. The main focus of these submissions is history. The supporters of the Illinois law present historical evidence that there was no generally recognized private right to carry arms in public in 1791, the year the Second Amendment was ratified—the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago, supra*, 130 S. Ct. at 3035 and n. 14. Similar evidence against the existence of an eighteenth-century right to have weapons in the home for purposes of self-defense rather than just militia duty had of course been presented to the Supreme Court in the *Heller* case. See, e.g., Saul Cornell, *A Well-Regulated Militia* 2–4, 58–65 (2006); Lois G. Schwoerer, "To Hold and Bear Arms: The English Perspective," 76 *Chi.-Kent L. Rev.* 27, 34–38 (2000); Don Higginbotham, "The Second Amendment in Historical Context," 16 Constitutional Commentary 263, 265 (1999). The District of Columbia had argued that "the original understanding of the Second Amendment was neither an individual right of self-defense nor a collective right of the states, but rather a civic right that guaranteed that citizens would be able to keep and bear those arms needed to meet their legal obligation to participate in a well-regulated militia." Cornell, *supra*, at 2; see also Paul Finkelman, "'A Well Regulated Militia': The Second Amendment in Historical Perspective," 76 *Chi.-Kent L. Rev.* 195, 213–14 (2000); Don Higginbotham, "The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship," 55 *William & Mary Q.* 39, 47–50 (1998); Roy G. Weatherup,

"Standing Armies and Armed Citizens: An Historical Analysis of the Second Amendment," 2 *Hastings Constitutional L.Q.* 961, 994–95 (1975).

The Supreme Court rejected the argument. The appellees ask us to repudiate the Court's historical analysis. That we can't do. Nor can we ignore the implication of the analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home. The first sentence of the *McDonald* opinion states that "two years ago, in *District of Columbia v. Heller*, we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense," *McDonald v. City of Chicago, supra*, 130 S. Ct. at 3026, and later in the opinion we read that "*Heller* explored the right's origins, noting that the 1689 English Bill of Rights explicitly protected a right to keep arms for self-defense, 554 U.S. at 593, and that by 1765, Blackstone was able to assert that the right to keep and bear arms was 'one of the fundamental rights of Englishmen,' *id*. at 594." 130 S. Ct. at 3037. And immediately the Court adds that "Blackstone's assessment was shared by the American colonists." *Id*.

Both *Heller* and *McDonald* do say that "the need for defense of self, family, and property is *most* acute" in the home, *id*. at 3036 (emphasis added); 554 U.S. at 628, but that doesn't mean it is not acute outside the home. *Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home, as when it says that the amendment "guarantee[s] the individual right to possess and

carry weapons in case of confrontation." 554 U.S. at 592. Confrontations are not limited to the home.

The Second Amendment states in its entirety that "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep *and bear* Arms, shall not be infringed" (emphasis added). The right to "bear" as distinct from the right to "keep" arms is unlikely to refer to the home. To speak of "bearing" arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home.

And one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home. Suppose one lived in what was then the wild west—the Ohio Valley for example (for until the Louisiana Purchase the Mississippi River was the western boundary of the United States), where there were hostile Indians. One would need from time to time to leave one's home to obtain supplies from the nearest trading post, and en route one would be as much (probably more) at risk if unarmed as one would be in one's home unarmed.

The situation in England was different—there was no wilderness and there were no hostile Indians and the right to hunt was largely limited to landowners, Schwoerer, *supra*, at 34–35, who were few. Defenders of the Illinois law reach back to the fourteenth-century Statute of Northampton, which provided that unless on King's business no man could "go nor

ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. III, c. 3 (1328). Chief Justice Coke interpreted the statute to allow a person to possess weapons inside the home but not to "assemble force, though he be extremely threatened, to go with him to church, or market, or any other place." Edward Coke, *Institutes of the Laws of England* 162 (1797). But the statute enumerated the locations at which going armed was thought dangerous to public safety (such as in fairs or in the presence of judges), and Coke's reference to "assemble force" suggests that the statutory limitation of the right of self-defense was based on a concern with armed gangs, thieves, and assassins rather than with indoors versus outdoors as such.

In similar vein *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686), interpreted the statute as punishing "people who go armed to terrify the King's subjects." Some weapons do not terrify the public (such as well-concealed weapons), and so if the statute was (as it may have been) intended to protect the public from being frightened or intimidated by the brandishing of weapons, it could not have applied to all weapons or all carriage of weapons. Blackstone's summary of the statute is similar: "the offence of riding or going armed, with *dangerous or unusual* weapons, is a crime against the public peace, by terrifying the good people of the land." 4 *Commentaries on the Law of England* 148–49 (1769) (emphasis added). *Heller* treated Blackstone's reference to "dangerous or unusual weapons" as evidence that the ownership of *some* types of

firearms is not protected by the Second Amendment, 554 U.S. at 627, but the Court cannot have thought *all* guns are "dangerous or unusual" and can be banned, as otherwise there would be no right to keep a handgun in one's home for self-defense. And while another English source, Robert Gardiner, *The Compleat Constable* 18–19 (3d ed. 1707), says that constables "may seize and take away" loaded guns worn or carried by persons not doing the King's business, it does not specify the circumstances that would make the exercise of such authority proper, let alone would warrant a prosecution.

Blackstone described the right of armed self-preservation as a fundamental natural right of Englishmen, on a par with seeking redress in the courts or petitioning the government. 1 Blackstone, *supra*, at 136, 139–40. The Court in *Heller* inferred from this that eighteenth-century English law recognized a right to possess guns for resistance, self-preservation, self-defense, and protection against both public and private violence. 554 U.S. at 594. The Court said that American law was the same. *Id*. at 594–95. And in contrast to the situation in England, in less peaceable America a distinction between keeping arms for self-defense in the home and carrying them outside the home would, as we said, have been irrational. All this is debatable of course, but we are bound by the Supreme Court's historical analysis because it was central to the Court's holding in *Heller*.

Twenty-first century Illinois has no hostile Indians. But a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower. A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress. But Illinois wants to deny the former claim, while compelled by *McDonald* to honor the latter. That creates an arbitrary difference. To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*. It is not a property right—a right to kill a houseguest who in a fit of aesthetic fury tries to slash your copy of Norman Rockwell's painting *Santa with Elves*. That is not self-defense, and this case like *Heller* and *McDonald* is just about self-defense.

A gun is a potential danger to more people if carried in public than just kept in the home. But the other side of this coin is that knowing that many law-abiding citizens are walking the streets armed may make criminals timid. Given that in Chicago, at least, most murders occur outside the home, Chicago Police Dep't, *Crime at a Glance: District 1* 13 (Jan.–June 2010), the net effect on crime rates in general and murder rates in particular of allowing the carriage of guns in public is uncertain both as a matter of theory and empirically.

"Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence." Robert A. Hahn et al., "Firearms Laws and the Reduction of Violence: A Systematic Review," 28 *Am. J. Preventive Med.* 40, 59 (2005); cf. John J. Donohue, "The Impact of Concealed-Carry Laws," in *Evaluating Gun Policy Effects on Crime and Violence* 287, 314–21 (2003). "Whether the net effect of relaxing concealed-carry laws is to increase or reduce the burden of crime, there is good reason to believe that the net is not large…. [T]he change in gun carrying appears to be concentrated in rural and suburban areas where crime rates are already relatively low, among people who are at relatively low risk of victimization—white, middle-aged, middle-class males. The available data about permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders. Based on available empirical data, therefore, we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand." Philip J. Cook, Jens Ludwig & Adam M. Samaha, "Gun Control After *Heller*: Threats and Sideshows from a Social Welfare Perspective," 56 *UCLA L. Rev.* 1041, 1082 (2009); see also H. Sterling Burnett, "Texas Concealed Handgun Carriers; Law-Abiding Public Benefactors," www.ncpa.org/pdfs/ba324.pdf (visited Oct. 29, 2012). But we note with disapproval that the opening brief

for the plaintiffs in appeal no. 12-1788, in quoting the last sentence above from the article by Cook and his colleagues, deleted without ellipses the last clause—"assuming that some sort of permit system for public carry is allowed to stand."

If guns cannot be carried outside the home, an officer who has reasonable suspicion to stop and frisk a person and finds a concealed gun on him can arrest him, as in *United States v. Mayo*, 361 F.3d 802, 804-08 (4th Cir. 2004), and thus take the gun off the street before a shooting occurs; and this is argued to support the ban on carrying guns outside the home. But it is a weak argument. Often the officer will have no suspicion (the gun is concealed, after all). And a state may be able to require "open carry"—that is, require persons who carry a gun in public to carry it in plain view rather than concealed. See *District of Columbia v. Heller, supra*, 554 U.S. at 626; James Bishop, Note, "Hidden or on the Hip: The Right(s) to Carry After *Heller*," 97 *Cornell L. Rev.* 907, 920–21 (2012). Many criminals would continue to conceal the guns they carried, in order to preserve the element of surprise and avoid the price of a gun permit; so the police would have the same opportunities (limited as they are, if the concealment is effective and the concealer does not behave suspiciously) that they do today to take concealed guns off the street.

Some studies have found that an increase in gun *owner-ship* causes an increase in homicide rates. Mark Duggan's study, reported in his article "More Guns, More

Crime," 109 *J. Pol. Econ.* 1086, 1112 (2001), is exemplary; and see also Philip J. Cook & Jens Ludwig, "The Social Costs of Gun Ownership," 90 *J. Pub. Econ.* 379, 387 (2006). But the issue in this case isn't ownership; it's carrying guns in public. Duggan's study finds that even the concealed carrying of guns, which many states allow, doesn't lead to an increase in gun ownership. 109 *J. Pol. Econ.* at 1106–07. Moreover, violent crime in the United States has been falling for many years and so has gun ownership, Patrick Egan, "The Declining Culture of Guns and Violence in the United States," www.themonkeycage.org/blog/2012/07/21/the-declining-culture-of-guns-and-violence-in-the-united-states (visited Oct. 29, 2012); see also Tom W. Smith, "Public Attitudes Towards the Regulation of Firearms" 10 (University of Chicago Nat'l Opinion Research Center, Mar. 2007), http://icpgv.org/pdf/NORCPoll.pdf (visited Oct. 29, 2012)—in the same period in which gun laws have become more permissive.

A few studies find that states that allow concealed carriage of guns outside the home and impose minimal restrictions on obtaining a gun permit have experienced increases in assault rates, though not in homicide rates. See Ian Ayres & John J. Donohue III, "More Guns, Less Crime Fails Again: The Latest Evidence From 1977–2006," 6 *Econ. J. Watch* 218, 224 (2009). But it has not been shown that those increases persist. Of another, similar paper by Ayres and Donohue, "Shoot-ing Down the 'More Guns, Less Crime' Hypothesis,"

55 *Stan. L. Rev.* 1193, 1270–85 (2003), it has been said that if they "had extended their analysis by one more year, they would have concluded that these laws [laws allowing concealed handguns to be carried in public] reduce crime." Carlisle E. Moody & Thomas B. Marvell, "The Debate on Shall-Issue Laws," 5 *Econ. J. Watch* 269, 291 (2008). Ayres and Donohue disagree that such laws reduce crime, but they admit that data and modeling problems prevent a strong claim that they *increase* crime. 55 *Stan. L. Rev.* at 1281–82, 1286–87; 6 *Econ. J. Watch* at 230–31.

Concealed carriage of guns might increase the death rate from assaults rather than increase the number of assaults. But the studies don't find that laws that allow concealed carriage increase the death rate from shootings, and this in turn casts doubt on the finding of an increased crime rate when concealed carriage is allowed; for if there were more confrontations with an armed criminal, one would expect more shootings. Moreover, there is no reason to expect Illinois to impose *minimal* permit restrictions on carriage of guns outside the home, for obviously this is not a state that has a strong pro-gun culture, unlike the states that began allowing concealed carriage before *Heller* and *MacDonald* enlarged the scope of Second Amendment rights.

Charles C. Branas et al., "Investigating the Link Between Gun Possession and Gun Assault," 99 *Am. J. of Pub. Health* 2034, 2037 (2009), finds that assault victims are more likely to be armed than the rest

of the population is, which might be thought evidence that going armed is not effective self-defense. But that finding does not illuminate the deterrent effect of knowing that potential victims may be armed. David Hemenway & Deborah Azrael, "The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey," 15 *Violence & Victims* 257, 271 (2000), finds that a person carrying a gun is more likely to use it to commit a crime than to defend himself from criminals. But that is like saying that soldiers are more likely to be armed than civilians. And because fewer than 3 percent of gun-related deaths are from accidents, Hahn et al., *supra*, at 40, and because Illinois allows the use of guns in hunting and target shooting, the law cannot plausibly be defended on the ground that it reduces the accidental death rate, unless it could be shown that allowing guns to be carried in public causes gun ownership to increase, and we have seen that there is no evidence of that.

In sum, the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law. Bishop, *supra*, at 922–23; Mark V. Tushnet, *Out of Range: Why the Constitution Can't End the Battle over Guns* 110–11 (2007). Anyway the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts. 554 U.S. at 636. If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.

And a ban as broad as Illinois's can't be upheld merely on the ground that it's not irrational. *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (per curiam); see also *Heller v. District of Columbia*, *supra*, 554 U.S. at 628 n. 27; *United States v. Chester*, 628 F.3d 673, 679–80 (4th Cir. 2010). Otherwise this court wouldn't have needed, in *United States v. Skoien*, 614 F.3d 638, 643–44 (7th Cir. 2010) (en banc), to marshal extensive empirical evidence to justify the less restrictive federal law that forbids a person "who has been convicted in any court of a misdemeanor crime of domestic violence" to possess a firearm in or affecting interstate commerce. 18 U.S.C. § 922(g)(9). In *Skoien* we said that the government had to make a "strong showing" that a gun ban was vital to public safety—it was not enough that the ban was "rational." 614 F.3d at 641. Illinois has not made that strong showing—and it would have to make a stronger showing in this case than the government did in *Skoien*, because the curtailment of gun rights was much narrower: there the gun rights of persons convicted of domestic violence, here the gun rights of the entire law-abiding adult population of Illinois.

A blanket prohibition on carrying gun in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would. In contrast,

when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need. Similarly, the state can prevail with less evidence when, as in *Skoien*, guns are forbidden to a class of persons who present a higher than average risk of misusing a gun. See also *Ezell v. City of Chicago, supra*, 651 F.3d at 708. And empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons such as felons and the mentally ill. *Heller v. District of Columbia, supra*, 554 U.S. at 626. Illinois has lots of options for protecting its people from being shot without having to eliminate all possibility of armed self-defense in public.

Remarkably, Illinois is the *only* state that maintains a flat ban on carrying ready-to-use guns outside the home, though many states used to ban carrying concealed guns outside the home, Bishop, *supra*, at 910; David B. Kopel, "The Second Amendment in the Nineteenth Century," 1998 *BYU L. Rev.* 1359, 1432–33 (1998)—a more limited prohibition than Illinois's, however. Not even Massachusetts has so flat a ban as Illinois, though the District of Columbia does, see D.C. Code §§ 22-4504 to -4504.02, and a few states did during the nineteenth century, *Kachalsky v. County of Westchester*, Nos. 11-3642, -3962, 2012 WL 5907502, at *6 (2d Cir. Nov. 27, 2012)—but no longer.

It is not that all states but Illinois are indifferent to the dangers that widespread public carrying of guns

may pose. Some may be. But others have decided
that a proper balance between the interest in self-defense
and the dangers created by carrying guns in public is
to limit the right to carry a gun to responsible persons
rather than to ban public carriage altogether, as Illinois
with its meager exceptions comes close to doing. Even
jurisdictions like New York State, where officials have
broad discretion to deny applications for gun
permits, recognize that the interest in self-defense
extends outside the home. There is no suggestion
that some unique characteristic of criminal activity
in Illinois justifies the state's taking a different approach
from the other 49 states. If the Illinois approach
were demonstrably superior, one would expect at least
one or two other states to have emulated it.

Apart from the usual prohibitions of gun ownership
by children, felons, illegal aliens, lunatics, and in
sensitive places such as public schools, the propriety
of which was not questioned in *Heller* ("nothing in
this opinion should be taken to cast doubt on longstanding
prohibitions on the possession of firearms by felons
and the mentally ill, or laws forbidding the carrying
of firearms in sensitive places such as schools and
government buildings," 554 U.S. at 626), some
states sensibly require that an applicant for a
handgun permit establish his competence
in handling firearms. A person who carries a
gun in public but is not well trained in the use of firearms
is a menace to himself and others. See Massad
Ayoob, "The Subtleties of Safe Firearms Han-
dling," *Backwoods Home Magazine*, Jan./Feb. 2007, p.

30; Debra L. Karch, Linda L. Dahlberg & Nimesh Patel, "Surveillance for Violent Deaths—National Violent Death Reporting System, 16 States, 2007," *Morbidity and Mortality Weekly Report*, p. 11, www.cdc.gov/mmwr/pdf/ss/ss5904.pdf (visited Oct. 29, 2012). States also permit private businesses and other private institutions (such as churches) to ban guns from their premises. If enough private institutions decided to do that, the right to carry a gun in public would have much less value and might rarely be exercised—in which event the invalidation of the Illinois law might have little effect, which opponents of gun rights would welcome.

Recently the Second Circuit upheld a New York state law that requires an applicant for a permit to carry a concealed handgun in public to demonstrate "proper cause" to obtain a license. *Kachalsky v. County of Westchester*, *supra*. This is the inverse of laws that forbid dangerous persons to have handguns; New York places the burden on the applicant to show that he needs a handgun to ward off dangerous persons. As the court explained, 2012 WL 5907502, at *13, New York "decided not to ban handgun possession, but to limit it to those individuals who have an actual reason ('proper cause') to carry the weapon. In this vein, licensing is oriented to the Second Amendment's protections.... [I]nstead of forbidding anyone from carrying a handgun in public, New York took a more moderate approach to fulfilling its important objective and reasonably concluded that only individuals having a bona fide reason

to possess handguns should be allowed to introduce them into the public sphere."

The New York gun law upheld in *Kachalsky*, although one of the nation's most restrictive such laws (under the law's "proper cause" standard, an applicant for a gun permit must demonstrate a need for self-defense greater than that of the general public, such as being the target of personal threats, *id.* at *3, *8), is less restrictive than Illinois's law. Our principal reservation about the Second Circuit's analysis (apart from disagreement, unnecessary to bore the reader with, with some of the historical analysis in the opinion—we regard the historical issues as settled by *Heller*) is its suggestion that the Second Amendment should have much greater scope inside the home than outside simply because other provisions of the Constitution have been held to make that distinction. For example, the opinion states that "in *Lawrence v. Texas*, the [Supreme] Court emphasized that the state's efforts to regulate private sexual conduct between consenting adults is especially suspect when it intrudes into the home." 2012 WL 5907502, at *9. Well of course—the interest in having sex inside one's home is much greater than the interest in having sex on the sidewalk in front of one's home. But the interest in self-protection is as great outside as inside the home. In any event the court in *Kachalsky* used the distinction between self-protection inside and outside the home mainly to suggest that a standard less demanding than "strict scrutiny" should govern the constitutionality of laws limiting the carrying of guns outside the home; our analysis is not

based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states.

Judge Wilkinson expressed concern in *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011), that "there may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation. The notion that 'self-defense has to take place wherever [a] person happens to be,' appears to us to portend all sorts of litigation over schools, airports, parks, public thoroughfares, and various additional government facilities.... The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree" (citation omitted). Fair enough; but that "vast *terra incognita*" has been opened to judicial exploration by *Heller* and *McDonald*. There is no turning back by the lower federal courts, though we need not speculate on the limits that Illinois may in the interest of public safety constitutionally impose on the carrying of guns in public; it is enough that the limits it *has* imposed go too far.

The usual consequence of reversing the dismissal of a suit (here a pair of suits) is to remand the case for evidentiary proceedings preparatory to the filing of motions for summary judgment and if those motions fail to an

eventual trial. But there are no evidentiary issues in
these two cases. The constitutionality of the challenged
statutory provisions does not present factual questions
for determination in a trial. The evidence marshaled in
the *Skoien* case was evidence of "legislative facts," which
is to say facts that bear on the justification for legislation,
as distinct from facts concerning the conduct of parties
in a particular case ("adjudicative facts"). See Fed. R. Evid.
201(a); Advisory Committee Note to Subdivision (a) of
1972 Proposed Rule [of Evidence] 201. Only adjudicative
facts are determined in trials, and only legislative facts
are relevant to the constitutionality of the Illinois gun law.
The key legislative facts in this case are the effects
of the Illinois law; the state has failed to show
that those effects are positive.

   We are disinclined to engage in another round of histori-
cal analysis to determine whether eighteenth-century
America understood the Second Amendment to include
a right to bear guns outside the home. The Supreme
Court has decided that the amendment confers
a right to bear arms for self-defense, which is as
important outside the home as inside. The theoretical
and empirical evidence (which overall is inconclusive)
is consistent with concluding that a right to
carry firearms in public may promote self-defense. Illinois
had to provide us with more than merely a rational basis
for believing that its uniquely sweeping ban is justified
by an increase in public safety. It has failed to meet
this burden. The Supreme Court's interpretation of
the Second Amendment therefore compels us to reverse
the decisions in the two cases before us and remand

them to their respective district courts for the entry of declarations of unconstitutionality and permanent injunctions. Nevertheless we order our mandate stayed for 180 days to allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with the public safety and the Second Amendment as interpreted in this opinion, on the carrying of guns in public.

REVERSED AND REMANDED, WITH DIRECTIONS;

BUT MANDATE STAYED FOR 180 DAYS.

WILLIAMS, *Circuit Judge*, dissenting.   The Supreme Court's decisions in *Heller* and *McDonald* made clear that persons in the state of Illinois (unless otherwise disqualified) must be allowed to have handguns in their homes for self-defense. But those cases did not resolve the question in this case—whether the Second Amendment also requires a state to allow persons to carry ready-to-use firearms in public for potential self-defense. The majority opinion presents one reading of *Heller* and *McDonald* in light of the question presented here, and its reading is not unreasonable. But I think the issue presented is closer than the majority makes it out to be. Whether the Second Amendment

protects a right to carry ready-to-use firearms in public
for potential self-defense requires a different analysis from
that conducted by the Court in *Heller* and *McDon-
ald*. Ultimately, I would find the result here
different as well and would affirm the judgments of
the district courts.

*Heller*'s approach suggests that judges are to examine
the historical evidence and then make a determination
as to whether the asserted right, here the right to carry
ready-to-use arms in public (in places other than
those permitted by the Illinois statute) for potential self-
defense, is within the scope of the Second Amendment.
(*Heller* has been criticized for reasons including that judges
are not historians.) In making this historical inquiry,
and in assessing whether the right was a generally recog-
nized one, I agree with the majority that the relevant
date is 1791, the date of the Second Amendment's ratifica-
tion. *See* Maj. Op. at 3. But I do not agree that the Supreme
Court in *Heller* rejected the argument that the State
makes here, nor do I think the State's argument
effectively asks us to repudiate *Heller*'s historical analysis.

The historical inquiry here is a very different
one. *Heller* did not assess whether there was a pre-existing
right to carry guns in public for self-defense. By asking
us to make that assessment, the State is not asking
us to reject the Court's historical analysis in *Heller*;
rather, it is being true to it. As I see it, the State embraces
*Heller*'s method of analysis and asks us to conduct it
for the different right that is being asserted. I am not
the only one to think that *Heller* did not settle the

historical issues. The Second Circuit's recent unanimous decision upholding New York's "proper cause" prerequisite to obtaining a license to carry a handgun in public recognized and discussed the different historical inquiry that occurs when the asserted right is to possess a handgun in public. *See Kachalsky v. County of Westchester,* 2012 WL 5907502, at *6-7, *10-11 (2d Cir. Nov. 27, 2012). (Under the New York law that the Second Circuit upheld, "[a] generalized desire to carry a concealed weapon to protect one's person and property does not constitute 'proper cause,'" and "[g]ood moral character plus a simple desire to carry a weapon is not enough." *Id.* at *3 (internal citations and quotations omitted)).

*Heller* tells us that "the Second Amendment was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Heller*, 554 U.S. at 599 (internal quotations omitted). For our English ancestors a man's home was his castle, and so he had broad powers to defend himself there. *See* 4 William Blackstone, *Commentaries on the Laws of England* 223 (1769). The focus of *Heller*'s historical examination was on whether the Second Amendment included an individual right to bear arms or whether that right was limited to militia service. Once the *Heller* majority found that the Second Amendment was personal, the conclusion that one could possess ready-to-use firearms in the home for self-defense there makes sense in light of the home-as-castle history.

It is less clear to me, however, that a widely understood right to carry ready-to-use arms in public for potential self-defense existed at the time of the founding. *Cf. Heller*, 554 U.S. at 605 (rejecting argument by dissenters and stating, "That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties."). In contrast to inside the home, where one could largely do what he wished, there was a long history of regulating arms in public. The 1328 Statute of Northampton, quoted by the majority on page 6, provided in relevant part that no man could "go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. III, c. 3 (1328). If the words of a statute are supreme, the words of the Statute of Northampton expressly prohibit going or riding while "armed," whether at night or in the day, whether the arms are visible or hidden. And the statute contains no intent requirement. So the Statute of Northampton, by its terms, prohibited going armed in public.

This matters because the Statute of Northampton and its principles did not disappear after its enactment in 1328. The leading scholars relied upon at the time of our country's founding also turned to the Statute of Northampton as they discussed criminal offenses. Massachusetts, North Carolina, and Virginia incorporated the Statute of Northampton in the years immediately after the Constitution's adoption. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: Historical Versus*

*Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 31-32 (2012). Although the plaintiffs suggest that later generations did not view the Statute of Northampton to mean what its terms said, whether that is true is not obvious. William Blackstone, cited frequently by the *Heller* majority, for example, summarized the Statute of Northampton as he explained public wrongs. He wrote, "[t]he offense of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour." 4 Blackstone, *supra*, 148-49 (internal citation omitted); *see also* Eugene Volokh, *The First and Second Amendments*, 109 Colum. L. Rev. Sidebar 97, 101 (2009) (recognizing that Blackstone summarized the Statute of Northampton in this passage).

Some, like the plaintiffs, read Blackstone to mean that the Statute of Northampton was understood to cover only those circumstances where the carrying of arms was unusual and therefore terrifying. But that seems to be a strained reading of Blackstone's words. The more natural reading is that Blackstone states that riding or going armed with dangerous weapons is an offense and is a crime against the public peace. He then explains why the offense of riding or going armed with dangerous weapons is a crime against the public peace—because doing so makes people terrified or nervous. Notably, Blackstone compares going

armed with dangerous weapons to the mere act of walking around a city in armor, which was prohibited in ancient Greece. The comparison suggests that just as seeing a person walking around a city in armor would cause other citizens to be nervous, regardless of any affirmative action, so would the reaction be to seeing another carrying dangerous weapons in a populated area.

It is true as the majority states that *Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686), stated that the meaning of the Statute of Northampton "was to punish people who go armed to terrify the King's subjects." But it immediately followed that statement by saying that "[i]t is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects; and therefore this Act is but an affirmance of that law." The case is consistent with the idea that going armed in the public arena with dangerous weapons without government permission, by its nature, terrifies the people, whether the arms can be seen or not. *See* Charles, *supra*, at 28 (examining background and implications of case and explaining that persons who were the "King's Officers and Ministers in doing their Office" were exempt from punishment under the Statute, which explains Sir Knight's acquittal).

Robert Gardiner's *The Compleat Constable,* written for seventeenth- and eighteenth-century British constables, comports with the understanding that the Statute of Northampton's intent was to prohibit the carrying of any weapon that might "endanger

society among the concourse of the people," Charles, *supra*, at 23, and that it was an affirmation of governmental police authority, as well as that "dangerous weapons" included guns, *id.* at 23-24. *The Compleat Constable* stated, with a specific reference to "guns," that a British constable could arrest upon seeing any person ride or go armed offensively, "in Fairs or Markets or elsewhere, by Day or by Night, in affray of Her Majesties Subjects, and Breach of the Peace; or wear or carry any Daggers, Guns, or Pistols Charged." Robert Gardiner, *The Compleat Constable* 18-19 (3d ed. 1707). The only exceptions were for persons serving Her Majesty, sheriffs and their officers, and those "pursuing Hue and Cry, in Case of Felony, and other Offences against the Peace." *Id.* at 19.

Sir Edward Coke also discussed the Statute of Northampton, and he interpreted it to allow persons to keep weapons inside the home, explaining that a man's home was his castle. As the majority notes, Coke also stated that one could not assemble force to go out in public. But that does not necessarily mean that persons were free to carry arms for potential personal self-defense. Indeed, in Coke's explanation of the Statute, he recounted the case of Sir Thomas Figett, who was arrested after he "went armed under his garments, as well as in the palace, as before the justice of the kings bench." Edward Coke, *Institutes of the Laws of England* 161-62 (1797). In his defense, Figett said there "had been debate" between him and another earlier in the week, "and therefore for doubt of danger, and safeguard of his life, he went so

armed." *Id.* at 162. Nonetheless, he was ordered to forfeit his arms and suffer imprisonment at the king's pleasure. *Id.*

I also note that in examining the contours of the proposed right, the majority looks to the perspective of an Ohio frontiersman. But it seems that when evaluating the rights originally embodied in the Second Amendment, looking to the margins should not be the inquiry. *Cf Heller*, 554 U.S. at 605. We have already observed that there were a number of laws in our country around the time of the founding that limited the discharge of firearms in public cities. *See Ezell v. City of Chicago*, 651 F.3d 684, 705 (7th Cir. 2011) ("The City points to a number of founding-era, antebellum, and Reconstruction state and local laws that limited discharge of firearms in urban environments."); *id.* at 705-06 & nn.13-14; *id.* at 713-14 (Rovner, J., concurring) (observing that "none of the 18th and 19th century jurisdictions cited by the City . . . were apparently concerned that banning or limiting the discharge of firearms within city limits would seriously impinge the rights of gun owners" and that some of the early laws' concern with fire suppression reflected that "public safety was a paramount value to our ancestors" that sometimes trumped a right to discharge a firearm in a particular place). So while there are a variety of other sources and authorities, the ones I have discussed suggest that there was not a clear historical consensus that persons could carry guns in public for self-defense. *See also Kachalsky*, 2012 WL 5907502, at *6 (stating that unlike the ban

on handguns in the home at issue in *Heller*, "[h]istory and tradition do not speak with one voice" regarding scope of right to bear arms in public and that "[w]hat history demonstrates is that states often disagreed as to the scope of the right to bear arms [in public]").

I will pause here to state that I am not convinced that the implication of the *Heller* and *McDonald* decisions is that the Second Amendment right to have ready-to-use firearms for potential self-defense extends beyond the home. That the Second Amendment speaks of the "right of the people to keep *and bear* arms" (emphasis added) does not to me imply a right to carry a loaded gun outside the home. *Heller* itself demonstrates this. The Court interpreted "bear" to mean to "carry" or to "wear, bear, or carry," upon one's person, for the purpose of being armed and ready in case of conflict. *Heller*, 554 U.S. at 584. And we know that *Heller* contemplated that a gun might only be carried in the home because it ordered the District of Columbia to permit Heller to do precisely that: it directed that unless Heller was otherwise disqualified, the District must allow him "to register his handgun and must issue him a license *to carry it in the home*." *Id.* at 635 (emphasis added). Mr. Heller did not want simply "to keep" a gun in his closet. He wanted to be able "to bear" it in case of self-defense, and the Supreme Court said he could.

We have warned against "treat[ing] *Heller* as containing broader holdings than the Court set out to establish:

that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. . . . Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration." *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). The Supreme Court made clear in *Heller* and *McDonald* that its holdings only applied to handguns in the home for self-defense. *See, e.g., id.*; *Heller*, 554 U.S. at 635 ("And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). The Court's language must be read in that light. The plaintiffs point, for example, to *Heller*'s statement that the operative clause of the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. But *Heller* makes this statement in the portion of its opinion supporting the conclusion that the Second Amendment included a personal right, as compared to one solely related to the militia. *See id.* at 592-95. The plaintiffs also point out that *Heller* stated that the need for self-defense is "most acute" in the home, which they argue implies that there is a Second Amendment right to possess ready-to-use firearms in places outside the home. *See id.* at 628. But the Court made this comment in the context of its conclusion that the District of Columbia handgun ban applied in the home; the fact that the need was acute in the home emphasized that the fatal flaw in the handgun ban was that it applied in the home. *See id.* at 628-30.

By all this I do not mean to suggest that historical evidence definitively demonstrates there was not a right to carry arms in public for self-defense at the time of the founding. The plaintiffs point to other authorities that they maintain reveal the opposite. At best, the history might be ambiguous as to whether there is a right to carry loaded firearms for potential self-defense outside the home. But if that is the case, then it does not seem there was "a venerable, widely understood" right to do so. That may well mean that the right the plaintiffs seek here is outside the scope of the Second Amendment. Perhaps under *Heller*'s rationale that the Second Amendment codified a preexisting right, with history not seeming to clearly support a generally recognized right, the analysis ends right here.

## II.

We said in *Ezell* that "if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." 651 F.3d at 703. In doing so, we stated that "the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id.* Any right to carry firearms in public for potential self-defense, if there is one, is not at the "core" of the Second Amendment. *See Kachalsky*, 2012 WL 5907502, at *9; *United States v. Marzzarella*, 614 F.3d 85, 92 (3d Cir. 2010).

The Supreme Court made clear in *Heller* that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." 554 U.S. at 626. *McDonald* made sure to "repeat those assurances." *McDonald*, 130 S. Ct. at 3047. That a legislature can forbid the carrying of firearms in schools and government buildings means that any right to possess a gun for self-defense outside the home is not absolute, and it is not absolute by the Supreme Court's own terms.

Indeed, the Supreme Court would deem it presumptively permissible to outright forbid the carrying of firearms in certain public places, but that does not mean that a self-defense need never arises in those places. The teacher being stalked by her ex-husband is susceptible at work, and in her school parking lot, and on the school playground, to someone intent on harming her. So why would the Supreme Court reassure us that a legislature can ban guns in certain places? It must be out of a common-sense recognition of the risks that arise when guns are around.

Any right to carry loaded firearms outside the home for self-defense is, under *Heller*'s own terms, susceptible to a legislative determination that firearms should not be allowed in certain public places. The Supreme Court tells us that a state can forbid guns in schools. That probably means it can forbid guns not just inside the school building, but also in the playground and

parking lot and grassy area on its property too. And if a state can ban guns on school property, perhaps it can ban them within a certain distance of a school too. *Cf.* 18 U.S.C. § 922(q)(2)(A). The Supreme Court also tells us that a state can ban guns in government buildings. The list of such buildings would seem to include post offices, courthouses, libraries, Department of Motor Vehicle facilities, city halls, and more. And the legislature can ban firearms in other "sensitive places" too. So maybe in a place of worship. *See GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) (upholding ban on firearms in places of worship). Maybe too on the grounds of a public university. *See DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365 (Va. 2011) (upholding regulation prohibiting possession of guns in university facilities and at campus events). Or in an airport, or near a polling place, or in a bar. And if the latter is true then perhaps a legislature could ban loaded firearms any place where alcohol is sold, so in restaurants and convenience stores as well. The resulting patchwork of places where loaded guns could and could not be carried is not only odd but also could not guarantee meaningful self-defense, which suggests that the constitutional right to carry ready-to-use firearms in public for self-defense may well not exist.

It is difficult to make sense of what *Heller* means for carrying guns in public for another notable reason. Immediately before the sentence giving a presumption of lawfulness to bans on guns for felons and the like, *Heller* states: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through

the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. *For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.*" 554 U.S. at 626 (emphasis added and internal citations omitted). The implication of the Supreme Court's statement would seem to be that concealed carry is not within the scope of the Second Amendment (or at the least that that is the presumption). *See, e.g.,* Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence,* 56 UCLA L. Rev. 1343, 1359 (2009) ("This appears to be an endorsement of yet another exception to the constitutional right."); *Hightower v. City of Boston,* 693 F.3d 61, 73 (1st Cir. 2012) (interpreting this language to mean that laws prohibiting the carrying of concealed weapons are an example of presumptively lawful restrictions); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L. Rev. 1443, 1523-24 (2009). That would not be the first time the Supreme Court had made such a statement. *See Robertson v. Baldwin,* 165 U.S. 275, 281-82 (1897) (stating in dicta that Second Amendment right "is not infringed by laws prohibiting the carrying of concealed weapons").

If carrying concealed weapons is outside the scope of the Second Amendment, the consequence would be significant. "'In the nineteenth century, concealed carry was often considered outside the scope of the

right to bear arms. Today, it is the most common way in which people exercise their right to bear arms.'" Joseph Blocher, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1, 45 (2012) (quoting David B. Kopel, *The Right to Arms in the Living Constitution*, 2010 Cardozo L. Rev. 99, 136 (2010)). And, as the *Moore* plaintiffs acknowledge in their brief, "today, openly carrying handguns may alarm individuals unaccustomed to firearms." The implication, as explained by Nelson Lund (author of the Second Amendment Foundation's *amicus curiae* brief in *Heller* in support of Mr. Heller): "In some American jurisdictions today, for example, openly carrying a firearm might plausibly be thought to violate the ancient common law prohibition against 'terrifying the good people of the land' by going about with dangerous and unusual weapons. If courts were to conclude that open carry violates this common law prohibition (and thus is not within the preexisting right protected by the Second Amendment), after *Heller* has decreed that bans on concealed carry are per se valid, the constitutional right to bear arms would effectively cease to exist." Lund, *supra*, at 1361-62. (To be clear, if there is a Second Amendment right to carry arms outside the home for potential self-defense in Illinois as my colleagues have found, I am not suggesting that Illinois should not implement concealed carry laws.)

If there is any right to carry ready-to-use firearms among the public for potential self-defense, the plaintiffs contend the Illinois statutes must be unconstitutional because their ban is far-reaching. But I see the question as somewhat more nuanced.

Protecting the safety of its citizens is unquestionably a significant state interest. *United States v. Salerno,* 481 U.S. 739, 748 (1987); *Kelley v. Johnson,* 425 U.S. 238, 247 (1976). Illinois chose to enact the statutes here out of concern for the safety of its citizens. *See People v. Marin,* 795 N.E.2d 953, 959-62 (Ill. App. Ct. 2003).

Given the State's obvious interest in regulating the safety of its citizens, the question is who determines the contours of any right to carry ready-to-use firearms for self-defense in public when they are unsettled as a matter of both original history and policy. The *Heller* majority concluded that "enshrinement of constitutional rights necessarily takes certain policy choices off the table . . . includ[ing] the absolute prohibition of handguns held and used for self-defense in the home." 554 U.S. at 636. But "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *United States v. Masciandro*, 638 F.3d 458, 470 (4th Cir. 2011).

The Supreme Court has told us that we must "accord substantial deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997). "In the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 2012 WL 5907502, at *12. The legislature knows the statis-

tics and is in a far better position than we are to
weigh their import. Illinois reasonably wants to try
to reduce the incidence of death and injury
by firearms, both those which come from affirmative acts
of violence and also the many deaths and injuries that
occur accidentally, and doing so by taking them off the
streets is a legislative judgment substantially related to
its important governmental objective of reducing injury
and death by firearms.[1]

It is common sense, as the majority recognizes, that a
gun is dangerous to more people when carried outside
the home. *See* Maj. Op. at 8. When firearms are
carried outside of the home, the safety of a broader
range of citizens is at issue. The risk of being injured
or killed now extends to strangers, law
enforcement personnel, and other private citizens
who happen to be in the area. *Cf.* David
Hemenway & Deborah Azrael, *The Relative Frequency of
Offensive and Defensive Gun Uses: Results from a National
Survey*, 15 Violence & Victims 257, 271 (2000) (finding
that guns are used "far more often to kill and wound

---

[1]State courts that have addressed a state constitutional right to
bear arms have used a "reasonable regulation" standard, a test
that is more deferential than intermediate scrutiny but
that, unlike the interest-balancing test proposed in Justice
Breyer's *Heller* dissent, does not permit states to prohibit all
firearm ownership. *See, e.g., State v. Hamdan,* 665 N.W.2d 785,
798-801 (Wis. 2003); Adam Winkler, *Scrutinizing the Second
Amendment*, 105 Mich. L. Rev. 683, 686-87 (2007) (discussing
"hundreds" of state court opinions using this test).

innocent victims than to kill and wound criminals"). Indeed, the Illinois legislature was not just concerned with "crime rates" and "murder rates" when it passed the law. *Cf.* Maj. Op. at 8. It also sought to "prevent situations where no criminal intent existed, but criminal conduct resulted despite the lack of intent, e.g., accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or . . . the danger of a police officer stopping a car with a loaded weapon on the passenger seat." *See Marin*, 795 N.E.2d at 962. The danger of such situations increases if guns may be carried outside the home.

That the percentage of reported accidental gun-related deaths is lower as compared to suicide (which accounts for the majority of firearms-related deaths) and murder, *see* Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 Am. J. Preventive Med. 40, 40 (2005), does not make the Illinois law invalid. First, in those statistics, "[u]nintentional firearm-related deaths appear to be substantially undercounted (i.e., misclassified as due to another cause)," *id.* at 47, and in any event the State has a significant interest in reducing the risk of accidental firearms-related deaths as well as accidental injuries. The majority says the law cannot be justified on the ground that it reduces the accidental death rate unless it could be shown that allowing guns to be carried in public causes gun ownership to increase. *See* Maj. Op. at 13. But whether gun ownership increases is not the question. *See id.* at 10-11. It is not the number of guns owned that matters but where the guns are carried. Illinois already

allows people to own and have guns in their homes; however, they cannot carry them in public. The Illinois legislature reasonably concluded that if people are allowed to carry guns in public, the number of guns carried in public will increase, and the risk of firearms-related injury or death in public will increase as well. *Cf. Marin*, 795 N.E.2d at 959-62.

And it is also common sense that the danger is a great one; firearms are lethal. *Cf. Skoien*, 614 F.3d at 642 ("guns are about five times more deadly than knives, given that an attack with some kind of weapon has occurred") (citing Franklin E. Zimring, *Firearms, Violence, and the Potential Impact of Firearms Control*, 32 J. L. Med. & Ethics 34 (2004)). For that reason too the focus simply on crime rates misses the mark. As Philip J. Cook, a Duke University professor cited twice by the majority, put it: "My research over 35 years demonstrates that the effect of gun availability is not to increase the crime rate but to intensify the crime that exists and convert assaults into murders." Ethan Bronner, *Other States, and Other Times, Would Have Posed Obstacles for Gunman*, N.Y. Times, July 25, 2012, at A12.

The majority's response to the fact that guns are a potential lethal danger to more people when carried in public seems to be to say that knowing potential victims could be armed may have a deterrent effect or make criminals timid. *See* Maj. Op. at 8, 13. Yet even an article relied upon by the majority cautions that the effect on criminals may well be *more* gun use: "Two-thirds of prisoners incarcerated for gun offenses reported

that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal." Philip J. Cook, Jens Ludwig & Adam M. Samaha, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009).

On the other side of the lethal danger to the State's citizens is the asserted interest in carrying guns for self-defense, yet even the majority does not contend that carrying guns in public has been shown to be an effective form of self-defense. For example, as the majority acknowledges, University of Pennsylvania researchers found that assault victims are more likely to be armed than the rest of the population. *See* Maj. Op. at 12-13 (citing Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. of Pub. Health 2034, 2037 (2009)). The researchers examined shootings in Philadelphia and concluded that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," *id.*, which suggests, if anything, that carrying a gun is not effective self-defense. The researchers posited that possible reasons for their findings included that a gun may falsely empower its possessor to overreact, that persons with guns may increase the risk of harm by

entering dangerous environments that they normally would have avoided, and that persons bringing guns to an otherwise gun-free conflict may have those guns wrested away and turned on them. *Id.* at 2037-38.

Other studies have found that in states with broad concealed-carry laws there is an increased chance that one will be a victim of violent crime. Yale Law School Professors Ian Ayres and John J. Donohue III concluded that "the evidence is most supportive of the claim that [right-to-carry] laws *increase* aggravated assault." *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218, 220 (May 2009).[2] (Donohue is now at

---

[2]The majority cites Moody and Marvell's 2008 paper suggesting that Ayres and Donohue should have extended their 2003 analysis by one more year. But extending their data is just what Ayres and Donohue did in their May 2009 piece, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*. And after extending their state panel data by six additional years, they again concluded that "the best evidence to date suggests that [right-to-carry] laws at the very least *increase* aggravated assault." *Id.* at 231. They also thoroughly responded to Moody and Marvell's criticism that their initial 2003 analysis evaluated the trend for five years rather than six, explaining in part: "We would have thought, though, that one would want to be very cautious in evaluating trends beyond five years when 14 of the 24 states have no post-passage data beyond *three* years." *Id.* at 218-19. They also criticized Moody and Marvell's conclusions and demonstrated that the two had incorrectly graphed the estimates from Donohue's table and

(continued...)

Stanford.) Similarly, another study showed that "an increase in gun prevalence causes an *intensification* of criminal violence–a shift toward a greater lethality, and hence greater harm to a community." Philip J. Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379, 387 (2006). Other researchers have concluded that guns are "used far more often to intimidate and threaten than they are used to thwart crimes." Hemenway & Azrael, *supra*, at 271.

The ban on firearms in public is also an important mechanism for law enforcement to protect the public. With guns banned in public an officer with reasonable suspicion to stop and frisk a person can, upon finding a gun, take the gun off the street before a shooting occurs. The majority says that a state may be able to require "open carry," where persons who carry guns in public must carry them in plain view. Maj. Op. at 10. Living with the open carrying of loaded guns on the streets of Chicago and elsewhere would certainly be a big change to the daily lives of Illinois citizens. Even the plaintiffs do not seem to want Illinois to take that drastic a step, recognizing that "openly carrying handguns may alarm individuals unaccustomed to firearms" and that *Heller* "does not force states to allow the carrying of handguns in a manner that may cause needless public alarm." *Moore* Br. at 35.

The majority also suggests that with open carry the police could still arrest persons who carry

───────────────────

(...continued)
misinterpreted the estimates. *Id.* at 219.

concealed guns. This is true but seems contradictory to its statement two sentences earlier that in its view, under the current law police will often lack reasonable suspicion to stop a person with a concealed gun since it is concealed. *See* Maj. Op. at 10. To the latter, guns are not allowed now, so theoretically persons are attempting to conceal them. Nonetheless, Chicago's Police Department made over 4,000 arrests on weapons violations in 2009, though some of these arrests could have been made in conjunction with other crimes as well.[3] More importantly, "concealed" does not mean "invisible." An officer who reasonably suspects he sees a gun in a car when he pulls someone over, or notices what he reasonably suspects to be a gun bulging out of someone's clothes, can under the law as it currently stands arrest that person and take the gun off the street.

Allowing open (or concealed) carry does not address the fundamental point about law enforcement's ability to protect the public: if guns are not generally legal to have in public, officers can remove them from the streets before a shooting occurs whenever they come across a gun. Under a law like the Illinois law, an officer with some reasonable belief that a person is carrying a firearm can stop that person and remove the gun from the street because the officer has a

---

[3] Chicago Police Dep't Annual Report 2010, at 34, *available at* https://portal.chicagopolice.org/portal/page/portal/ClearPath /News/Statistical%20Reports/Annual%20Reports/10AR.pdf.

reasonable belief that a crime is taking place. The ability to use stops and arrests upon reasonably suspecting a gun as a law enforcement tactic to ultimately protect more citizens does not work if guns can be freely carried.

To the extent the majority opinion's studies draw different conclusions, the Supreme Court has made clear that "the possibility of drawing two inconsistent conclusions from the evidence" does not prevent a finding from being supported by substantial evidence. *Turner Broad.*, 520 U.S. at 211; *see also Kachalsky*, 2012 WL 5907502, at *13 (recognizing different studies concerning relationship between handgun access and violent crime, and handgun access and safety and character of public places, and stating, "It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments."). Moreover, it is not necessary for "the statute's benefits" to be "first established by admissible evidence" or by "proof, satisfactory to a court." *Skoien*, 614 F.3d at 641. Nor would the State need to make a stronger showing here than in *Skoien*. *Skoien* concerned the prohibition on firearm possession by misdemeanants with domestic violence convictions, a ban that also applies to the core Second Amendment right of gun possession in the home. As such, the "strong showing" the government acknowledged it needed to demonstrate there made sense. *See id.*

I would note too that the 2005 paper "Firearms Laws and the Reduction of Violence: A Systematic Review," quoted by the majority for its statement that based on its review, evidence was insufficient to determine

whether the degree of firearms regulation is associated with decreased or increased violence, Maj. Op. at 9, did not limit that conclusion to the degree of firearms regulation. The paper found the evidence available from identified studies "insufficient to determine" the effectiveness of *any* of the laws it reviewed, even including acquisition restrictions (e.g., felony convictions and personal histories including persons adjudicated as "mental defective"), and firearms registration and licensing—propositions that even the plaintiffs seem to favor. And, the paper cautioned that "[a] finding that evidence is insufficient to determine effectiveness means that we do not yet know what effect, if any, the law has on an outcome—not that the law has no effect on the outcome." Hahn et al., *supra*, at 40.

The Illinois statutes safeguard the core right to bear arms for self-defense in the home, as well as the carry of ready-to-use firearms on other private property when permitted by the owner, along with the corollary right to transport weapons from place to place. *See* 720 Ill. Comp. Stat. 5/24-2; 720 Ill. Comp. Stat. 5/24-1.6(a)(1). Guns in public expose all nearby to risk, and the risk of accidental discharge or bad aim has lethal consequences. Allowing public carry of ready-to-use guns means that risk is borne by all in Illinois, including the vast majority of its citizens who choose not to have guns. The State of Illinois has a significant interest in maintaining the safety of its citizens and police officers. The legislature acted within its authority when it concluded that its interest in reducing gun-related deaths and injuries would not be as effectively

served through a licensing system. For one, every criminal was once a law-abiding citizen, so strategies for preventing gun violence that bar prior criminals from having firearms do not do enough. *See* Philip J. Cook, et al., *Criminal Records of Homicide Offenders*, 294 J. Am. Med. Ass'n 598, 600 (2005) (homicide prevention strategies targeted toward prior offenders "leave a large portion of the problem untouched"). Nor could the State ensure that guns in public are discharged only, accurately, and reasonably in instances of self-defense. *See People v. Mimes*, 953 N.E.2d 55, 77 (Ill. App. Ct. 2011) ("The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force.").

The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems," and courts "should not diminish that role absent impelling reason to do so." *Oregon v. Ice*, 555 U.S. 160, 171 (2009). Indeed, "[i]t is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). (And to the extent it matters, Illinois is not the only place that has and enforces strict gun laws. New York City, for example, has gun laws that are in effect like those of Illinois; while technically a "may issue" location where the city may issue permits

for handgun carry outside the home, New York City rarely does so and so has been characterized as maintaining a virtual ban on handguns. *See* Lawrence Rosenthal, *Second Amendment Plumbing after* Heller: *Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs*, 41 Urb. Lawyer 1, 39 (2009)). Reasonable people can differ on how guns should be regulated. Illinois has chosen to prohibit most forms of public carry of ready-to-use guns. It reaffirmed that just last year, when its legislature considered and rejected a measure to permit persons to carry concealed weapons in Illinois. *See* Dave McKinney, *Concealed-Carry Measure: Shot Down in Springfield*, Chicago Sun-Times, 2011 WLNR 9215695 (May 6, 2011). In the absence of clearer indication that the Second Amendment codified a generally recognized right to carry arms in public for self-defense, I would leave this judgment in the hands of the State of Illinois.