# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 30, 2013

Lyle W. Cayce
Clerk

————

No. 11-10959

————

NATIONAL RIFLE ASSOCIATION, INCORPORATED; ANDREW M.
PAYNE; REBEKAH JENNINGS; BRENNAN HARMON,

Plaintiffs–Appellants

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; B.
TODD JONES, In His Official Capacity as Acting Director of the Bureau of
Alcohol, Tobacco, Firearms, and Explosives; ERIC H. HOLDER, JR., U.S.
ATTORNEY GENERAL,

Defendants–Appellees

————

Appeal from the United States District Court
for the Northern District of Texas

————

ON PETITION FOR REHEARING EN BANC
(Opinion October 25, 2012, 700 F.3d 185)

Before KING, PRADO, and HAYNES, Circuit Judges.

PER CURIAM:

The court having polled at the request of a member of the court (*see* Internal Operating Procedure accompanying 5TH CIR. R. 35, "Requesting a Poll on Court's Own Motion"), and a majority of the judges who are in regular active service and not disqualified not having voted in favor (*see* FED. R. APP. P. 35(a) and 5TH CIR. R. 35.6), rehearing en banc is DENIED.

In the en banc poll, 7 judges voted in favor of rehearing (Judges Jolly, Jones, Smith, Clement, Owen, Elrod, and Higginson), and 8 judges voted against rehearing (Chief Judge Stewart and Judges King, Davis, Dennis, Prado, Southwick, Haynes, and Graves).

ENTERED FOR THE COURT:

    /s/ Edward C. Prado
United States Circuit Judge

EDITH H. JONES, Circuit Judge, joined by JOLLY, SMITH, CLEMENT, OWEN, and ELROD, Circuit Judges, dissenting from denial of rehearing en banc.

By a one-vote margin, this court declined to consider en banc the constitutionality, under the Supreme Court's recent Second Amendment decisions, of federal laws barring licensed gun dealers from selling handguns or handgun ammunition to people less than 21 years old (and similar provisions). *See* 18 U.S.C. § 922(b)(1).[1] Effectively, these provisions bar law-abiding adults aged 18 to 20 from purchasing handguns in the highly regulated commercial firearms market.

I respectfully dissent. There are serious errors in the panel decision's approach to the *fundamental* right to keep and bear arms. *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). Moreover, the implications of the decision—that a whole class of adult citizens, who are not as a class felons or mentally ill, can have its constitutional rights truncated because Congress considers the class "irresponsible"—are far-reaching.

---

[1] The related provisions include 18 U.S.C. § 922(c)(1) and the regulations that implement these statutes: 27 C.F.R. §§ 478.99(b)(1), 478.124(a), & 478.96(b).

## I. The Panel Decision

Like other circuits,[2] the panel adopted a two-step approach to interpretation of the Second Amendment. The first consideration is whether "the conduct at issue falls within the scope of the Second Amendment right" as shown by "historical traditions." *NRA v. ATF*, 700 F.3d 185, 194 (5th Cir. 2012). The second level of consideration is to apply a type of intermediate scrutiny based on the panel's conclusion that "[a] less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing." *Id.* at 195. The panel held that "a longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *Id.* at 196. Such a measure "would not threaten the core of the Second Amendment guarantee." *Id.*

After conducting an overview of "Founding-Era Attitudes" and 19th century laws that allegedly regulated firearms use by people under 21, the panel was "inclined" to hold that the challenged federal laws are "historically rooted," and thus the conduct they regulate has no constitutional protection. *Id.* at 200, 204. "In an abundance of caution," however, the panel went on to uphold these provisions under a version of intermediate scrutiny. *Id.* at 204. The panel states, during that part of the discussion, that "Congress could have sought to

---

[2] *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). *See also United States v. Skoien*, 614 F.3d 638, 641–42 (7th Cir. 2010) (*en banc*) (adopting a form of intermediate scrutiny but forgoing the two-step analysis). *But see Houston v. City of New Orleans*, 675 F.3d 441, 448 (5th Cir.) (Elrod, J., dissenting), *op. withdrawn and superseded on reh'g. by* 682 F.3d 361 (5th Cir. 2012); *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting).

prohibit all persons under 21 from possessing handguns—or all guns, for that matter." *Id.* at 209. Surely this is hyperbole? Never in the modern era has the Supreme Court held that a fundamental constitutional right could be abridged for a law-abiding adult class of citizens.

Three major points of the panel's opinion, in my view, are incorrect. First, the panel's treatment of pertinent history does not do justice to *Heller's* tailored approach toward historical sources. A methodology that more closely followed *Heller* would readily lead to the conclusion that 18- to 20-year old individuals share in the core right to keep and bear arms under the Second Amendment. Second, because they are partakers of this core right, the level of scrutiny required to assess the federal purchase/sales restrictions must be higher than that applied by the panel. Finally, even under intermediate scrutiny, the purchase restrictions are unconstitutional. I will address each of these concerns.

## II.    *Heller* **and the Proper Role of History**

### A.    *The Supreme Court's Historical Inquiry*

The panel decision purports to follow *Heller's* originalist inquiry, but its first step does not take seriously *Heller's* methodology and reasoning. *Heller*, of course, held that there is an individual Second Amendment right to keep and bear arms, and that the D.C. law banning handgun possession for self-defense in a person's home is accordingly unconstitutional.

To determine whether the Second Amendment conferred an individual right "to keep and bear arms," and to explain the meaning and implicit limits of that constitutional right, the Court majority embarked on a meticulous textual and historical review. Rather than generalizing about "founding era attitudes," as the panel did, Justice Scalia's review proceeded in precise stages, each of which addressed relevant historical materials. First, the text of the Constitution was interpreted in light of historical documents bearing on each phrase and

clause of the Second Amendment *as those were understood at the time of its drafting*. Second, the conclusion, that the Second Amendment codified a pre-existing right of the people to bear arms for self defense, was then "confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," covering the period from 1789 to 1820. *Dist. of Columbia v. Heller*, 554 U.S. 570, 600–01, 128 S. Ct. 2783, 2802 (2008). Finally, the Court examined interpretations of the Second Amendment from its adoption through the 19th century in "a variety of legal and other sources to determine the *public understanding* of [the] legal text." *Id.* at 605, 128 S. Ct. at 2805.

But these sources are not all equal. Text, structure, and contemporary drafting indications are the primary historical sources for originalist inquiry. After that, *Heller* devoted attention to pre-Civil War case law and commentators, whose intellectual foundations were close to those of the founding generation. Post-Civil War sources, the Court noted, "do not provide as much insight into its original meaning as earlier sources." *Id.* at 614, 128 S. Ct. at 2810.

Significantly, the opinion stated that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited. . . . [T]he right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626, 128 S. Ct. at 2816. For example, bans on concealed carrying were common in the 19th century, and private ownership of military-type weapons and short-barreled shotguns was long forbidden. Further, listing "non-exclusive examples," the Court did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the

commercial sale of arms." *Id*. at 626–27, 128 S. Ct. at 2816–17.

Notably, in referring more than once to permissible historic limits on gun ownership, the Court never mentions a minimum age requirement for exercise of the right. On the contrary, to explain the "militia clause," the Court quoted the first federal Militia Act, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years . . . shall . . . be enrolled in the militia." *Id*. at 596, 128 S. Ct. at 2800 (quoting Act of May 8, 1792, 1 Stat. 271). Further, the Court explained, the right of able-bodied citizens to keep and bear arms for self defense was constitutionally codified "to prevent elimination of the militia," which some feared the newly created Federal Government, like past tyrants, might do by taking away the citizens' arms. *Id*. at 599, 128 S. Ct. at 2801. Those subject to militia duty are therefore a subset of citizens entitled to be armed, and for them the right is essential.

In another demonstration of the proper historical approach, the Court rejected Justice Breyer's isolated and irrelevant historical examples of founding era laws that did not come close to the banning of a class of useful weapons. Justice Breyer would have held that, assuming *arguendo* the existence of a personal constitutional right to keep and bear arms, the existence of various founding era regulations of "firearms in urban areas"—on gunpowder storage, firing weapons in public places, and one Massachusetts law designed to protect firefighters—are "compatible" with the D.C. ban on handgun possession. *Id*. at 683–86, 128 S. Ct. at 2848–50 (Breyer, J., dissenting). The Court rejected such examples, which were not germane to an outright ban on keeping weapons of self-defense. The Court noted, *inter alia*, how insignificant, in comparison to D.C.'s ban, were the penalties attached to violations of such local laws. The Court squarely rejected Justice Breyer's "freestanding 'interest balancing'

approach" and it rejected the rational basis test for review of gun regulations. *Id*. at 634, 128 S. Ct. at 2821 (majority opinion).

B.     *Heller's Methodology*

In sum, the Court's discussion leaves no doubt that the original meaning of the Second Amendment, understood largely in terms of germane historical sources contemporary to its adoption, is paramount. Further, the personal right to keep and bear arms stands on a par with the First Amendment's personal rights:

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. *Constitutional rights are enshrined with the scope they were understood to have when the people adopted them* . . . . We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrongheaded views. The Second Amendment is no different. . . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Id*. at 635, 128 S. Ct. at 2821 (citation omitted) (second emphasis added).

The Court's analogy between the scope of Second Amendment and First Amendment rights particularly illuminates how historical sources should be used and how lower courts should approach today's firearms regulations. Free speech, in the classic sense, is never subject to interest-balancing before it merits constitutional protection. "Speech" is protected categorically unless it fits within specifically defined classes, *e.g.,* obscenity, fraud, libel, and state secrets, that received no legal protection at the time of ratification of the Bill of Rights.

Nevertheless, the exercise of free speech rights may be regulated by time/place/manner restrictions, all of which have evolved in the jurisprudence.

Applying these concepts to the Second Amendment, as *Heller* requires, we should presuppose that the fundamental right to keep and bear arms is not itself subject to interest balancing. The right categorically exists, subject to such limitations as were present at the time of the Amendment's ratification.[3]

Consequently, a government entity that seeks significantly to interfere with the Second Amendment rights of an entire class of citizens bears a heavy burden to show, with relevant historical materials, that the class was originally outside the scope of the Amendment. It is not enough to contend that the existence of *some* founding-era firearms regulations shields all future regulations no matter how onerous; the historical record must bear on the issue at hand. Moreover, post-Civil War laws, enacted 75 years after the Amendment's ratification, "do not provide as much insight into its original meaning as earlier sources." *Id.* at 614, 128 S. Ct. at 2810.

C.   *The Historical Record Regarding the Right of 18- to 20-Year Olds to Keep and Bear Firearms*

When we turn to the properly relevant historical materials, they couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history. The panel's error is in rummaging through random "gun safety regulations" of the 18th century and holding that these justify virtually any limit on gun ownership. If the panel is correct, then *Heller* had to be wrongly decided. The panel also relies on laws

---

[3] To repeat, however, according to *Heller*, those historical restrictions included at least certain types of military weapons, "longstanding" bans on possession by felons and the mentally ill, laws forbidding carrying weapons in sensitive places, and laws imposing conditions and qualifications on the commercial sale of arms. *Id.* at 626–27, 128 S. Ct. at 2816–17.

that "targeted particular groups for public safety reasons." *NRA,* 700 F.3d at 200. Laying aside that no such invidiously discriminatory laws would pass muster today, none of them specifically limits firearms possession or purchase by minors or 18 to 20 year old people. The panel's resort to generalized history is not only uninformative of the issue before this court, but it would render *Heller* valueless against most class-based legislative assaults on the right to keep and bear arms. The panel has employed Justice Breyer's scattershot approach to history, while *Heller* rejected that in favor of a targeted study.

From a historical perspective, it is more than odd that the panel relegates militia service to a footnote.

History and tradition yield proof that 18- to- 20-year olds had full Second Amendment rights. Eighteen year olds were required by the 1792 Militia Act to be available for service, and militia members were required to furnish their own weapons; therefore, eighteen year olds must have been allowed to "keep" firearms for personal use. Because they were within the "core" rights-holders at the founding, their rights should not be infringed today. As Tench Coxe said, "the powers of the sword are in the hands of the yeomanry of America from 16 to 60. . . . Their swords . . . are the birthright of an American."[4] The panel opinion presents a different history.

The panel questions inclusion of the 18- to- 20-year old group in the "core" of the Amendment by reference to early sources and 19th and 20th Century laws restricting that age group's rights. As I have shown, the latter references are highly questionable. The original public meaning of the Second Amendment at the time of its ratification should be the norm for this initial scope question.[5]

---

[4] Tench Coxe, "A Pennsylvanian, No. 3," *Pennsylvania Gazette*, Feb. 20, 1788.

[5] 1791—the year the Second Amendment was ratified—is "the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*,

Following *Heller*'s methodology correctly, the laws prior to and immediately surrounding passage of the Second Amendment illuminate its contemporary understanding. Sixteen was the minimum age for colonial militias almost exclusively for 150 years before the Constitution. In 1650, it was not just the right but the duty of all persons aged sixteen and above in Connecticut, for example, to bear arms.[6] The other colonies had similar militia laws, at least for males. Delaware was an exception, though, as the minimum militia age there was seventeen.[7]

At the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen.[8] Almost every

---

[130 S. Ct. 3020,] 3035 and n.14 [(2010)]." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). And *Heller* makes plain that 19th-century sources may be relevant to the extent they illuminate the Second Amendment's original meaning, but they cannot be used to construe the Second Amendment in a way that is inconsistent with that meaning. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 634–35, 128 S. Ct. 2783, 2821 (2008) (enshrining the scope of the right as what was understood when the people ratified the Second Amendment).

[6] Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON FIREARMS & PUB. POL'Y 2004, 1, 3.

[7] *Id.* at 8.

[8] Alphabetically by state, these are the available minimum militia ages set around the time of ratification of the Second Amendment and the federal Militia Act of 1792:

**Connecticut: 18** / Acts and Laws, 308 (1792) (following a reprint of the federal militia law, Connecticut provided that militia fines imposed on those who had not yet reached the age of twenty-one would be paid by their parents).
**Delaware: 18** / Ch. XXXVI, An Act for Establishing the Militia In This State, 1134 (1793).
**Georgia: 18** / An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled "An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States," as contained in Digest of the Laws of Georgia, 460 (1792).
**Maryland: 18** / Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793).

state adopted the federal Militia Act of 1792 by reference and began using its age structure.[9] The duty range in the Militia Act, 18 to 45 years, was based on what President Washington thought was the best age for soldiers. The historical data thus confirm that those eighteen and above had the right to keep and bear arms.

The panel cites "several States" that chose to enroll only those twenty-one

---

**Massachusetts: 18** / Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, "An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service," 172 (1793).

**New Hampshire: 18** / An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, 251 (1792).

**New Jersey: 18** / Ch. CCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey, 825 (1792).

**New York: 18** / Ch. 45, An Act to Organize the Militia of This State. Laws of New York 440 (1793).

**North Carolina: 18** / Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina—1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, "An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States," Also to Amend an Act, Passed at Fayetteville, in the Year One Thousand Seven Hundred and Eighty Six, Entitled, "An Act for Establishing the Militia in This State," (1793)).

**Pennsylvania: 18** / Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 455 (1793).

**South Carolina: 18** / An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, 21 (1794) (enrolling citizens turning eighteen and evidencing a shift from the former militia age of sixteen as seen in: No. 1154, An Act for the Regulation of the Militia of This State, 682 (1782–91)).

**Virginia: 18** / Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, 182 & 184 (1792).

[9] The choice of eighteen as the militia age for the federal law owed, in large part, to George Washington's stated belief that the best soldiers were those aged eighteen to twenty-one. Further, it is likely, but not provable, that the right to bear arms was thought still to extend even to those sixteen to eighteen (enrollment in the militia was sufficient, but not necessary, to the right to own a gun), but appellants disclaim any intent to reduce the minimum age below 18.

and older in their militias. In fact, both of the examples offered for this proposition are wrong. One is New Jersey in 1779.[10] To begin, New Jersey's minimum age for serving in the militia at that time was sixteen[11] and, more importantly, New Jersey's militia age in 1792 was eighteen.[12] The 1779 Act cited by the opinion was not a general militia act but, rather, a specific purpose act of the type states would enact from time to time as supplements to their overall militia structure.[13] These would address a specific need and sometimes only be in effect for a certain amount of time. Additionally, the 1779 Act did not say twenty-one was the minimum age; it said the officers would make lists of everyone above twenty-one, not exempted by some other duties. It laid out specific numbers of militiamen to be drafted from each county so that an even 1000 was reached. Unlike every general militia act, there was no top age listed

---

[10] Ch. XXIV, An Act to Embody, For a Limited Time, One Thousand of the Militia of This State, for the Defence of the Frontiers Thereof, Sec. 3, Acts of the State of New Jersey, 59 (1779).

[11] *Compare* Ch. XIII, An Act for the Regulating, Training, and Arraying of the Militia, and For Providing More Effectually for the Defence and Security of the State, Sec. 10, Acts of the General Assembly of the State of New Jersey, 40 (1781) (affirming the age group to be enrolled in the state militia as sixteen to fifty), *with* Ch. XXIV, An Act to Embody, For a Limited Time, One Thousand of the Militia of This State, for the Defence of the Frontiers Thereof (using twenty-one as the cut-off age for a specific purpose act, but not ruling out the use of those between the ages of sixteen and twenty-one *who were still part of the militia*).

[12] *See* note 7, *supra*; *see also* Ch. CCCCXXXIII, A Supplement to the Act, Intitled, 'An Act for Organizing and Training the Militia of This State,' Sec. 6, Acts of the General Assembly of the State of New Jersey, 853 (1793) (enrolling free, white males from eighteen to forty-five in the state militia); Ch. DCCCXXII, An Act for the Regulation of the Militia of New-Jersey, Sec. 1, Acts of the General Assembly of the State of New Jersey, 609 (1799) (same); Ch. CLXXXVII, An Act for Establishing and Conducting the Military Force of New-Jersey, Sec. 1, Acts of the General Assembly of the State of New Jersey, 536 (1806) (same).

[13] *See, e.g.*, Ch. XLII, An Act to Authorize the Governor of Commander in Chief of This State for the Time Being, to Call Out a Part of the Militia of This State, and to Continue Them in Service for Three Months, Acts of the General Assembly of the State of New Jersey, 112 (1781); Ch. XI, An Act to Establish a Company of Artillery, in the City of New-Brunswick, Acts of the General Assembly of the State of New Jersey, 11 (1782).

because not everyone was being called in that Act—they only needed 1000 men. Finally, the Act stated that "nothing herein contained shall be construed to prevent employing Officers, and enlisting non-commissioned Officers and Privates between the Age of sixteen and twenty-one years." This, after all, is following a period of 140 years of setting the militia age at sixteen.

The other example given by the panel is an Ohio statute from 1843, which is not as probative for establishing the original meaning of the Second Amendment. In fact, though, the militia age in Ohio was eighteen at that time.[14] The 1843 law only exempted persons under twenty-one from duties during times of peace; eighteen to twenty year olds were still allowed in the militia.[15]

The right to keep and bear arms was not coextensive with militia service, of course, but it was intimately related. Gun ownership was necessary for militia service; militia service wasn't necessary for gun ownership. The panel notes that they were not strictly linked but never considers that the age at which citizens actually used guns was lower. Not only had the colonies employed sixteen year olds in the militia for a century and a half, but other gun laws in place at that time serve as indicia of the founders' mind set. Massachusetts, for example, required "all youth" from ten to sixteen to be trained in gun use.[16]

The panel opinion is correct in noting that, during the founding era, the common-law age of majority was twenty-one.[17] This is confirmed by several of

---

[14] An Act To Organize and Discipline the Militia, Sec. 1 (1837).

[15] Ohio's minimum age changed to twenty-one the following year, An Act To Regulate the Militia, Sec. 2 (1844), but sixteen year olds were still allowed to volunteer for the militia even after the shift, *id.* at Sec. 14.

[16] Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston: William White, 1853), 2:99 (noting the May 14, 1645 order).

[17] This point does not help the panel opinion in consideration of the gun restrictions placed on many "minors" during the late 1800s. *See infra* notes 26–32 and accompanying text.

the state militia laws which required the parents of minors in the militia to pay any fines incurred by their sons.[18] But the point remains that those minors were in the militia *and, as such,* they were required to own their own weapons. What is *inconceivable* is any argument that 18- to 20-year olds were not considered, at the time of the founding, to have full rights regarding firearms.

Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging device violates the original public meaning of the Fourth Amendment is a hard question. *See Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038 (2001). In this case, however, the answer to the historical question is easy. The original public meaning of the Second Amendment included individuals eighteen to twenty: the same scenario at issue here. The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar. We have enough historical evidence to decide that 18- to 20-year olds can claim "core" Second Amendment protection.

Against this clear and germane evidence, the panel asserts that at the time of the founding and before, the colonies placed various regulations on the private use of firearms.[19] Like Justice Breyer's non-probative historical references, however, these give no support to an age-based ban on firearms purchases by 18- to 20-year olds. Some class-based firearms limits targeted Indians, blacks, and Catholics.[20] Other regulations operated against Loyalists to the Crown, but "Loyalty Test" regulations actually work against the panel's

---

[18] *See, e.g.*, Connecticut Acts and Laws, 308 (1792).

[19] *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–08 (2004) (detailing eighteenth-century gun laws).

[20] Cramer, *supra* note 6, at 16–23.

conclusion. A brief survey reveals that they were applicable to persons *above eighteen* and stated that those who did not swear allegiance would be *dis*armed—eighteen year olds were considered to have rights even if they were being restricted equally with other suspect class members.[21] Additionally, the Loyalty Tests were applied to individuals on a case-by-case basis. Individuals were not part of the suspect "group" unless they were considered disloyal by virtue of their conduct. Finally, while certain laws prevented discharging guns at certain times or using them in an especially dangerous manner such as "fire hunting" (where participants were likely to hurt themselves needlessly),[22] such laws did not interfere with the self-defense "core" of the right. The panel's reference to gunpowder storage laws is also misplaced, as those regulations only applied to the amount that was in excess of what an individual could physically possess. Each person still kept a significant amount of powder.[23]

The panel also recites multiple, and wholly inapt, examples of gun restrictions against 18- to 20-year olds as "longstanding" regulations that detract from the core Second Amendment right of 18- to 20-year olds even though they do not "boast a precise founding-era analogue." *NRA*, 700 F.3d at 196. First, using the 1968 Omnibus Crime Control gun regulations against this age group to *contradict* the original meaning of the Second Amendment is contrary to *Heller*. Second, drawing analogies between this age group and felons and the mentally ill is not only offensive but proves too much. *Heller* acknowledged the "longstanding" prohibitions against firearms possession by these two groups, but

---

[21] In Massachusetts, for example, the age cut-off was sixteen in 1775. See Ch. VII, 1775–1776 Mass. Acts. at 31. In Pennsylvania, it was eighteen. *See* Penn. Test Act of 1777.

[22] Cramer, *supra* note 6, at 30–34.

[23] Cornell & DeDino, *supra* note 19, at 510–12.

it did *not* state or imply that such limited class-based restrictions could be projected on to other classes in order to limit their core Second Amendment right. Third, the truth is that prohibitions on felons are even more "longstanding" than the panel acknowledges. Until rather recently, historically speaking, felons incurred the death penalty; regulations on gun ownership by felons was, therefore, a non-issue.[24] Indeed, early in the Republic, felons were stripped of their rights to own anything, even, and perhaps, especially, a gun.[25] Also simply wrong is the assumption that the Supreme Court's reference to "longstanding" gun regulations entitles a circuit court panel to evolve class-based Second Amendment restrictions contrary to the Amendment's original scope. If this is so, then *Heller* and *McDonald* have no point.

The panel's strongest case for narrowing core Second Amendment rights relates to "longstanding" limits on young adults' firearms access. In some states eighteen-to-twenty-year-olds have been prohibited from possessing, carrying, and purchasing certain types of weapons for over a century. The panel's argument is overstated, though. At footnote 14, the panel cites the laws of many different states and territories to bolster its claim that "arms-control legislation" affected late teenagers. This is accurate as to a few states—D.C., Maryland, Mississippi, Wisconsin, and Wyoming each prohibited the sale of pistols specifically to those under twenty-one—but there are significant problems in the treatment of other states' laws. The earliest law cited is from Alabama in 1856,

---

[24] *See* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. . . . All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent.").

[25] Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L. J. 1339, 1360–62 (2009).

where the state prohibited pistol and other weapon sales to male minors only.[26] The Nevada statute cited by the panel only prohibits those under twenty-one from *concealed* carry of pistols.[27] Other state statutes reveal a clear bias during the late 1800s against teenage males. In Illinois,[28] Iowa,[29] Kansas,[30] and Missouri,[31] the age of majority was twenty-one for males but was eighteen for females. Additionally, in Texas, for example, a female was not a minor once married[32] and in Iowa any married person was of age (and this in a time when the average age of marriage was quite young). Such gender and marital bias, which cannot stand in today's society, undermines the conclusion reached by the panel.

With its merely general references to firearms regulations at the founding and its only support in regulations against 18- to 20-year olds late in the 19th century, the panel is unable to prove that banning commercial firearms sales to late teens has any analogue in the founding era. Contrary to the panel's equivocation about the existence of a right of self-defense for 18- to 20-year olds during the historical period most critical to *Heller*, the record is clear: the right

[26] 1856 Ala. Acts 17 ("That any one who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction, be fined . . . .").

[27] 1885 Nev. Stat. 51. Like many laws against concealed carry promulgated in the past, the law must be understood in the context of a society where open carry was permitted and practiced; a prohibition on concealed carry was a minuscule burden on the right to bear arms.

[28] 1881 Ill. Revised Stat. 766 (Ch. 64, § I).

[29] 1884 Revised & Annotated Code of Iowa 595 (Ch. 4, § 2237).

[30] 1885 Laws of Kan. 558 (Ch. 67, § 3476).

[31] 1879 Miss. Revised Stat. 430 (Ch. 37, § 2559).

[32] Batts' Annotated Civil Statutes of Texas, Title LI, Chapter One, Art. 2552 (1895).

belonged (at least) to those the federal government decreed should serve in the militia. Eighteen to forty-five year old white males fit this description. It is untenable to argue that the core of the Second Amendment right to keep and bear arms did not extend to 18- to 20-year olds at the founding.

## III. The Appropriate Level of Scrutiny

Had the panel correctly applied *Heller*'s historical analysis, it would have concluded that prohibiting a class of law-abiding adult citizens from purchasing "the quintessential self-defense weapon," *Heller*, 554 U.S. at 628, 128 S. Ct. at 2818, interferes with core Second Amendment rights. Whether the interference is unconstitutional depends on further comparison of the goals and means of the government's regulations with the limitations imposed on 18- to 20-year olds. We know from *Heller* that rational basis analysis cannot apply, and we further know that the D.C. ban on handgun possession by all law-abiding adults fails under any conventional standard of scrutiny. *Id*. at 628, 128 S. Ct. at 2817. We have here a class-wide, age-related ban on the purchase of handguns from federally licensed firearms dealers. This is not an outright ban on the age group's access to guns, or even handguns, but it is a serious impediment to their participating in the lawful market and, for 18- to 20-year olds not living at home, it may effectively ban lawful possession of handguns. Denying access to handguns in this manner must be viewed as coming close to banning their legal possession by the age group in question, contrary to the rights they possessed at the founding.

Because the panel struck an agnostic pose toward the historical rights of this age group, and because the panel inappropriately considered as "longstanding" the regulations that have existed since 1968, *i.e.* for less than twenty percent of our history, the panel instead placed the weight of its analysis

on the level of scrutiny to apply and then applied "intermediate scrutiny" of a very weak sort. The panel's level of scrutiny is based on an analogy between young adults and felons and the mentally ill, as if any class-based limitation on the possession of firearms justifies any other, so long as the legislature finds the suspect "discrete" class to be "dangerous" or "irresponsible." On such reasoning, a low level of scrutiny could be applied if a legislature found that other groups—*e.g.* aliens, or military veterans with PTSD—were "dangerous" or "irresponsible." In any event, it is circular reasoning to adopt a level of scrutiny based on the assumption that the legislature's classification fits that level.

Even when taken at face value, the panel's reasons for adopting its "intermediate scrutiny" test are flawed. First, contrary to the panel's approach, these federal laws cannot be shoehorned into the "conditions and qualifications on the commercial sale of firearms," a category of regulations presumptively approved by *Heller*. That they affect commercial sales is not the point, because nearly every regulation will affect commercial sales. These laws prohibit a class of adults from purchasing a class of firearms, just as was the case in *Heller*. Second, restating the Second Amendment right in terms of what IS LEFT after the regulation rather than what EXISTED historically, as a means of lowering the level of scrutiny, is exactly backward from *Heller*'s reasoning. Thus, the panel erroneously says this is a "bounded regulation"; we would not say a content-based speech restriction is "bounded" just because it only barred speech on one topic. Third, stating that young adults will "grow out of" their disability from purchasing firearms cannot limit the scope of infringement on their pre-existing constitutional rights. This is no different than saying they may be disabled from exercising constitutionally protected speech until they've attained a "responsible" age; this cannot be the law for 18- to 20-year olds. *Cf. Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2736 n.3 (2011).

Despite these systemic flaws in the panel's logic, there is currently a debate about how to assess the level of scrutiny courts apply to regulations that infringe on gun ownership.[33]  I need not stake out a definitive position on the conflicting views, however, because under "intermediate scrutiny" as it has conventionally been applied in the First Amendment context, these regulations do not fulfill their purpose in relation to the burdens they manifestly impose on adult, law-abiding citizens.

## IV.  Applying the Proper Level of Scrutiny

The panel uses a rather rough means-ends calculation to uphold these federal regulations.  The panel recites at length Congress's determinations that violent crimes are disproportionately perpetrated by young adults, that young adults often use handguns in the crimes, and  therefore young adults should be excluded from the commercial handgun market.  QED.  As the panel notes, Congress need not address every problem in a statute—*e.g.*, by also outlawing unregulated legal sales of handguns to minors—when it legislates.  *Buckley v. Valeo*, 424 U.S. 105 (1976).  Nevertheless, under a First Amendment analogy, which *Heller* seems clearly to support, the legislature's objective must be narrowly tailored to achieve its constitutional purpose.  Real scrutiny is different from parroting the government's legislative intentions.  The First Amendment test for intermediate scrutiny allows a "content-neutral regulation" of speech to be sustained if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."  *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 189, 117 S. Ct. 1174 (1997) (citing *United States v. O'Brien*, 391 U.S. 367,

---

[33] *Compare* Judge Ginsburg and Judge Kavanaugh in *Heller II*, 670 F.3d 1244; Judge Sykes in *Ezell*, 651 F.3d 684; and Judge Posner in *Moore*, 702 F.3d 933.

88 S. Ct. 1673 (1968)).

Transposing the First Amendment standard to this case, heightened scrutiny can be conducted in the following, somewhat abbreviated, manner. First, the young adults from 18 to 20 are within the originalist core protection of the Second Amendment's right to keep and bear arms. As far as possible, their rights should be equal to those of fellow citizens 21 and older. Because there is no originalist support for reducing their rights, the government's regulations must be closely tailored to address a real need with a real potential solution.

Congress passed a ban on commercial market sales to young adults in order to address the perceived greater likelihood that such firearms would be used in criminal activity. There is an important governmental interest in reducing violent crime. Congress's ban, however, fails to achieve its goals in two respects. Factually, with forty years of data on these regulations, it is known that the sales ban has not actually advanced this government interest. In fact, as the panel concedes, the share of violent crime arrests among the 18- to 20-year age group has increased, and the use of guns by that group is still disproportionately high. Further, the ban perversely assures that when such young adults obtain handguns, they do not do so through licensed firearms dealers, where background checks are required, *see* 18 U.S.C. § 922(t), but they go to the unregulated market. Legally, the ban does not square with *Craig v. Boren*, 429 U.S. 190, 97 S. Ct. 451 (1976), in which the Supreme Court invalidated, as discriminatorily overbroad, Oklahoma's law that treated young males and females differently in the ability to purchase 3.2% beer. The state justified the distinction based on an alleged connection between young males' (under 21) drinking and their DUI arrests. The Court derided the state's most

persuasive statistics, which showed only 2% of males in the affected age group had been arrested: "Certainly if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.'" *Id.* at 202–03, 97 S. Ct. at 459. NRA's Petition for Rehearing En Banc here recites that only 0.58% of 18- to 20-year olds were arrested for violent crimes in 2010. *See* NRA Pet., fn. 1. If the "fit" of 2% was so inaccurate as to be unconstitutional in *Craig*, how can a "fit" of less than 1% be upheld in regard to the alleged criminality of 18- to 20-year olds?

## CONCLUSION

Congress has seriously interfered with this age group's constitutional rights because of a class-based determination that applies to, at best, a tiny percentage of the lawbreakers among the class. Of course, the lawbreakers obtain handguns, but the law-abiding young adults are prevented from doing so, which adds an unusual and perverse twist to the constitutional analysis. I stress again the panel's incredibly broad language approving these restrictions. The class is "irresponsible"; the Second Amendment protects "law-abiding *responsible* adults"; the Second Amendment permits "categorical regulation of gun possession by classes of persons" (citing *Booker*, 644 F.3d at 23) irrespective of their being within the core zone of rights-holders; and finally, "Congress could have sought to prohibit all persons under 21 from possessing handguns—or all guns, for that matter."

If any of these phrases were used in connection with a First Amendment free speech claim, they would be odious. Free speech rights are not subject to tests of "responsible adults," speakers are not age-restricted, and class-based abridgement of speech is unthinkable today. Even if it is granted that safety concerns exist along with the ownership of firearms, they exist also with regard

to incendiary speech. Some reasonable regulations are surely permissible,[34] but the panel's approval of banning young adults from the commercial and federally regulated market for "the quintessential self-defense weapon" is class-based invidious discrimination against a group of largely law-abiding citizens.

I respectfully dissent from the denial of rehearing en banc.

---

[34] There are alternatives. Background checks occur when firearms are purchased in the licensed market. Other conceivable restrictions might include assuring responsible use of handguns, or prescribing parental notification of purchases.